IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WARREN BERES, *et al.*,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

No. 03-785L, 04-1456L, 04-1457L, 04-1458L, 04-1459L, 04-1463L, 04-1465L, 04-1466L, 04-1467L, 04-1468L, 04-1469, 04-1471L, 04-1472L, 04-1473L, 04-1474L
Hon. Marian Blank Horn

(E-filed March 23, 2018)

**THE UNITED STATES' COMBINED REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT OR IN THE ALTERNATIVE REQUEST FOR RELIEF UNDER RULE 56(d)**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.      Plaintiffs Lack Title to Land Underlying the Right-of-Way ................................. 2

      A.      Conveyances for Five of the Parcels at Issue Use Metes and Bounds Descriptions that Exclude the Right-of-Way, Thereby Rebutting the Centerline Presumption .............................................................................. 5

            1.      Plaintiffs' Deeds Exclude the ROW ............................................... 6

            2.      *Kershaw* is not a Centerline Presumption Case and is of Limited Applicability Here ............................................................. 9

            3.      Willis J. Connell Did Not Convey the ROW to the Predecessors of Spencer, Rossi, or Brockway ............................. 10

            4.      The Schroeders' Deed Excludes the ROW .................................. 12

      B.      The "Shorelands" Conveyances did not Convey Property Underlying the ROW ....................................................................... 13

            1.      The Evidence Suggests that the Heirs of Bertha Palmberg Owned Land Underlying the ROW as of 1945 ............................ 13

            2.      The Land Underlying the ROW was not Included in the Partition Proceeding .................................................................... 15

             3.      Later Conveyances of "Shorelands" Did not Convey Land Underlying the ROW ................................................................... 19

II.     Plaintiffs Cannot Adversely Possess the Reversionary Interest in the Right-of-Way .............................................................................................................. 23

      A.      Plaintiffs' Adverse Possession Claims are Preempted Under the ICCTA ................................................................................................. 23

      B.      Under Washington State Law, Plaintiffs Cannot Adversely Possess A Reversionary Interest .......................................................... 25

III.    The Court Should in any Event Deny Plaintiffs' Cross-Motion for Partial Summary Judgment in Order to Allow Adequate Time for Discovery Under Federal Rule of Civil Procedure 56(d) ................................................................. 29

      A.      The United States Seeks the Opportunity to Take Discovery Germane to the Issues Presented in Plaintiffs' Cross-Motion. ................. 30

B.      Fairness Requires that the United States Have a Full Opportunity to
        Conduct Discovery Before Defending Against Plaintiffs' Adverse
        Possession Claims. ..................................................................................... 35

CONCLUSION ............................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*14500 Ltd. v.CSX Transp., Inc.,*
No. 12-1810, 2013 WL 1088409 (N.D. Ohio Mar. 14, 2013) .................................................. 25

*Alta Wind I Owner – Lessor C v. United States,*
117 Fed. Cl. 369 (2014) ................................................................................................ 34, 35

*Am. Pelagic Fishing Co. v. United States,*
379 F.3d 1363 (Fed. Cir. 2004) ............................................................................................. 2

*Anderson & Middleton Lumber Co. v. Quinault Indian Nation,*
929 P.2d 379 (Wash. 1996) ................................................................................................. 19

*Anderson v. Hudak,*
907 P.2d 305 (Wash. Ct. App.1995) .................................................................................... 33

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ....................................................................................................... 30, 35

*B & S Holdings, LLC v. BNSF Railway Co.,*
889 F. Supp.2d 1252 (E.D. Wash. 2012) ............................................................................ 25

*Baxter-Wyckoff Co. v. City of Seattle,*
408 P.2d 1012 (Wash. 1965) ............................................................................................... 29

*Beres v. United States,*
97 Fed. Cl. 757 (2011) ........................................................................................................... 4

*Berg v. Hudesman,*
801 P.2d 222 (1990) ............................................................................................................... 3

*BHL Properties, LLC v. United States,*
135 Fed. Cl. 222 (2017) .......................................................................................................... 2

*Bishop v. Lynch,*
111 P.2d 996 (Wash. 1941) ................................................................................................. 16

*Bleakley v. Lake Wash. Mill Co.,*
118 P. 5 (Wash. 1911) ............................................................................................... 22, 23, 24

*Brown v. State,*
924 P.2d 908 (Wash. 1996) ................................................................................................. 28

*Burgess v. United States,*
109 Fed. Cl. 223 (2013) .......................................................................................................... 3

*Cavin v. United States,*
956 F.2d 1131 (Fed. Cir. 1992) .............................................................................................. 2

*Chaplin v. Sanders,*
676 P.2d 431 (Wash. 1984) ........................................................................................... 27, 32

*Chevron U.S.A. Inc. v. United States,*
 72 Fed. Cl. 817 (2006) ................................................................. 30

*City of Seattle v. Nazarenus,*
 374 P.2d 1014 (Wash. 1962) .......................................................... 3

*Clear Creek Cmty. Servs. Dist. v. United States,*
 100 Fed. Cl. 78 (2011) ............................................................. 29, 30

*Convertino v. DOJ,*
 684 F.3d 93 (D.C. Cir. 2012) ....................................................... 35

*Corpon v. Kellogg,*
 No. 6956457, 2014 WL 1420068 (Apr. 14, 2014) ......................... 31

*Crites v. Koch,*
 741 P.2d 1005 (Wash. Ct. App. 1987) ......................................... 32

*Davidson v. State,*
 802 P.2d 1374 (Wash. 1991) ........................................................ 15

*Davies v. Wickstrom,*
 105 P. 454 (Wash. 1909) ............................................................... 8

*Donald v. Vancouver,*
 719 P.2d 966 (Wash. Ct. App. 1986) ............................................ 3

*Duffy v. United States,*
 120 Fed. Cl. 55 (2015) ................................................................. 36

*Earnheart* v. *Carlson*
 736 P.2d 1106 (Wash App. 1987) ............................................ 24, 25

*Erickson v. Wick,*
 591 P.2d 804 (Wash. Ct. App. 1979) ............................................ 8

*Estate of Hage v. United States,*
 687 F.3d 1281 (Fed. Cir. 2012) .................................................... 3

*Fagan v. Walters,*
 197 P. 635 (Wash. 1921) ............................................................. 12

*Finley v. Jordan,*
 508 P.3d 636 (Wash Ct. App. 1973) ........................................... 33

*Franks Investment Company LLC v. Union Pacific Railroad Co.,*
 593 F.3d 404 (5th Cir. 2010) ....................................................... 24

*Frye v. King Cnty.,*
 275 P. 547 (Wash. 1929) ............................................................. 10

*Hanson Indus., Inc. v. Cty. of Spokane,*
 58 P.3d 910 (Wash. Ct. App. 2002) ......................................... 3, 26

*Harris v. Hylebos Indus.*,
505 P.2d 457 (Wash. 1973) ............................................................ 18

*Harris v. Ski Park Farms, Inc.*,
814 P.2d 684 (Wash. Ct. App. 1991) ........................................... 3, 4

*Hearst Comm'ns, Inc. v. Seattle Times Co.*,
115 P.3d 262 (Wash. 2005) ............................................................. 4

*Hellberg v. Coffin Sheep Co.*,
404 P.2d 770 (Wash. 1965) ........................................................... 18

*Hollis v. Garwall, Inc.*,
974 P.2d 836 (1999) ........................................................................ 4

*Hudson House, Inc. v. Rozman*,
509 P.2d 992 (Wash. 1973) ............................................................. 7

*Hyde v. Phillips*,
112 P. 257 (Wash. 1910) ................................................................. 8

*In re Estate of Belt*,
70 P. 74 (Wash. 1902) ................................................................... 11

*In re Grant*,
397 P.3d 912 (Wash. Ct. App. 2017) ........................................... 19

*ITT Rayonier, Inc. v. Bell*,
774 P.2d 6 (Wash. 1989) ............................................................... 31

*Jie Ao and Xin Zhou – Pet. for Declaratory Order*,
No. 35539, 2012 WL 2047726 (STB served June 4, 2012) ....... 24, 26

*Kaseburg v. Port of Seattle*,
No. C14-0784 JCC, 2016 WL 4440959 (W.D. Wash. Aug. 23, 2016) ................................ 6, 9

*Kelley v. Tonda*,
393 P.3d 824 (Wash. Ct. App. 2017) ........................................... 3, 4

*Kershaw Sunnyside Ranches, Inc. v. Yakima Interuban Lines Ass'n*,
126 P.3d 16 (Wash. 2006) ................................. 6, 8, 9, 10, 13, 26

*Kiely v. Graves*,
217 P.3d 226 (Wash. 2012) ........................................................... 25

*King Cty. v. Squire Inv. Co.*,
801 P.2d 1022 (Wash. Ct. App. 1990) ........................................ 2, 28

*Klamath Irrigation Dist. v. United States*,
635 F.3d 505 (Fed. Cir. 2011) ........................................................ 3

*Lambert v. Lambert*,
403 P.2d 664 (Wash. 1965) ........................................................... 19

*Lawson v. State*,
730 P.2d 1308 (Wash. 1986) ...................................................... 3, 27, 28

*LeBleu v. Aalgaard*,
193 Wash. App. 66 (2016) ..................................................................... 34

*Martin v. Smith*,
368 P.3d 227 (Wash. App. Div. 1 2016) ................................................ 4

*Mezere v. Flory*,
173 P.2d 776 (Wash. 1946) ................................................................. 11

*Netherlands Am. Mortg. Bank v. E. Ry. & Lumber Co.*,
252 P. 916 (Wash. 1927) .................................................. 26, 27, 28, 29

*Northlake Marine Works, Inc. v. City of Seattle*,
857 P.2d 283 (Wash. App. 1993) .......................................................... 7

*O'Steen v. Wineberg's Estate*,
640 P.2d 28 (Wash. App. 1982) ........................................................... 11

*Pac. Ry. Co. v. S.E. Slade Lumber Co.*,
112 P. 240 (Wash. 1910) ..................................................................... 18

*Pearl Oyster Co. v. Heuston*,
107 P. 349 (1910) ......................................................................... 15, 16

*Philbrick v. Andrews*,
35 P. 358 (Wash. 1894) ....................................................................... 19

*Preseault v. United States*,
100 F.3d 1525 (1996) .......................................................................... 28

*Puget Sound Elec. Ry.* v. *Railroad Com'm of Washington*,
117 P. 739 (1911) ............................................................................... 27

*Roeder v. Burlington Northern*,
716 P.2d 855 (Wash. 1986) .......................................... 5, 6, 7, 9, 13, 20

*Rue v. Ore. & W.R. Co.*,
186 P. 1074 (Wash. 1920) ..................................................................... 7

*Sammamish Homeowners v. Cty. of King*,
No. C15-284 MJP, 2015 WL 3561533 (W.D. Wash. June 5, 2015) ......... 9

*Scott v. Mofford*,
28 N.E.2d 947 (Ohio Ct. App. 1940) .................................................... 11

*Sears v. Rusden*,
235 P.2d 819 (1951) ............................................................................ 19

*Selva & Sons, Inc. v. Nina Footwear, Inc.*,
705 F.2d 1316 (Fed. Cir. 1983) ........................................................... 36

*Slater v. Murphy,*
    55 Wash. 2d 892 (1959)..................................................................... 33

*Staaf v. Bilder,*
    415 P.2d 650 (Wash. 1966) .......................................................... 12

*State ex. rel. Mountain Timber Co. v. Superior Court of Cowlitz Cnty.,*
    137 P. 994 (1914)......................................................................... 18

*Strom v. Sheldon,*
    527 P.2d 1382 (Wash. App. 1974).............................................. 15

*Sunnyside Valley Irrigation Dist. v. Dickie,*
    73 P.3d 369 (Wash. 2003) ........................................................ 3, 4

*Swan v. O'Leary,*
    225 P.2d 199 (1950)....................................................................... 4

*Theisen Vending Co. v. United States,*
    58 Fed. Cl. 194 (2003) ........................................................... 31, 34

*Thomas v. United States,*
    106 Fed. Cl. 467 (2012) ................................................................ 3

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)..................................................................... 35

*Veach v. Culp,*
    599 P.2d 526 (Wash. 1979) .......................................................... 26

*Wedemeyer v. CSX Transp., Inc.,*
    No.13-00440, 2015 WL 6440295 (S.D. Ind. Oct. 20, 2015) ................. 25

*Wood v. Nelson,*
    57 Wash. 2d 539 (1961)............................................................... 33

**Statutes**

16 U.S.C. § 1247(d) ............................................................................. 25

RCW 4.16.020 .................................................................................... 31

RCW 7.28.090 .................................................................................... 27

RCW 8.24.010 .................................................................................... 18

RCW 58.04.020 .................................................................................. 12

**Rules**

Fed. R. of Civ. P. 56(d)........................................................................ 29

Fed. R. of Civ. P. 56............................................................................ 29

RCFC 56 ............................................................................................. 29

RCFC 56(d) ........................................................................................ 29, 30, 37

RCFC 56(f) .............................................................................................. 29

**Other Authorities**

23 Am. Jur. 2d Deeds § 259 (2018) ............................................................. 8

*Boundary Under Conveyance of Land Bordering on Railroad Right of Way*
    85 ALR 404 (1933) ............................................................................... 6

*The Timing of Summary Judgment*,
    198 F.R.D. 679 (2001) ....................................................................... 36

*Twenty-First Centuries*,
    27 ECOLOGY L.Q. 351 (2000) ............................................................ 26

**TABLE OF EXHIBITS**

| Exhibit No.[1] | Document |
|---|---|
| 27 | Connell to McCarty Deed, July 17, 1956 |
| 28 | Connell to Fohn Investment Co. Deed, February 11, 1933 |
| 29 | Connell to Berry Deed, November 18, 1931 |
| 30 | Connell to Ebken Deed, April 25, 1929 |
| 31 | Connell to Nelson Deed, January 27, 1940 |
| 32 | Sammamish River Corridor Action Plan Excerpt |
| 33 | Report of State Engineer re: Hughes Parcel, March 7, 1951 |

---

[1] Exhibit numbers are sequential to those used in the United States' Motion for Partial Summary Judgment, ECF No. 235.

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), Defendant, the United States, replies in support of its Motion for Partial Summary Judgment, ECF No. 235 ("U.S. Br."), and responds in opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment, ECFs No. 244 & 244-1 ("Pls.' MSJ"), in the following actions: *Schroeder v. United States*, No. 04-1456L (Fed. Cl.); *Peterson v. United States*, No. 04-1459L (Fed. Cl.); *Spencer v. United States*, No.04-1463L (Fed. Cl.); and *Nelson v. United States*, No. 04-1465L (Fed. Cl.); *Collins v. United States*, No. 04-1472L (Fed. Cl.).[2]

## INTRODUCTION

Plaintiffs rely on a series of creative but unsupported assumptions to attempt to establish that they possessed title to land underlying the right-of-way ("ROW") when the NITU was issued. But the clear language of their deeds shows that they did not own land underlying the ROW as of September 18, 1998. The Schroeder, Matrinez, Spencer, Brockway, and Rossi Plaintiffs have deeds that use a metes-and-bounds description that excludes land underlying the ROW. The Hughes, Nelson, Collins, Freedman, and Barrett Plaintiffs have deeds that only give them title to "second-class shorelands," which does not include land underlying the ROW.

Because of this fatal deficiency, and in an attempt to circumvent the clear language of their deeds, Plaintiffs now claim that they obtained fee title to land underlying the ROW through

---

[2] The specific plaintiffs subject to this motion are: Clifford and Kathryn Schroeder (*Schroeder*, No. 04-1456L); Donna Marie Raab Matrinez (*Peterson*, No. 04-1459L); Raymond and Lael Spencer, Reid and Susan Brockway, and John Rossi (*Spencer*, No.04-1463L); Robert and Beth Nelson and Estate of William F. Hughes (*Nelson*, No. 04-1465L); D. Michael and Vanessa Collins, Howard and Pam Freedman, and Donald Barrett (*Collins*, No. 04-1472L). The parties have reached a settlement in principal regarding the Collins claim related to parcel 202506-9113 and the community beach property, numbered as 202506-TRCT. The parties have reached a settlement in principal of the remaining claims in *Estate of Welch*, No. 04-1471L and *Waverly Hills Club*, No. 04-1474L, and dispositive title issues are not present in the remaining three actions: *Beres v. United States*, No. 03-785L (Fed. Cl.); *Brown v. United States*, No. 04-1473L (Fed. Cl.); and *Morel v. United States*, No. 04-1467 (Fed. Cl.).

adverse possession.  As a legal matter, Plaintiffs' state law adverse possession claims are

preempted by the ICCTA and they cannot in any event adversely possess against a reversionary

interest under Washington law.  Additionally, even if Plaintiffs' adverse possession claims were

not barred as a matter of law, such claims require a fact-intensive analysis, are not suitable for

resolution through a motion for partial summary judgment, and if not simply denied outright, as

set out in our request for additional time for discovery under Rule 56(d), they should be deferred.

## ARGUMENT

### I.   Plaintiffs Lack Title to Land Underlying the Right-of-Way

Plaintiffs have offered no evidence that they ever acquired title to land underlying the

ROW.  Instead, they openly state that "the grantors who first used a metes and bounds reference

did not use, sell, or bequeath the right of way."  Pls.' MSJ 5.  Because the grantors who first used

metes and bounds references to exclude the ROW from their conveyances of the property nor

separately sold the ROW to the adjoining landowners, those adjoining landowners lack title, and

their claims must be dismissed.  "If the claimant fails to demonstrate the existence of a legally

cognizable property interest, the court[']s task is at an end." *Am. Pelagic Fishing Co. v. United

States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citation omitted); *see also Cavin v. United States*,

956 F.2d 1131, 1134 (Fed. Cir. 1992) ("Without undisputed ownership of the . . . property [at

issue] at the time of the takings, [plaintiffs] cannot maintain a suit alleging that the Government

took their property without just compensation." (citations omitted)).  The United States need not

demonstrate, and the Court need not determine, who actually owns the land underlying the

ROW.  *See BHL Properties, LLC v. United States*, 135 Fed. Cl. 222, 229 (2017) (granting

summary judgment for the United States in rail-trail takings case because the plaintiff had failed

to "produce evidence sufficient to support his claim that the land at issue belongs to him,"

despite absence of evidence that land in dispute was owned by another individual); *King Cty. v.*

*Squire Inv. Co.*, 801 P.2d 1022, 1028 (Wash. Ct. App. 1990) (rejecting argument that *Roeder* did

not apply when successors to the original grantor of the right-of-way were not "in court or even

identified" because "*Roeder* does not recognize or support any such limitation.").  It is enough

that Plaintiffs fail to show that they own the property they claim has been taken.  *See Burgess v.*

*United States*, 109 Fed. Cl. 223, 237 (2013) (citing *Klamath Irrigation Dist. v. United States*, 635

F.3d 505, 519 n.12 (Fed. Cir. 2011); *Estate of Hage v. United States*, 687 F.3d 1281, 1291 (Fed.

Cir. 2012); *Thomas v. United States*, 106 Fed. Cl. 467, 478 (2012)) (other citations omitted).

Therefore, their claims must be dismissed.

While deed interpretation is a mixed question of fact and law under Washington law, *see*

*Lawson v. State*, 730 P.2d 1308, 1311 (Wash. 1986) (en banc), where, as here, there is no dispute

as to the language included in a deed or plat, interpretation of either document is a pure question

of law that can be resolved on summary judgment.  *See Hanson Indus., Inc. v. Cty. of Spokane*,

58 P.3d 910, 913 (Wash. Ct. App. 2002); *see also Harris v. Ski Park Farms, Inc.*, 814 P.2d 684,

686 (Wash. Ct. App. 1991) ("The construction of a deed generally is a matter of law for the

court." (citing *Donald v. Vancouver*, 719 P.2d 966 (Wash. Ct. App. 1986))).

The Court may not consider extrinsic evidence where the "plain language" of the deed,

read as a whole, is unambiguous.  *Sunnyside Valley Irrigation Dist. v. Dickie*, 73 P.3d 369, 372

(Wash. 2003) (en banc) (citing *City of Seattle v. Nazarenus*, 374 P.2d 1014, 1019–20 (Wash.

1962)).  Plaintiffs cite to *Berg v. Hudesman* and *Kelley v. Tonda* for the proposition that extrinsic

evidence may be considered even if the deed is unambiguous, but they ignore the later

pronouncements of the Washington Supreme Court in *Sunnyside* and *Hearst*.  *See* Pls.' MSJ 9–

10 (citing *Berg v. Hudesman*, 801 P.2d 222 (1990); *Kelley v. Tonda*, 393 P.3d 824, 830 (Wash.

Ct. App. 2017)).  As mentioned above, in *Sunnyside*, the Washington Supreme Court, sitting *en*

*banc*, held that "[i]f the plain language" in a deed "is unambiguous, extrinsic evidence will not be considered." *Sunnyside Valley Irrigation Dist.*, 73 P.3d at 372. Although the court in *Sunnyside* cited to *Berg* for a different proposition, it did not address the discrepancy between the two lines of cases.

In *Hearst*, the Washington Supreme Court recognized that "there has been much confusion over the implications of *Berg*." *Hearst Comm'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 266 (Wash. 2005) (en banc). There, the Washington Supreme Court noted that "surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *See id.* at 267 (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (1999) (en banc))). The court in *Hearst* clarified that

> Washington continues to follow the objective manifestation theory of contracts. Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. We impute an intention corresponding to the reasonable meaning of the words used . . . when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used.

*Hearst*, 115 P.3d at 267.

As this Court has recognized, the "intention of the parties to the conveyance is of paramount importance and must ultimately prevail in a given case." *See Beres v. United States*, 97 Fed. Cl. 757, 806 (citing *Swan v. O'Leary*, 225 P.2d at 200)). The intent of the grantor "must be ascertained from reading the deed as a whole, and the words are to be given their ordinary meaning." *Ski Park Farms*, 814 P.2d at 686. Even when courts consider extrinsic evidence, "'[the court] focus[es] on the agreement's objective manifestations to ascertain the parties' intent.'" *Kelley v. Tonda*, 393 P.3d 824, 829 (Wash. Ct. App. 2017) (quoting *Martin v. Smith*, 368 P.3d 227, *review denied*, 380 P.3d 501 (2016))). As explained in our opening brief and

below, the plain language of the Plaintiffs' deeds and their predecessor's conveyances do not show intent to convey the ROW to these Plaintiffs.

To the extent the Court considers the extrinsic evidence provided by Plaintiffs, as explained below, none of this evidence shows that they obtained the land underlying the ROW, nor that anyone intended to convey the land underlying the ROW to them or their predecessors.

### A. Conveyances for Five of the Parcels at Issue Use Metes and Bounds Descriptions that Exclude the Right-of-Way, Thereby Rebutting the Centerline Presumption

The Spencer, Rossi, Brockway, Matrinez, and Schroeder plaintiffs own property that is described as "extending up to the edge of the [ROW]," thus rebutting the centerline presumption. *See Roeder v. Burlington Northern*, 716 P.2d 855, 863 (Wash. 1986)); U.S. Br. 10–16. Under *Roeder*, the centerline presumption is only applicable when the owner of abutting property shows that they "received that property from the fee owner of the right of way property." It appears that Plaintiffs have met that prong here. However,

> [e]ven in the face of such evidence, other persuasive evidence of the grantor's intent to retain the right of way can rebut the presumption. Specifically, language in a deed that describes the adjoining property as extending up to the edge of the right of way rebuts the presumption that the grantor intended to convey title to the center of the [ROW].

*Id.* at 862–63. In their response, Plaintiffs have not provided any countervailing evidence that illustrates that the centerline presumption applies with respect to their deeds.

Plaintiffs make two broad assertions in an attempt to establish that the clear language of their deeds does not mean what it says. First, Plaintiffs argue that references to water boundaries and the use of the phrase "more or less" make the deeds insufficiently "careful" to rebut the centerline presumption under *Roeder*. But Plaintiffs confuse difficulty in applying a precise, albeit dated, metes and bounds description of property boundaries, with an intent to convey something other than was stated in the deed. Second, Plaintiffs argue that *Kershaw* modified

*Roeder's* holding on the centerline presumption, set out above, but *Kershaw* was not a centerline presumption case. *See* Pls.' MSJ 10 (citing *Kershaw Sunnyside Ranches, Inc. v. Yakima Interuban Lines Ass'n*, 126 P.3d 16, 25–26 (Wash. 2006)). Plaintiffs also make certain arguments specific to the Connell plat and the Schroeder chain of title that will be discussed in more detail below. Because none of these arguments counter the actual language on their deeds, which excludes the ROW from the property conveyed, the Court should grant summary judgment for the United States.

### 1. Plaintiffs' Deeds Exclude the ROW

Plaintiffs argue that the Spencer, Rossi, Brockway, Schroeder, and Raab deeds are insufficiently "careful" to rebut the centerline presumption under *Roeder* by discussing a footnote in *Roeder*, water boundaries in their deeds, and the phrase "more or less" in their deeds. *See* Pls.' MSJ 13–18. None of these arguments overcomes the clear language of their deeds, which exclude the ROW.

First, Plaintiffs spend a significant amount of time discussing a footnote in *Roeder* that considers the effect of a deed description that is less precise than descriptions in their own deeds. *See* Pls.' MSJ 14–15 (citing U.S. Br. 12–13, *Roeder*, 716 P.2d at 862 n.27).[3] The Court need not

_____

[3] Plaintiffs also misquote the footnote in question and ignore its context in the case. The Washington Supreme Court in *Roeder* described the deeds at issue in the case as ones in which the "grantors conveying abutting property used metes and bounds to describe that property as extending up to the rights of way," "*[w]ith one exception*[.]" *See Roeder*, 716 P.2d at 862 (emphasis added). The footnote then described the exception as a description in which the abutting property is described as "lying Northerly of the right-of-way" and goes on to say that "[w]hile not in metes and bounds terms, under the facts herein such a description appears to exclude any interest in the right-of-way." *See id.* at 862 n.27 (citing 85 ALR at 409). Contrary to Plaintiffs' argument that the footnote refers to unknown facts, the "facts"–the deed description summarized above–on which the court's rationale rests are clear. *See Roeder*, 716 P.3d at 862 & n.27. *See also Kaseburg v. Port of Seattle*, No. C14-0784 JCC, 2016 WL 4440959, at *7 (W.D. Wash. Aug. 23, 2016) (rejecting argument that *Roeder* must be limited to its facts).

consider this issue in any detail because all of these Plaintiffs' deeds describe the property using metes and bounds, in a manner that uses the ROW as a boundary; none are the type of deed that the *Roeder* court considered in footnote 27. Nonetheless, the footnote shows that a deed that uses one side of the ROW as a boundary need not also use a metes and bounds description to evince the grantors' intent to exclude the ROW from the conveyance. *See Roeder*, 716 P.2d at 862 n.27.[4]

Second, Plaintiffs' argument that the metes and bounds description is insufficiently "careful" to exclude the ROW because it uses water as a boundary from which a distance is measured also fails. *See* Pls.' MSJ 16 (citing *Hudson House, Inc. v. Rozman*, 509 P.2d 992 (Wash. 1973)). The case that Plaintiffs cite, *Hudson House, Inc. v. Rozman*, is about entitlement to land that accretes as water levels change, thus enlarging the plaintiffs' property. *See* 509 P.2d at 997. But there is no indication that any accretions that enlarged the western side of the property, where the lakeshore is, would change the boundary on the east side, where the ROW is located. Water bodies are common property boundaries, and frequently used as monuments in property descriptions despite their variable nature. *See Rue v. Ore. & W.R. Co.*, 186 P. 1074, 1076–77 (Wash. 1920).

Third, the "more or less" language in the deeds do not somehow make them insufficiently careful to exclude the ROW. *Contra* Pls.' MSJ 16. Although the caselaw analyzing the effect of

---

[4] *Northlake Marine Works* is inapposite. *Contra* Pls.' MSJ 15–16 (citing *Northlake Marine Works, Inc. v. City of Seattle*, 857 P.2d 283, 287, 289 (Wash. App. 1993). There, the Washington Court of Appeals noted that the centerline presumption applies when a property is "merely" described by lot number, and not using a metes and bounds description. *See Northlake Marine Works*, 857 P.2d at 289. None of these deeds convey property that is only described by lot number. *See* U.S. Ex. 1 at 1, U.S. Ex. 2 at 2, U.S. Ex. 3 at 2, U.S. Ex. 9 at 1–2, U.S. Ex. 10 at 1. The *Northlake* court ultimately remanded "the factual question of ownership" of the lot in question to the lower court. *See Northlake Marine Works*, 857 P.2d at 293.

the phrase "more or less" when used in a metes and bounds description is sparse,[5] when the phrase is used after a quantification of the acreage conveyed through a deed that uses a metes and bounds description or references fixed boundaries, "little if any importance [is] . . . attached to the words 'more or less.'" *Hyde v. Phillips*, 112 P. 257, 259 (Wash. 1910); *see also Erickson v. Wick*, 591 P.2d 804, 807 (Wash. Ct. App. 1979) (phrase "more or less" used in qualification of acreage conveyed did not limit amount of land conveyed). In that context, "[t]he words 'more or less' are used as words of precaution and safety and are intended to cover unimportant inaccuracies." 23 Am. Jur. 2d Deeds § 259 (2018).

The phrase "more or less" does not have greater import when used in a metes and bounds description. In one case the Washington Supreme Court found that the phrase "more or less" made the call to which the phrase was appended "less certain than the former call, which read 'east,' unqualified." *Davies v. Wickstrom*, 105 P. 454, 456 (Wash. 1909). The *Davies* court did not find that the phrase "more or less" made the entire description suspect. In both the Spencer and Rossi descriptions, the phrase "more or less" is only used at the end of the description, to qualify a point 52 degrees southeast of a point on the westerly line of Government Lot 2. *See* U.S. Ex. 2 at 2, U.S. Ex. 3 at 2. But the phrase "more or less" does not qualify any of the boundary points that are on the ROW. In the Brockway deed, the phrase is used twice, once to qualify a call to the westerly line of Government Lot 2, and once in the last call to the place of beginning, which lies along the ROW. *See* U.S. Ex. 10 at 1. The phrase "more or less" in this context is properly read to "cover unimportant inaccuracies," in the deed description, *see* 23 Am. Jur. 2d Deeds § 259, and does not somehow indicate an intent to include property under the

---

[5] *Kershaw* also says nothing about "more or less" language in a deed, instead discussing exception language that is not at issue in this case. *See Kershaw Sunnyside Ranches*, 126 P.3d at 26. *Contra* Pls.' MSJ 16.

ROW that the deed clearly excludes. Thus, the caselaw does not support Plaintiffs' position that the language in the deeds fails to unambiguously exclude the ROW.

## 2. *Kershaw* is not a Centerline Presumption Case and is of Limited Applicability Here

Plaintiffs misapply *Kershaw*. *See* Pls.' MSJ 10–11. The *Kershaw* case does not address the centerline presumption or exclusion of the ROW through a metes and bounds description. Instead, in *Kershaw*, the court determined that a clause in a quit claim deed from mother to son that "excepted" a railroad ROW conveyed any interest the mother had in the land underlying the ROW to her son. *See Kershaw*, 126 P.3d at 19. It did not address a deed in which a metes and bounds description of the property conveyed excluded the ROW. As the Western District of Washington noted in addressing a similar argument,

> [*Kershaw*] is not helpful to Plaintiffs. First and foremost, it is not a 'centerline presumption' case, so the theory that Plaintiffs are relying on is not at issue in *Kershaw*. Nor did the Washington Supreme Court overrule any of the previous holdings of *Roeder*[,] . . . which means that *Roeder's* 'metes and bounds rebutting the presumption' ruling remains intact.

*Sammamish Homeowners v. Cty. of King*, No. C15-284 MJP, 2015 WL 3561533, at *3 (W.D. Wash. June 5, 2015).

Plaintiffs ask this Court to conclude that *Kershaw* means that if the original grantor never sold the land underlying the ROW, they did not intend to keep it. *See* Pls.' MSJ 10 (citing *Kershaw Sunnyside Ranches, Inc. v. Yakima Interuban Lines Ass'n*, 126 P.3d 16, 25–26 (Wash. 2006)). This conclusion is untenable. Not selling the land underlying the ROW would mean that the grantor retained it. *See Kaseburg*, 2015 WL 6449305, at *11 ("Under the centerline presumption . . . if any grantor in Plaintiffs' chain of title intended to retain rather than convey the corridor, then their claim must fail.") (citing *Roeder v. Burlington Northern*, 716 P.2d 855 (1986)). Further, in *Kershaw*, the Washington Supreme Court merely considered the effect of a

phrase in a deed excepting the ROW, together with the "circumstances of the transfer, one from mother to son, suggest[ing] a conveyance of the entire property was intended," and found that the mother's lack of a later conveyance to a third party was consistent with that intent. *See Kershaw*, 126 P.3d at 26. *Kershaw* did not discuss the centerline presumption, nor did it consider the effect of a metes and bounds description in a deed. There is nothing in *Kershaw* that supports Plaintiffs' assertion that where a grantor conveys a deed that explicitly excludes the ROW, he or she somehow meant to convey it to the grantee anyway, simply because Plaintiffs have been unable to locate a later conveyance of the ROW.

### 3. Willis J. Connell Did Not Convey the ROW to the Predecessors of Spencer, Rossi, or Brockway

Plaintiffs claim that the Spencer, Rossi, and Brockway deeds only contain a metes and bounds description because those descriptions were used in an unrecorded plat and then carried into the deeds themselves. *Contra* Pls.' MSJ 13–14. Plaintiffs speculate that Mr. Connell, who is the predecessor in interest to Spencer, Rossi, and Brockway, only added metes and bounds descriptions to the plat to please tax assessors, relying on Mr. Broadus's unsupported statement that it is "common knowledge among surveyors" that metes and bounds descriptions were regularly added to unrecorded plats at the insistence of tax assessors. *See id.*; Pls' Ex. 4-1 (Broadus declaration) ¶ 15. But Mr. Broadus has no personal knowledge about the transaction and there is no evidence whatsoever that these metes and bounds descriptions were added to the plat for this reason, and not because Mr. Connell intended to exclude the ROW from the lots conveyed. "It is the well-settled law that in construing a plat the intention of the dedicator controls" and "this intention must be adduced from the plat itself, where possible, as that furnishes the best evidence thereof." *Frye v. King Cnty.*, 275 P. 547, 548 (Wash. 1929). Here,

the unrecorded plat and the language of the deeds show the intent of Mr. Connell to exclude the ROW from his conveyances of the adjoining lots. *See* Pls' Ex. 3F-1, Pls' Ex. 3G-1 (plat).

Even if Plaintiffs were correct that these metes and bounds descriptions were added by a tax assessor "to properly identify to the world the property being foreclosed upon," *see* Pls.' MSJ 14, that property identified still does not include land underlying the ROW. If Mr. Connell wished to include land underlying the ROW in the plat, he could have extended the platted lots to do so. He did not. Nor did Mr. Connell include the right-of-way in the written deed descriptions in any of the five deeds through which he conveyed property to the predecessors of Spencer, Rossi, and Brockway, respectively. *See* Pls' Ex. 3, ECF No. 244-3 ("Klinge Decl".) ¶¶ 12, 15, 18; U.S. Ex. 27 (Connell to McCarty deed); U.S. Ex. 28 (Connell to Fohn); U.S. Ex. 29 (Connell to Berry); U.S. Ex 30 (Connell to Ebken); U.S. Ex. 31 (Connell to Nelson). Furthermore, the absence of the ROW in Mr. Connell's probate inventory is of no consequence. *Contra* Pls.' MSJ 17. "The primary purpose of an inventory is to furnish a list of the property which appears to belong to the decedent and a valuation thereof. It is made on an *ex parte* investigation and clearly binds no one." *Mezere v. Flory*, 173 P.2d 776, 779 (Wash. 1946) (citing *Scott v. Mofford*, 28 N.E.2d 947, 948 (Ohio Ct. App. 1940)); *see also O'Steen v. Wineberg's Estate*, 640 P.2d 28, 34 (Wash. App. 1982) ("The inventory is not conclusive as to the decedent's ownership of that property.") (citing *In re Estate of Belt*, 70 P. 74, 76 (Wash. 1902)). Whatever the disposition of Mr. Connell's property, Plaintiffs have provided no indication that either Mr. Connell or his heirs conveyed title to land underlying the ROW to them or their predecessors in interest, which is all that is matters for purposes of this action. Therefore, they cannot establish that any land has been taken from them.

## 4. The Schroeders' Deed Excludes the ROW

The deed for the Schroeder property uses the "northwesterly margin of the Northern Pacific Railroad right of way" as a boundary. *See* U.S. Ex. 1 at 1. Plaintiffs' argument seems to be that measurements made in a 2003 survey, which was completed almost three decades after the Schroeders purchased their property, conflict with the metes and bounds description set out in the deed. *See* Pls' MSJ 17, Klinge Decl. ¶ 43. However, Washington state law is clear that "When there is a call . . . along the boundary line of adjoining land, this boundary, if marked, is a kind of monument that will control inconsistent courses or distances." 18 Wash. Prac., Real Estate (2d ed.) § 13.7 Inconsistent descriptions (citing *Fagan v. Walters*, 197 P.635, 638 (Wash. 1921); see also *Staaf v. Bilder*, 415 P.2d 650, 652 (Wash. 1966) (when there are math errors and discrepancies in a plat, "the known monuments and boundaries of the original plat take precedence over other evidence and are of greater weight than other evidence of the boundaries not based on the original monuments and boundaries.") (citing Clark, Surveying and Boundaries s 258 (3d ed. 1959)). Here, the known monument is one side of the ROW, the call to the side of the ROW takes precedence over any discrepancies between the metes and bounds stated in the deed and actual measurements on the ground. "Authorities are numerous which hold that, where the call . . . for the boundary of another tract is expressed as 'by such a line' or 'by the north line of such a tract,' the line or boundary referred to . . . fixes the boundary definitely, and is a monument." *Fagan v. Walters*, 197 P. 635, 638 (Wash. 1921). Any uncertainty in the distance between monuments does not mean that their deed description that explicitly excludes the ROW should somehow be read to so include it.[6]

---

[6] If Plaintiffs are uncertain about their boundaries, they can file suit to establish lost or uncertain boundaries in state court. *See* RCW 58.04.020.

**B.  The "Shorelands" Conveyances did not Convey Property Underlying the ROW**

In their brief, Plaintiffs argue that the term "shorelands" or "second-class shorelands" was intended to refer to all of the land from the eastern boundary of the ROW to the current water line of Lake Sammamish, including the properties of Hughes, Nelson, Freedman, Barrett, and Collins.  *See* Pls.' MSJ 19–31.  Plaintiffs admit that the normal definition of "second-class shorelands" refers to land underwater.  *Id.* at 19.  The only basis for their claim to land underlying the ROW is their assertion that the term was used in a manner contrary to its normal definition, to include property it could not have included.  But the undisputed facts before this Court show that the land underlying the ROW was never "shorelands," and thus conveyances of "shorelands" could not have included the land underlying the ROW.

**1.  The Evidence Suggests that the Heirs of Bertha Palmberg Owned Land Underlying the ROW as of 1945**

It appears that Alfred Palmberg, Sr.,[7] did not convey the land underlying the ROW within his homestead patent, located in Government Lots 1 and 2 in Section 20, Township 25 North, Range 6 East, between the time he conveyed the ROW to the railroad in 1887 prior to his death in 1908.  *See* Pls.' MSJ 20.  It also appears that his property passed to his wife, Bertha Palmberg. *See* Pls.' Ex. 3HH-3–4 (discussing probate of Alfred Palmberg, Sr.'s, will).  However, Bertha Palmberg's probate documents only partitioned land east of the ROW.  *See* Pls' Ex. 3DD-2–3. Each of the four properties listed in her probate inventory is described as property to the east of the "east line" of the railroad ROW, and excludes the ROW itself under *Roeder*.  *See id*; *Roeder*, 716 P.2d at 862–63.  Any land that was not listed in the probate inventory, such as land underlying the ROW, was distributed to her six heirs (Maude Palmberg, Annie Stangroom,

---

[7] We use "Sr." and "Jr." here to distinguish Alfred Palmberg, husband of Bertha Palmberg and who died in 1908, from his son, Alfred W. Palmberg, who died in 1942.

Bessie Zengal, Gertie Gorman, Bert Stares, and Alfred W. Palmberg, Jr.) (together, the "Palmberg heirs") in undivided one-sixth shares. *See* Pls' Ex. 3DD-3. Thus, if Bertha Palmberg owned the land underlying the ROW at the time of her death, the Palmberg heirs each inherited an undivided share.

The ownership of the strip of land between Lake Sammamish and the ROW during this period is less clear. The United States does not believe that it is necessary for either party to conclusively establish who owned this strip of land in September 1998, because ownership of land underlying the ROW is the ultimate issue, and that issue is separate from ownership of the strip of land between the ROW and Lake Sammamish. However, the United States discusses that issue here because Plaintiffs argue that the term "second class shorelands" was intended to refer to both this strip of land and the ROW. *See* Pls.' MSJ 24. From the evidence the Plaintiffs have provided, it does appear that a strip of dry land on the west side of the ROW, between the ROW and the water, existed at least by 1928, when the state's engineer noted that line of the high water is located outside of the west line of the Northern Pacific ROW. *See* Pls.' Ex. 3EEE-1–2.[8]

But we do not have sufficient information to determine who owned this strip as of 1945. *Contra* Pls.' Br. 22. Its ownership was dependent on how it came into being. It is possible that the land was already dry land when Alfred Palmberg, Sr., patented his property from the United States, in which case it would have been owned by the Palmberg heirs. It is also possible that its existence was the result of a gradual change, such as accretion, in which it would have also been

_____

[8] In 1928, the State's engineer concluded that the Palmberg heirs owned "certain uplands," but did not conclusively determine that the Palmbergs owned the strip of land between the railroad and the lake. *See* Pls.' Ex. 3EEE-1–2.

owned by the Palmberg heirs.  *See Strom v. Sheldon*, 527 P.2d 1382, 1384 (Wash. App. 1974) (other citations omitted) (upland owners acquires title to gradually-formed land created by accretions or relictions, but a sudden avulsion does not change existing boundaries).  On the other hand, if the strip of land avulsed through some sort of sudden change in the water level, such as the construction of the ship canal between Lake Washington and the Puget Sound in 1917, the State, as the owner of the land when it was underwater, would continue to be its owner when the land became dry.[9]  *See id.*

Regardless of whether the Palmberg heirs owned the strip of land between the railroad and the water, the state approved the conveyance of second-class shorelands in front of Government Lot 2, except those adjacent to the Stares tract, to the Palmberg heirs in 1940.  *See* Pls.' Ex. 3FF-1.  Because this was a grant from the state, the deed must be "interpreted most strongly against the grantee rather than the grantor state."  *Davidson v. State*, 802 P.2d 1374, 1378 (Wash. 1991) (en banc) (citing *Pearl Oyster Co. v. Heuston*, 107 P. 349 (1910)).  Thus, the State only conveyed "shore lands of the second class," not any dry land that it may have owned. *See* Pls.' Ex. 3FF-1.  And the state could not have conveyed land underlying the ROW with this 1940 conveyance, because the state did not own it and Mr. Palmberg had already patented that land from the United States.  *See* U.S. Br. 20.

## 2. The Land Underlying the ROW was not Included in the Partition Proceeding

As of 1945, at the outset of the partition proceeding, it is undisputed that the Palmberg heirs owned certain land to the east of the ROW, land underlying the ROW itself, and second-

---

[9] Lake Sammamish drains into Lake Washington through the Sammamish River, and information from the county indicates that the water level of Lake Sammamish dropped approximately six feet after construction of the ship canal.  *See* Ex. 32 at 3 (Sammamish River Corridor Action Plan).

class shorelands adjacent to Government Lot 2.  However, in the 1945 partition proceeding, the Palmberg heirs only sought to partition the second-class shorelands and land to the east of the ROW that reaches to the "[n]ortheasterly line of said railroad [ROW]."  *See* Pls.' Ex. 3GG-1 (Bert Stares' Complaint); 3HH-2 (title report accompanying bill of particulars).  The description of the property to be partitioned in both the complaint and the bill of particulars does not mention land underlying the ROW itself, nor a dry strip of land between the ROW and the lake.  *See id.* This description is repeated throughout the documents related to the partition proceeding, including the decree eventually entered in the case.  *See id.*; Pls.' Ex. 3II-2 (Findings of Fact and Conclusion of Law); Pls.' Ex. 3II-14 (Decree).  This decree is a final order that determines the respective rights of the parties to the property that was subject to the proceeding.  *See Bishop v. Lynch*, 111 P.2d 996, 997 (Wash. 1941).  Notably, there is no evidence that the Palmberg heirs disputed the property description used in the partition proceeding, and Plaintiffs cannot now challenge it collaterally in this proceeding.

In an attempt to circumvent this clear omission of land underlying the ROW from the proceedings, Plaintiffs argue that the phrase "second class shore lands" in the deed description is "technically a misnomer" and was in fact a "shorthand description of all land southwesterly of the easterly line of the railroad [ROW]."  *See* Pls.' MSJ 24.  Plaintiffs have offered no evidence whatsoever in support of this subjective and self-serving interpretation.  This Court should also reject their invitation to adopt this interpretation because it contradicts the clear language of the property described in the partition proceeding as well as the clear language of deeds following that proceeding.

To the extent that Plaintiffs argue that the term "adjoining" means that the second-class shorelands referred to in the partition proceeding must be immediately next to the land east of the

ROW, including land underlying the ROW, the term "adjoining" does create some ambiguity. The United States does not dispute that at the time of the partition proceeding, the second-class shorelands adjacent to Government Lots 1 and 2 were separated from the land east of the ROW that was described in the property descriptions by the ROW itself. Thus, the shorelands did not "adjoin" land to the east of the ROW. Thus, the description's use of the term "adjoining" seems to be inaccurate. This inaccuracy, however, is not sufficient reason to jump to the conclusion that the Court intended to include land underlying the ROW in the partition proceeding despite failing to explicitly reference it.

Indeed, the corrective deed issued to J.A. Earley confirms that the phrase "second class shorelands" in the partition proceeding meant only those second-class shorelands conveyed by the State of Washington to the Palmberg heirs in 1940. *See* Ex. 3KK-2. After the partition proceeding, the court-appointed referee, Charles Bovee, sold the shorelands to J.A. Earley, using a deed that described the property conveyed as "second-class shore lands" adjoining property in Government Lot 2 lying east of the ROW, "except portion, if any, in said railroad right of way." *See* Ex. 3GGG-2. However, because of Mr. Earley's concerns that this deed description was "ambiguous," Mr. Bovee requested that the Court issue a corrected deed, which clarified that the shorelands being sold were those "formerly owned by the State of Washington" and conveyed by the state to the Palmberg heirs in 1940. *See* Ex. 3HHH-1–2. The proposed order setting out this description was presented by attorneys of the Palmberg heirs, in addition to the attorney for Mr. Bovee. *See* Ex. 3HHH-4. The Palmberg heirs were aware of and agreed to a revised description that clarified that the only property being sold to Mr. Earley was what they previously obtained from the State of Washington in 1940. If they intended that the referee convey land underlying the ROW to Mr. Earley, they did not take the opportunity to make that intention clear when Mr.

Earley sought a corrective deed. Moreover, as discussed above and in the United States' opening brief, U.S. Br. 20, the State could not have sold the Palmberg heirs land underlying the ROW in 1940. Thus, there is no basis for Plaintiffs' claim that lands underlying the ROW were included in the partition proceeding, or conveyed to Mr. Earley.

Plaintiffs argue that ownership of land underlying the ROW would have been necessary to guarantee access to the property conveyed to Mr. Earley. *See* Pls.' MSJ 29 n.18. Not only would conveyance of land underlying the ROW to be contrary to the plain language of the conveyance, such a conveyance is unnecessary to ensure access, particularly to shorelands. Generally speaking, one does not need to own property to have access across it. Common law ways of necessity arise or condemnation rights arise when a property is landlocked. *See Hellberg v. Coffin Sheep Co.*, 404 P.2d 770, 773 (Wash. 1965) (citing *State ex. rel. Mountain Timber Co. v. Superior Court of Cowlitz Cnty.*, 137 P. 994 (1914)); RCW 8.24.010. More specifically for shorelands, Washington State is rather unique in that there is no right of access by the upland owner through adjacent shorelands to navigable waters. *See Harris v. Hylebos Indus.*, 505 P.2d 457, 463 (Wash. 1973) (en banc). Moreover, since a shore land or tide land owner has a right of access to the shoreland through the adjacent navigable water, it is not clear that it would be necessary for the shoreland owners to cross adjacent uplands to reach their shorelands. *See N. Pac. Ry. Co. v. S.E. Slade Lumber Co.*, 112 P. 240, 242 (Wash. 1910) ("By virtue of the improvement and location of the tide land and respondent's ownership thereof, it (the respondent) has acquired a right of access to its wharf over the navigable waters . . . ."). In any event, Plaintiffs have not shown that the Palmberg heirs intended to convey the land underlying the ROW to Mr. Earley.

If the Palmberg heirs owned the land underlying the ROW as of 1945, they failed to include it in the partition proceeding, since none of the descriptions of the property to be divided included the ROW. "An action for partition of real property is a proceeding *in rem*." *Anderson & Middleton Lumber Co. v. Quinault Indian Nation*, 929 P.2d 379, 385 (Wash. 1996). Therefore, the court's assertion of jurisdiction is "over the property or the 'res' *in rem*." *Id.* However, when the court did not exercise its jurisdiction over the property, it cannot be presumed to be divided. *See In re Grant*, 397 P.3d 912, 918 (Wash. Ct. App. 2017) (citing *Sears v. Rusden*, 235 P.2d 819, 822 (1951)); *see also Philbrick v. Andrews*, 35 P. 358, 359 (Wash. 1894) ("If the property was not brought into said case by either party, the court had no jurisdiction over it, and could not dispute of it therein . . . ."). This is so even where the failure to include the property is inadvertent, as in when all community property is intended to be divided in a divorce proceeding. *See Lambert v. Lambert*, 403 P.2d 664, 668 (Wash. 1965) (minor stock account not included in divorce proceeding continued to be owned by parties as tenants in common). The state court that oversaw the partition proceeding did not have jurisdiction over property that was not before it, and thus this Court cannot assume that it acted to partition it, even though the omission may have been inadvertent.

### 3. Later Conveyances of "Shorelands" Did not Convey Land Underlying the ROW

Later conveyances of "second-class shorelands" in Government Lots 1 and 2 did not convey land underlying the ROW because land under the ROW is not "second-class shorelands," and land underlying the ROW was not partitioned in the 1945 partition proceeding nor otherwise conveyed by Palmberg's heirs. As discussed above, the corrective deed to J.A. Earley made clear that J.A. Earley only conveyed the second-class shorelands that the Palmberg heirs purchased from the State of Washington in 1940. *See* Ex. 3HHH-1–2. Thus, the plaintiffs who

own shorelands in Government Lot 2 and who are successors to J.A. Earley did not obtain land underlying the ROW through their purchase of shorelands. *Contra* Pls.' MSJ 25.

Plaintiffs appear to be correct that the Hugheses received and retained all lands "in the partition action in Government Lot 1." *See* Pls.' MSJ 25. However, since that partition proceeding did *not* include land underlying the ROW, the Hughes estate did not receive any portion of land underlying the ROW by virtue of being the successor to Mr. Simpson, who purchased the property in Government Lot 1, also known as Parcel A, in the partition sale. *See* Ex. 3II-14 (decree); Ex. 3QQ-2. As with the property conveyed in Government Lot 2, and consistent with the property description in the partition proceeding, the property that Mr. Simpson purchased described the property he received as being east of the "northeasterly line of the said right-of-way."[10] *See* Pls.' MSJ 26; Ex. 3II-14 (decree); Ex. 3QQ-2. Plaintiffs argue that despite the clear language of the property description, which only describes the property conveyed as extending to the "northeasterly line of said right of way," Parcel A "*must have* included all the land Palmberg owned in Government Lot 1, including the fee underlying the right of way." *See* Pls.' MSJ 26 (emphasis added). Plaintiffs provide no evidence for this supposed intent to include the land underlying the ROW, despite clear language to the contrary.

Gertie Gorman Hughes purchased the shorelands adjacent to Government Lot 1 after Mr. Simpson purchased the portion of the Palmberg property in Government Lot 1, contracted to sell it to Ms. Hughes, and waived his preference right to the shorelands as the upland owner. Pls.' Ex. 3TT-1 (affidavit of actual ownership and waiver of preference right). Plaintiffs treat this

---

[10] Plaintiffs note that the deed to Simpson does not include a metes and bounds description to describe the edge of the ROW as a property boundary, but the use of metes and bounds is unnecessary to exclude land underlying the ROW so long as the language in the deed "describes the adjoining property as extending up to the edge of the right of way." *Roeder*, 716 P.2d at 862–63.

award of a preference right to Ms. Hughes as evidence of definitive ownership of land underlying the ROW. *See* Pls.' MSJ 27. This award of a preference right by the state is not definitive for two reasons.

First, we do not know what information the Public Lands Commissioner relied on in awarding this preference right, other than the description of property that Mr. Simpson used in his affidavit. Plaintiffs do not provide the certificate by the Washington Title Insurance Company that the Public Lands Commissioner relied on in awarding the preference right. *See* Pls.' Ex. 3UU-1. The state inspector's report that the Public Lands Commissioner considered identified a 40-foot wide strip of gravel between the lake and the railroad, yet neither the inspector nor the public lands commissioner sought to ascertain the ownership of either the strip or the land underlying the ROW prior to awarding the preference right to Ms. Hughes. *See* Ex. 33. Upon receipt of this information, there is no indication that the Public Lands Commissioner determined whether that strip was the property of the state and should be part of the lands sold to Ms. Hughes; nor did it determine whether the strip was owned by another party who may actually have a preference right. Thus, it does not appear that the preference right determination was based on a particularly exhaustive inquiry. Moreover, we do not dispute that Ms. Hughes owned an interest in one-sixth of the ROW, and thus she may have had a preference right simply by virtue of owning land underlying the ROW.

Second, the description of property that Mr. Simpson used in his affidavit to waive his preference right is, unsurprisingly, the same used in both the partition proceeding and in his deed from the referee after the proceeding, which describes his property as extending only to the "northeast line of said right-of-way; thence southeasterly along said northeasterly line . . . ." *Compare* Pls.' Ex. 3TT-1 (Simpson affidavit); Pls.' Ex. 3QQ-2 (referee's deed); Pls.' Ex. 3II-14.

It does not include any land underlying the ROW. If the Public Lands Commissioner's award of a preference right was based solely on this affidavit, which we do not know, that determination may have been in error because the land described does not abut the shorelands. *See Bleakley v. Lake Wash. Mill Co.*, 118 P. 5, 9 (Wash. 1911) (preference right should be awarded to adjoining owner).

While Ms. Hughes may have retained an interest in the land underlying the ROW as a tenant in common with the other Palmberg heirs, there is no evidence that she conveyed that interest to her son and daughter-in-law, William and Betty Hughes. *Contra* Pls.' MSJ 27. The deed from Ms. Hughes to William and Betty Hughes provides for sale of land to the east of the ROW as well as shorelands that she purchased from the state in 1951. *See* Pls.' Ex. 3WW-1. It does not provide for a sale of any of her interest in the land underlying the ROW. Nor have plaintiffs shown that she conveyed her interest in the land underlying the ROW at another time. Thus, the Hughes' Estate, as the successor to William and Betty Hughes, never obtained title to land underlying the ROW.[11]

Nor is the tax assessor's belated recognition of the strip of land between the lake and the ROW evidence of ownership of land underlying the ROW. *Contra* Pls.' MSJ 30. Despite references to the dry strip of land between the railroad ROW and Lake Sammamish in state records in 1928 and 1951, *see* Pls.' Ex. 3EEE-1–2 (1928); Ex. 33 at 5; the county tax assessor did not appear to notice the existence of this strip of land and, more specifically, the fact that no one was paying taxes on it, until 1981. *See* Pls.' Ex. 3PP-1. The tax assessor posited that the

---

[11] If the Hughes Estate and Beth Nelson obtained fractional shares of the land underlying the portion of the ROW originally conveyed by Alfred Palmberg by virtue of being the heirs to Gertie Gorman Hughes, Plaintiffs have provided no evidence that they inherited any of her estate, nor explained what portion of the ROW they would have obtained.

western side of the railroad ROW was considered to be coterminous with the shoreline when the area was first developed, and thus the strip was not assessed. *See id.* The tax assessor began to charge William F. Hughes and others who had title to "shorelands" taxes on the dry land property, which they did not contest. *See* Pls.' MSJ 30. The tax assessor did not charge them for taxes on the ROW itself. *See* Pls.' Ex. 3PP-1 (referring to "subtracting for the [ROW].") Plaintiffs' failure to contest having to pay taxes on this property does not mean that they obtained ownership of the strip of land through deed, much less that they obtained land underlying the ROW. *Contra* Pls.' MSJ 31.

In conclusion, none of the Plaintiffs who had title to property described as "shorelands" as of September 18, 1998 – the Hughes Estate, Nelson, Freedman, Barrett, and Collins – have shown that they owned land underlying the ROW as of that date. The land underlying the ROW was not included in the partition proceeding that lasted from 1945–1949, and was not otherwise conveyed to these plaintiffs. Thus, their claims must be dismissed.

## II. Plaintiffs Cannot Adversely Possess the Reversionary Interest in the Right-of-Way

### A. Plaintiffs' Adverse Possession Claims are Preempted Under the ICCTA

STB and Washington District Court precedent unambiguously stand for the proposition that state law adverse possession claims are preempted under the ICCTA, and Plaintiffs do not establish otherwise. In fact, the little case law that Plaintiffs do cite is inapposite to the facts currently before the Court. Plaintiffs argue that their adverse possession claim does not affect the surface easement and that their acquiring fee tittle to the right-of-way through adverse possession would still be subject to an easement for rail use. Pls.' Br. at 35. In a conclusory manner, they finish by asserting that because their "adverse possession claims in no way interfere with rail transportation or with federal powers to maintain interstate corridors . . . ." *Id.*

Plaintiffs' attempts to skirt precedent should be rejected and this Court should uphold the existing law finding that state law claims, such as these, are preempted under Federal law. *Id.*

Plaintiffs ignore the holding of *Jie Ao*, as evidenced by their failure to address the case in their response brief. Pls.' Br. at 33; *see also Jie Ao and Xin Zhou – Pet. for Declaratory Order,* ("*Jie Ao*") STB Finance Docket No. 35539, 2012 WL 2047726, at *5 (STB served June 4, 2012). The facts of *Jie Ao* involved adverse possession of a "strip of rail-banked ROW that is within the national rail network system and has not been abandoned." *Id.* at *6. Plaintiffs have entered no evidence in the record that distinguishes these facts from the situation at hand. What's more, the STB in *Jie Ao* distinguished fee title through adverse possession of a railway corridor from a prescriptive easement. The STB decided that the former, which Plaintiffs are asserting in this litigation, "would result in unreasonable interference with current or future transportation uses of the ROW." *Id.* at *7. The concern was that adverse possession of a portion of the rail corridor would "directly affect the amount and type of maintenance that could be performed on this railroad ROW, and limit future options for reactivation". *Id.*

In spite of this conclusion, the STB suggested that subject to state law determination, a prescriptive easement could possibly co-exist with active rail operations. *Id.* However, that is not the type of relief sought here by Plaintiffs. Nor are Plaintiffs requesting a crossing right over the ROW like the plaintiffs in *Franks Investment Company LLC v. Union Pacific Railroad Co.*, 593 F.3d 404, 405 (5th Cir. 2010). The Earnheart v. Carlson case that Plaintiffs cite in support of their argument, is also inapplicable. 736 P.2d 1106, 1107 (Wash Ct. App. 1987). That case involved a dispute between two private landowners and the absence of federally regulated property. *Id.* That title in private property could be quieted subject to an easement for "utility

lines and sewer drain fields" is of no import to the Court in resolving whether Congress intended for the ICCTA to preempt state law. *Id.*

Like the STB, the United States District Court for the Eastern District of Washington reached the same conclusion that state law adverse possession claims are categorically preempted under federal law. *B & S Holdings, LLC v. BNSF Railway Co.,* 889 F. Supp.2d 1252, 1256-57 (E.D. Wash. 2012). There the Court found that granting Plaintiffs fee simple title to portions of the ROW would "unquestionably prevent BNSF from constructing, acquiring and operating its facilities." *B & S Holdings,* 889 F. Supp. 2d at 1260. And here, as with *Jie Ao*, Plaintiffs put forth no basis for why their facts are distinguished. In fact, other federal district courts have also held that state law adverse possession claims are preempted under federal law. *See Wedemeyer v. CSX Transp., Inc.,* No.13-00440, 2015 WL 6440295, at * 5 (S.D. Ind. Oct. 20, 2015); *see also* 14500 Ltd. v. CSX Transp., Inc., No. 12-1810, 2013 WL 1088409, at *4 (N.D. Ohio Mar. 14, 2013). Under the Trails Act, railroad rights-of-way are subject to reactivation and future use as a rail line. 16 U.S.C. § 1247(d). The right-of-way in question is no exception, and this Court should follow the established precedent by finding Plaintiffs' adverse possession claims to be barred as a matter of law.

### B. Under Washington State Law, Plaintiffs Cannot Adversely Possess A Reversionary Interest

Plaintiffs' attempt to distinguish *Kiely v. Graves* fails because: a fee owner does not have a greater present possessory interest in a railroad easement than in a public street; *Kiely* is not limited to the statute it interprets; Plaintiffs' interest in the ROW prior to issuance of the NITU was in the nature of a reversionary interest; and encroachment on the easement is prohibited and any actions to take adverse possess of it were the same as those that would interfere with the railroad's easement. *See* 217 P.3d 226 (Wash. 2012) (en banc).

Plaintiffs argue that they had a greater right to use the ROW for private purposes than the plaintiffs in *Kiely* had to use the alleyway at issue. However, an adjoining landowner, even the grantor of the easement, has no more rights to use a railroad ROW for public purposes than a grantor has to use a public street that runs by his or her house. "A railroad right-of-way . . . carries the presumption of exclusive possession. Thus, the grantor would be precluded from entering . . . ." *See Hanson Indus.*, 58 P.3d at 917. "[R]ailroad right of way easements . . . often are deemed to include 'exclusive control of all land within the lines.'" *Kershaw Sunnyside v. Interurban Lines*, 126 P.3d 16, 26–27 (Wash. 2006) (quoting Danaya C. Wright & Jeffrey M. Hester, *Pipes, Wires, and Bicycles: Rails-to-Trails, Utility Licenses, and the Shifting Scope of Railroad Easements from the Nineteenth to the Twenty-First Centuries,* 27 ECOLOGY L.Q. 351, 421 (2000)). This is consistent with the STB's determination in *Jie Ao* that adverse possession of a portion of the ROW would interfere with the railroad. *See Jie Ao*, 2012 WL 2047726, at *7.

Even if some private use of a railroad ROW is permissible, and is not preempted under the ICCTA, that use is not sufficiently hostile to establish adverse possession. In *Veach v. Culp*, which Plaintiffs primarily rely on, s*ee* Pls.' MSJ 38, the Washington Supreme Court noted that "it is true that in most instances the very nature of a railroad will require it to enjoy a substantial right regardless of the nature of its title." 599 P.2d 526, 528 (Wash. 1979) (en banc). The Washington Supreme Court found that in that case, in which the railroad was merely an excursion operation and made fairly minimal use of the ROW, the owners of the dominant tenement could use the ROW in a manner that did not interfere with the railroad's use. *See id.* But this sort of use, which did not interfere with the railroad's operation, is insufficiently hostile to establish adverse possession. *See Netherlands Am. Mortg. Bank v. E. Ry. & Lumber Co.*, 252 P. 916, 917 (Wash. 1927) ("adverse title can be gained to land granted and conveyed as a

railroad right of way, but the adverse possession must be such as is *inconsistent* with the exercise of the right of way easement") (emphasis added).[12]  Furthermore, as discussed above, in Section I, Plaintiffs do *not* own the servient tenement.  Instead, they now seek to obtain it through adverse possession, and they cannot do so without substantially interfering with the railroad's easement, which is preempted under the ICCTA.  *See id.*  In other words, either Plaintiffs' use interfered with the railroad's easement and is preempted, or did not interfere with the railroad's easement and is insufficiently hostile to establish adverse possession under Washington law.  *See Chaplin v. Sanders*, 676 P.2d 431, 434 (Wash. 1984) (en banc) (listing elements of adverse possession).

Second, the Court's conclusion in *Kiely* should be applied to lands held for public purposes.  RCW 7.28.090, the statute at issue in *Kiely*, is not limited to land owned by the government.  RCW 7.28.090 bars adverse possession claims against "lands or tenements owned by the United States or this state," "school lands," and "lands held for any *public purpose*." (emphasis added).  The Washington Supreme Court in *Kiely* made clear that the "lands held for any public purpose" clause is distinct from ownership.  *Kiely*, 271 P.3d at 232.  The Court went on to find that the phrase referred to lands on which "the public holds an easement."  *See id.* Although a ROW is not owned by a governmental entity, the Washington Supreme Court has stated in other contexts that "[a] railroad is a public highway, created for public purposes." *Lawson v. State*, 730 P.2d 1308, 1311 (Wash. 1986) (en banc) (quoting *Puget Sound Elec. Ry.*, 117 P. 739)).  Thus, the statute provides another basis under which Plaintiffs' adverse possession claims must fail.

---

[12] *Netherlands* also predates the enactment of the ICCTA in 1995, and for the reasons discussed above in section II.A., adverse possession of the ROW would be preempted under the ICCTA.

Third, the owner of the fee underlying the ROW retained a reversionary interest in the ROW, not a present possessory interest. What interest the owner of the fee retained is a matter of Washington law, and the Federal Circuit's pronouncements of "traditional common law estates terminology" in a case applying Vermont law has no bearing on how Washington state law characterizes the fee interest. *Contra* Pls.' MSJ 40 (citing *Preseault v. United States*, 100 F.3d 1525, 1533–34 (1996)). Washington courts consistently refer to the interest held by the fee owner of land underlying a railroad ROW easement as a "reversionary interest." *See Brown v. State*, 924 P.2d 908, 916 (Wash. 1996) (en banc) (holding that "the reversionary interest never vested in the adjoining property owners in this case" because the ROW had not been abandoned); *Lawson*, 730 P.2d at 1315 (referring to plaintiffs who "presently own fee interests underlying the rights of way" as holders of "reversionary interests which entitle them to possession upon extinguishment of the railroad easement . . . ."); *Squire Inv. Co.*, 801 P.2d at 1025–26 ("the reversionary interest [in the ROW] passed to the successors of the grantors"). Thus, the Washington Supreme Court's holding in *Kiely* that "[a]n adverse possession claim cannot be asserted against a reversionary interest or a remainder interest until the future interest becomes a vested interest" is directly applicable to the adverse possession claims that Plaintiffs assert here against the fee owner of the land underlying the ROW.

Fourth, as in *Kiely*, here "there is no practical distinction between the overlying easement and underlying fee." 271 P.3d at 234. Any encroachments that these Plaintiffs established to trigger the start of the statutory period for adverse possession of reversionary interests would have necessarily interfered with the overlying public easement held by the railroad. *See Netherlands Am. Mortg. Bank*, 252 P. at 917. Because these encroachments by definition interfere with the actual and potential use of the easement, "it is ultimately not possible to

28

separate the adverse possession of the [reversionary interests'] fee simple interest from the encroachment upon the public easement." *Id.* For practical purposes, Plaintiffs here would have to rely on the very same actions to establish adverse possession of the fee interest underlying the right-of-way and/or the overlying easement. *Id.* As in *Kiely*¸ here it is not possible to achieve one without the other. The Court in *Kiely* concluded that "because it is not permissible to encroach upon a public easement, it is not permissible to adversely possess the underlying fee interest." *Id.* (citing *Baxter-Wyckoff Co. v. City of Seattle*, 408 P.2d 1012, 1015 (Wash. 1965) (en banc)). That Plaintiffs here are attempting to adversely possess portions of the right-of-way against a reversionary interest does not defeat the argument that their actions must have also been adverse to the railroad and interfered with actual and potential use of the railroad's easement.

## III. The Court Should in any Event Deny Plaintiffs' Cross-Motion for Partial Summary Judgment in Order to Allow Adequate Time for Discovery Under Federal Rule of Civil Procedure 56(d)

If the Court allows Plaintiffs' adverse possession claims to proceed, the United States requests that the Court deny Plaintiffs' cross-motion for partial summary judgment pursuant to RCFC 56(d)[13] in order to allow the United States adequate time to discover facts necessary to its defense. The current posture of the litigation is such that the parties have not engaged in intensive factual or expert discovery on the issue of adverse possession. As explained in the accompanying declaration, efficiencies could be realized by the parties proceeding to partial summary judgment briefing on the threshold legal issues remaining in the litigation. *See*

---

[13] RCFC 56 was revised to reflect the corresponding revisions in Federal Rules of Civil Procedure 56. As a result, RCFC 56(f) was revised to become RCFC 56(d). RCFC 56(d) contains the same revisions as its Federal Rule of Civil Procedure counterpart, for this reason the court's analysis of 56(d) is guided by case law that addressed subpart (f) of both former rules. *Clear Creek Cmty. Servs. Dist. v. United States*, 100 Fed. Cl. 78, 82 n.3 (2011).

Declaration of Rachel Roberts ("Roberts Decl.") ¶ 10-11. The costs and time associated with extensive discovery necessary to address Plaintiffs' adverse possession claims would be completely unnecessary if Plaintiffs cannot as a matter of law obtain title to the corridor via adverse possession. As further explained in the accompanying declaration, the United States understood that the parties were to focus solely on the threshold legal issues in this briefing. *See* Roberts Decl. ¶ 8-11.

Plaintiffs have not limited their briefing to threshold legal issues. Instead, Plaintiffs in their cross-motion have alleged numerous factual allegations to support their assertions that they obtained reversionary rights in the right-of-way through adverse possession. Without adequate time for discovery, the United States cannot gather and present facts essential to its defense. Moreover, the Court should have a full factual record before evaluating Plaintiffs' fact-intensive adverse possession claims on the merits. Therefore, if this Court concludes that it can entertain claims that Plaintiffs obtained a reversionary interests in the rail corridor through adverse possession, this Court should grant the United States' Rule 56(d) motion and deny Plaintiffs partial summary judgment to allow adequate time for discovery, subject to renewal of Plaintiffs' motion after discovery is complete.

### A. The United States Seeks the Opportunity to Take Discovery Germane to the Issues Presented in Plaintiffs' Cross-Motion.

Summary judgment must "be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986). As a result, motions for relief under Rule 56(d) are "generally favored and liberally granted." *Clear Creek Cmty. Servs. Dist.*, 100 Fed. Cl. at 83, (citing *Chevron U.S.A. Inc. v. United States,* 72 Fed. Cl. 817, 819 (2006)). Additional discovery

is necessary here to allow the United States to ascertain facts that are critical to its defense of Plaintiffs' adverse possession claims.

This Court has a five-part test to determine whether relief under Rule 56(d) is proper; the non-moving party has to:

> 1) Specify the particular factual discovery being sought, 2) explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact, 3) provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue, 4) recite the efforts previously made to obtain those facts, and 5) show good grounds for the failure to have discovered the essential facts sooner.

*Theisen Vending Co. v. United States*, 58 Fed. Cl. 194, 198 (2003).

First, additional factual discovery is necessary to determine whether there are no genuine issues of material fact relating to whether Plaintiffs or their predecessors in interest satisfy the element of adverse possession. Under Washington law, Plaintiffs must establish that their possession was: 1) open and notorious, 2) actual and uninterrupted, 3) exclusive and 4) hostile. *Chaplin*, 676 P.2d at434. Plaintiffs must prove each element. *ITT Rayonier, Inc. v. Bell,* 774 P.2d 6, 8 (Wash. 1989) (en banc). *Each* of these elements must exist for the statutorily prescribed period of 10 years. *Corpon v. Kellogg,* No. 6956457, 2014 WL 1420068 (Apr. 14, 2014), *see also* RCW 4.16.020. Because the NITU in this litigation issued on September 18, 1998, each Plaintiff would have to establish that it or its predecessor adversely possessed the rail corridor for a continuous 10-year period beginning no later than September 18, 1988.

By their own admission, many of the alleged uses occurred well after 1988, which, at best, would create a genuine issue of material fact in Plaintiffs' cross-motion. *See* Spencer Decl. ¶ 1, 6, (Ex. 5-1), Brockway Decl. ¶ 8, (Ex.7-2), Matrinez Decl. ¶ 7, (Ex. 10-5); Nelson Decl. ¶ 9, (Ex. 11-3); and Freedman Decl.¶¶ 1, 5-6 (Ex. 16-2). While the Spencers attempt to invoke tacking to meet the requisite time period, it is still unclear for how long their predecessors in

interest used portions of the right-of-way. The Spencers[14] rely on the recollections of another plaintiff, Doug McCallum, to suggest that their predecessor in interest used portions of the right-of-way, but McCallum is unable to state the time period this use occurred, whether it began before 1999, and does not provide the square footage of the portions of the right-of-way used. McCallum Decl. ¶ 4, (Ex. 8-2). Additionally, whether any of these uses have been interrupted for any length of time still remains an open factual question. *See Vanderhoof v. Mills*, No. 70343-9-I, 2013 WL 3872227at *5 (Wash. Ct. App. July 22, 2013) (upholding trial court ruling which held lack of uninterrupted use for a continued 10-year period failed to meet the notice and hostility elements of adverse possession); *Chaplin* , 676 P.2d at 437.

The United States believes that discovery would likely establish that Plaintiffs' use was not sufficiently open and hostile. More factual development is necessary to determine whether, for instance, the portions of the right-of-way used as a basketball court and for neighborhood parking were neighborly accommodations. Rossi Decl. ¶ 3; Brockway ¶ 8; *see Crites v. Koch*, 741 P.2d 1005, 1009 (Wash. Ct. App. 1987) (allowing others to park on and cross neighbors' fields considered to be a neighborly accommodation and therefore insufficiently hostile). Likewise, Plaintiffs allege that the planting of certain flowers and trees and the erection of structures in the right-of-way required continual maintenance. Spencer ¶ 4; Schroeder ¶6; Matrinez Decl. ¶7; Freedman Decl. ¶ 4. However, it is unclear, for example whether a boulder and blackberry bushes require any maintenance at all. Spencer Decl. ¶ 4; McCallum Decl. ¶ 2;

---

[14]  The Freedmans also allege they have met the elements of adverse possession through tacking and rely upon their predecessor in interest, Barry Lewis' use of the right-of-way. Pls.' Br. at 57-59*; see also* Freedman Decl. ¶¶ 1, 4. In what appears to be an oversight, Plaintiffs' counsel for the Freedmans failed to include Mr. Lewis' declaration with the parties' exhibits to their cross-motion. Pls. Br. at ix. The United States will reserve argument on the declaration's factual deficiencies until it and the Court have had an opportunity to review and examine the declaration in its entirety.

*Anderson v. Hudak*, 907 P.2d 305, 307 (Wash. Ct. App.1995) ("[W]e hold that the planting of a row of trees alone, without some use that is open and hostile, does not satisfy the elements of adverse possession. . . '").

The last area that warrants further factual development relates to the scope of Plaintiffs' use of the right-of-way. Since none of the Plaintiffs' chains of title contain a conveyance of the right-of-way, Plaintiffs' adverse possession claim is a claim of right. *Finley v. Jordan*, 508 P.3d 636, 638 (Wash Ct. App. 1973). Under Washington law, adverse possession under a claim of right does not confer title to the entire property. *Slater v. Murphy*, 55 Wash. 2d 892, 900 (1959) ("The absence of color of title affects the extent of the Slaters' possession and limits their claim to that portion of the property subject to actual possession."). A critical aspect of the United States' defense to Plaintiffs' adverse possession claims is the argument that even if Plaintiffs obtained title to the some part of the right-of-way through continuous and hostile use, this use still would not confer title to the entire width of the right-of-way.

Indeed, many of the uses alleged by Plaintiffs would not involve the entirety of the right-of-way: "installation of a basketball hoop" and "vegetable and flower garden", Rossi Decl. ¶¶ 3, 4 (Ex. 6-3); "the property had a treehouse", "vegetable and flower garden and a large compost pile", "mowed lawn" and "park cars on that lawn occasionally." Brockway Decl. ¶¶ 3, 5 (Ex. 7-3). And any erected structures on the right-of-way would create their own barriers. *See Wood v. Nelson,* 57 Wash. 2d 539, 540 (1961) (finding that a fence used to separate property was sufficient to constitute adverse possession, because a "fence is the usual means relied upon to exclude strangers."). For this reason, factual discovery with the assistance of a surveyor would be necessary to determine the scope of any alleged use, including any boundaries and a determination of whether any of the alleged uses occurred within the right-of-way. *None* of the

declarations provided by Plaintiffs allege the square footage of the portions of the right-of-way allegedly possessed or the locations of any boundaries created. Discovery about such matters is essential.

As for the second and third factors in *Theisen Vending Co*, additional discovery would likely introduce factual evidence that would defeat Plaintiffs' adverse possession claim or significantly scale back the Court's findings. 58 Fed. Cl. at 198. More discovery could well reveal that neither Plaintiffs, nor their predecessors in interest, adversely possessed portions of the right-of-way before 1998. Indeed, this seems likely given the factual assertions contained in some of Plaintiffs' own declarations. Further, evidence that the use was not continuous, nor sufficiently hostile and open, would create a material fact in dispute and potentially defeat Plaintiffs' cross-motion. Further, a determination by an expert witness on the dimensions of Plaintiffs' alleged actual use would aid the Court and the United States in determining which portions of the right-of-way, if any were adversely possessed. *See LeBleu v. Aalgaard*, 193 Wash. App. 66, 81 (2016) (reversing and remanding a lower court ruling while noting that "the boundary line established by adverse use remains a question of fact, to be determined based on the use and occupancy of the character that a true owner would assert in view of the property's nature and location.").

The fact that the United States received limited information on Plaintiffs' adverse possession claims during initial discovery does not warrant a different conclusion. The Court of Claims has previously held that "possessing pre-litigation documents" does not disqualify a party from seeking relief under Rule 56(d), nor does it increase the party's burden to show additional discovery is needed. *See Alta Wind I Owner – Lessor C v. United States*, 117 Fed. Cl. 369, 374 (2014) ("finding that "to the Court's knowledge, no case here or in the Federal Circuit has ever

held that possession pre-litigation documents disqualifies a party from or increases its burden in seeking Rule 56(d) discovery.").

Here, because adverse possession was never a theory of ownership asserted in Plaintiffs' complaints, Plaintiffs did not provide any factual information on any adverse possession claims until late 2016. Roberts Decl. ¶ 5. Once formal discovery began the United States and Plaintiffs each exchanged one set of Interrogatories, Requests for Production, and Requests for Admission in July and August of 2017, respectively. The United States retained a surveyor in early September 2017, but informed him after the September 15, 2017 status conference with the Court that the parties' discovery deadline was vacated. Roberts Decl. ¶ 11. In light of the changes, the United States informed the surveyor that its focus would be on summary judgment briefing, but would still proceed with its request for record research related to the boundaries of the right-of-way and the fee simple parcels. *Id.* at ¶ 11. Contemporaneous with these conversations, the United States deferred additional discovery on the remaining adverse possession claims in the case in light of the Court's instruction that the parties would brief threshold legal issues for summary judgment beginning in the winter of 2017. *Id.* In light of the late introduction of Plaintiffs' adverse possession claims and the Court's instruction, relief under Rule 56(d) is appropriate and discovery is likely to unearth numerous material facts that remain in dispute between the parties.

### B. Fairness Requires that the United States Have a Full Opportunity to Conduct Discovery Before Defending Against Plaintiffs' Adverse Possession Claims.

Plaintiffs here have ignored the general rule that summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Anderson,* 477 U.S. at 257). Due process requires the Court to "afford the parties a full opportunity to present their respective cases" before ruling on the

merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citation and quotation marks omitted); *see also* Edward Brunet, *The Timing of Summary Judgment*, 198 F.R.D. 679, 687 (2001) ("[I]t would be patently unfair to permit a judgment to be entered against a person without affording that party the opportunity to gather and submit evidence on his or her behalf.").

Allowing Plaintiffs here to receive a ruling on their cross-motion without allowing the parties to fully conduct discovery would violate the spirit of the Rules of the Court of Federal Claims and prejudice the United States. The bedrock principle of many rules of the Court of Federal Claims, is the idea that all parties have an adequate opportunity to gather evidence to support their defense. Rule 56(d)(2) expressly contemplates deferring summary judgment in order to "allow time" for the non-movant "to take discovery." Also, upon converting a motion to dismiss to a motion for summary judgment under Rule 12(d), a court must give the parties "full opportunity to prepare for and comply with the requirements of Rule 56." *Duffy v. United States*, 120 Fed. Cl. 55, 61 (2015) (citing *Selva & Sons, Inc. v. Nina Footwear, Inc.,* 705 F.2d 1316, 1322 (Fed. Cir. 1983)). If the Court concludes that Plaintiffs belated effort to establish ownership of a reversionary interest through the doctrine of adverse possession is legally viable, the Court should provide Defendant an opportunity to conduct the discovery necessary to mount a defense to Plaintiffs' adverse possession claims.

## CONCLUSION

For the foregoing reasons, Defendant requests that the Court grant its motion for partial summary judgment because Plaintiffs are unable to establish a property interest in the ROW and thus, the United States did not effect of a taking of their property. The documents that Plaintiffs rely upon, namely their deeds and plats, do not support their assertions of ownership. By

extension, Plaintiffs are also unable to establish under Washington state law that they have

obtained ownership to certain portions of the ROW through adverse possession.  Additionally,

Plaintiffs' adverse possession claims are also barred under federal law.  In the alternative,

pursuant to RCFC 56(d), the United States respectfully requests that the Court deny Plaintiffs'

cross-motion for summary judgment on its adverse possession claims until the United States has

been afforded a full and fair opportunity to conduct discovery.


      Respectfully submitted this 23rd day of March, 2018,


    JEFFREY H. WOOD
    Acting Assistant Attorney General
    United States Department of Justice
    Environment & Natural Resources Division

    */s/ Tanya Nesbitt*
    TANYA C. NESBITT
    United States Department of Justice
    Environment & Natural Resources Division
    Natural Resources Section
    601 D Street, NW
    Washington, D.C. 20004
    (202) 305-0457 (phone)
    tanya.nesbitt2@usdoj.gov

    *Attorney for the United States*