## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **WARREN BERES and VICKI BERES,** *et al.*, | ) ) ) | |
| **Plaintiffs,** | ) ) | Nos. 03-785L, 04-1456L, 04-1457L, 04-1458L, 04-1459L, 04-1463L, 04- |
| **v.** | ) ) | 1465L, 04-1466L, 04-1467L, 04-1468L, 04-1469L, 04-1471L, 04- |
| **UNITED STATES,** | ) ) | 1472L, 04-1473L, 04-1474L |
| **Defendant.** | ) ) ) | The Honorable Marian Blank Horn |

---

## Plaintiffs' Reply in Support of Plaintiffs' Cross Motion for Partial Summary Judgment

---

ACKERSON KAUFFMAN FEX, PC
Cecilia Fex
Ackerson Kauffman Fex, P.C.
1300 Pennsylvania Ave. NW, Suite 700
Washington, D. C. 20004
Phone: (202) 594-6825
Fax: (202) 789-7349
e-mail: fex@ackersonlaw.com
*Attorney of Record for the following consolidated Plaintiffs:*
*Brown, et al.; Collins, et al.;*
*Estate of Pearl Welch, et al.;*
*Waverly Hills Club, et al.*

STEPHENS & KLINGE LLP
Richard M. Stephens
Stephens & Klinge LLP
10900 NE 8th Street, Suite 1325
Bellevue, WA 98004
Phone: (425) 453-6206
e-mail: stephens@sklegal.pro
*Attorney of Record for the following consolidated Plaintiffs:*
*Beres; Ritzen, et al.; Morel, et al.;*
*Klein; Chamberlin, et al.; Nelson, et al.; Lane; Peterson, et al.; Schroeder; Manning, et al.; and Spencer, et al.*

**May 9, 2018**

# Table of Contents

Table of Contents……………………………………………………………………………………………i

Table of Authorities…………………………………………………………………………..…………iv

Table of Exhibits……………………………………………………………………………..…………ix

ARGUMENT…………………………………………………………………………………………...1

I.    Through their title, Plaintiffs Own the Land Underlying the Right of Way…...1

   A. Principles of deed construction support Plaintiffs' interpretations of
     the deeds……………………………………………………………….......................................2

     1. Under Washington law, deeds are construed against the grantor…...........2

     2. Questions of fact concern the intent of the parties and the use of
        extrinsic evidence is permitted here…………………………………………………3

   B. Plaintiffs own the land underlying the right of way even though their
     deed uses a measured distance to the right of way………….....................…………6

     1. The measured distances are not precise and thus are insufficient
        to overcome the presumption that the grantor was not intending
        to keep the strips of land…………………………………………………………………6

     2. For all the Plaintiffs in this Roeder group, the Grantor's subsequent
        actions, which are consistent with an intent not to retain the right
        of way, supports Plaintiffs' ownership under Kershaw……..........................…10

     3. Unique features of Plaintiffs' property transactions confirm there
        was no intent to reserve the right of way for conveyances……….................12

        a. For the Spencers, Rossis and Brockways, Connell (the plattor)
           did not retain the fee underlying the right of way………...........................12

        b. The Schroeders' legal description uses metes and bounds that
           does not corresponds to the border of the right of way; this fact
           distinguishes their situation from that in Roeder………………………….....14

   C. The evidence permits only one reasonable inference: in Palmberg parlance
     "shorelands" adjoined the easterly edge of the railroad right of way…..............15

1. The parties agree that the heirs of Palmberg owned land underlying the right of way up to and at the time of the partition hearing.................16

2. As an in rem action, the partition proceeding itself necessarily included the right of way because all parties treated the Complaint as including all lands extending to the shorelands in Government Lot 1 and including the shorelands in Government Lot 2........................16

3. Later conveyances in Government Lot 1 confirm the right of way is owned by the Hughes Estate and the Nelsons.....................................22

II. If Not by Their Deeds, Plaintiffs Have Acquired Title to the Fee Underlying the Railroad Right of Way by Adverse Possession.....................23

A. Adverse possession of a railroad right of way is permissible in this context....23

1. Federal law does not preempt Plaintiffs' state law adverse possession claims under ICCTA and Defendant has failed to meet its burden..............23

2. State law permits Plaintiffs' adverse possession claims..........................26

a. Railroad right of ways are different from public streets.......................26

b. Wash. Rev. Code §7.28.090 does not prohibit adverse possession claims against a railroad easement.......................................................28

c. Any owner of the fee underlying the railroad right of way has present possessory rights.................................................................30

d. There are real distinctions between the overlying easement and the underlying fee...............................................................31

B. Plaintiffs have met the requirements for proving title by adverse possession.......................................................................31

III. Plaintiffs Do Not Oppose Defendant's Request for a Delay Pursuant to RCFC 56(d), But Request the Scope and Time for Discovery not be Open-Ended...................................................................33

A. Requisite elements entitling a party reprieve from a summary judgment determination in order to conduct additional discovery...................34

1. The first requirement: specify the particular factual discovery being sought..........................................................................................................34

2. The second requirement: explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact.............34

3. The third requirement: provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue...................................................................35

4. The fourth requirement: recite the efforts previously made to obtain those facts...............................................................................36

5. The fifth requirement: show good grounds for the failure to have discovered the essential facts sooner................................................36

B. If the Court grants Defendant's request, Plaintiffs request the Court enter a ruling limiting the scope of and time for discovery, and that Defendant be required to respond to Plaintiffs' cross-motion within one month after the end of that discovery period......................................37

CONCLUSION.................................................................................................39

# Table of Authorities

Cases

*14500 Ltd. v. CSX Transp., Inc.*,
No. 12-1810, 2013 WL 1088409 (N.D. Ohio Mar. 14, 2013) .................................. 24

*Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*,
243 P.3d 521 (Wash. 2d 2010) .............................................................................. 4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................... 2, 36

*B & S Holdings, LLC v. BNSF Railway Co.*,
889 F. Supp. 2d 1252 (E.D. Wash. 2012) ............................................................. 24

*Beres v. United States*,
104 Fed. Cl. 408 (2012) ..................................................................................... 5

*BHL Properties, LLC v. United States*,
135 Fed. Cl. 222 (2017) .............................................................................. 1, 11

*Bradley v. Spokane & Inland Empire R.R.*,
140 P. 688 (Wash. 1914) .................................................................................. 13

*Brown v. State*,
924 P.2d 908 (Wash. 1996) ......................................................................... 21, 30

*Crites v. Koch*,
741 P.2d 1005 (Wash. Ct. App. 1987) ............................................................ 32, 33

*Davies v. Wickstrom*,
105 P. 454 (Wash. 1909) .................................................................................... 9

*DD & L, Inc. v. Burgess*,
753 P.2d 561 (Wash. Ct. App. 1988) .............................................................. 8, 15

*Franks Investment Co. v. Union Pac. R.R. Co.*,
593 F.3d 404 (5th Cir. 2010) ..................................................................... 25, 28

*Friends of Viretta Park v. Miller*,
940 P.2d 286 (Wash. Ct. App. 1997) ................................................................. 14

*Fry v. King Cnty.*,
275 P. 547 (Wash. 1929) .................................................................................. 12

*Hanson Indus., Inc. v. County of Spokane*,
58 P.3d 910 (Wash. Ct. App. 2002) ................................................................... 27

*Harris v. Ski Park Farms, Inc.*,
814 P.2d 684 (Wash. Ct. App. 1991) ................................................................... 5

*Hudson House, Inc. v. Rozman*,
509 P.2d 992 (Wash. 1973) ................................................................................ 8

*Jackson v. United States*
122 Fed. Cl. 376 (2015) .................................................................................... 34

*Jie Ao and Xin Zhou—Petition for Declaratory Order*, FD 34439,
2012 WL 2047726 (STB served June 6, 2012) ..................................................... 24

*Katzin v. United States*,
124 Fed. Cl. 122 (2015) .................................................................................... 12

*Kelley v. Tonda,*
393 P.3d 824 (Wash. Ct. App. 2017) ............................................................. 3

*Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n,*
126 P.3d 16 (Wash. 2006) ............................................................... passim

*Kiely v. Graves,*
271 P.3d 226 (Wash. 2012) ............................................................ passim

*King City v. Squire Inv. Co.,*
801 P.2d 1022 (Wash. Ct. App. 1990) ......................................................... 30

*Lawson v. State,*
730 P.2d 1308 (Wash. 1986) ............................................................ 29, 30

*Netherlands Am. Mortg. v. E. Ry. & Lumber Co.,*
252 P. 916 (Wash. 1927) .................................................................... 29

*Newport Yacht Basin Ass'n of Condominium Owners v. Supreme Northwest, Inc.,*
277 P.3d 18 (Wash. Ct. App. 2012) ............................................................ 5

*Northern Pac. Ry. Co. v. Ely,*
65 P. 555 (Wash. 1901) ................................................................. 29, 30

*Northern Pacific Ry. Co. v. Ely,* 197 U.S. 1 (1905) ....................................... 29

*Oak Forest, Inc. v. United States,*
23 Cl. Ct. 90 (1991) ........................................................................ 37

*Okerlund v. United States,*
53 Fed. Cl. 342 (2002) ...................................................................... 12

*Pelly v. Panasyuk,*
413 P.3d 619 (Wash. Ct. App. 2018) ................................................... 3, 4, 5, 6

*Preseault v. I.C.C.,*
494 U.S. 1 (1990) .......................................................................... 26

*Ray v. King County,*
86 P.3d 183 (Wash. App. 2004) .............................................................. 2

*Reece v. Good Samaritan Hosp.,*
953 P.2d 117 (Wash. Ct. App. 1998) ......................................................... 25

*Roeder Co. v. Burlington Northern, Inc.,*
714 P.2d 1170 (Wash. 1986) ................................................................ 13

*Roeder Co. v. Burlington Northern, Inc.,*
716 P.2d 855 (Wash. 1986) .......................................................... passim

*Sunnyside Valley Irrigation Dist. v. Dickie,*
73 P.3d 369 (Wash. 2003) ................................................................ 3, 4

*Theisen Vending Co. v. United States,*
58 Fed. Cl. 194 (2003) ................................................................. 34, 35

*State v. Superior Ct. for Cowlitz Cnty.,*
146 P. 609 (1915) ......................................................................... 15

*Veach v. Culp,* 599 P.2d 526 (Wash.1979) ........................................ 26, 27, 28, 30

*Wedemeyer v. CSX Transp., Inc.,*
No.13-00440, 2015 WL 6440295 (S.D. Ind. Oct. 20, 2015) ................................... 24

Statutes

Wash. Rev. Code §7.28.090....................................................................... passim

Rules

RCFC 56(d)............................................................................ii, 33, 34

Other Authorities

17 William B. Stoebuck, Washington Practice: Real Estate: Property Law § 7.9, at 463 (1995).............................................................................................2

Restatement (Second) of Contracts §§ 212, 214(c) (1981) ........................................... 7

# Table of Exhibits

Ex. 18             Answer by Annie Stangroom

Ex. 19             Answer to Plaintiff's Amended Complaint by Gertie
                   Gorman Hughes and Minnie Hughes

Ex. 20             Answer by Estate of Elizabeth Zengel

Ex. 21             Answer by Estate of Alfred Palmberg Deceased

Ex. 22             Answer by Defendants Maude Palmberg and Gertie
                   Gorman Hughes

Ex. 23             Amended Answer by Annie Stangroom and Estate of
                   Elizabeth Zengel

Ex. 24             Answer to Plaintiff's Amended Complaint by Gertie
                   Gorman Hughes and Minnie Hughes

Ex. 25             Answer by Reah Whitehead Harrison for Estate of Alfred
                   Palmberg

Ex. 26             Answer to Plaintiff's Amended Complaint by Annie
                   Stangroom and Estate of Elizabeth Zengel

Ex. 27             Amended Answer of Defendants Maude Palmberg and
                   Gertie Gorman Hughes

Ex. 28             ESM Engineering Diagrams of Plaintiffs' Properties
                   originally in Plaintiffs' Exhibits.

# ARGUMENT

## I. Through their title, Plaintiffs Own the Land Underlying the Right of Way.

Plaintiffs first respond below to the Defendant's reply as to the applicable law on deed construction under the circumstances of this case. Next, Plaintiffs respond to the merits of Defendant's arguments concerning the *Roeder* and shorelands issues.

As a preliminary matter, relying on *BHL Properties, LLC v. United States*, 135 Fed. Cl. 222 (2017), Defendant argues it "need not demonstrate, and the Court need not determine, who actually owns the land underlying the ROW." (U.S. Combined Reply, Doc. 253 (hereinafter "Doc. 253"), at 2). Defendant describes the case as "granting summary judgment for the United States in rail-trail takings case because the plaintiff had failed to 'produce evidence sufficient to support his claim that the land at issue belongs to him,' despite absence of evidence that land in dispute was owned by another individual." (Doc. 253 at 2 (quoting *BHL Properties*, 135 Fed. Cl. at 229.)

In *BHL Properties*, the only evidence submitted was a map showing a county highway separating the plaintiff's property from the railway, and two deeds with metes and bounds description excluding the highway. At best the plaintiff might have claims to ownership to the centerline of the highway, but not to the railway on the other side. 135 Fed. Cl. at 228-9. For that reason, the Court ruled the plaintiff "must do more than simply cite the absence of evidence in the record that another individual currently owns the land underlying [the h]ighway." *Id.* at 229. In other words, in *BHL Properties*, the plaintiff presented *no* extrinsic evidence to show

ownership. In contrast, Plaintiffs have submitted a great deal of extrinsic evidence, including evidence that title searches have overturned no sign of ownership elsewhere in another individual. These circumstances set this case apart.

While Defendant may have no duty to prove ownership in someone else, its burden on summary judgment is to submit evidence that creates a triable issue of fact and, if the evidence is "merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Defendant has submitted no extrinsic evidence to counter Plaintiffs' evidence.

## A. Principles of deed construction support Plaintiffs' interpretation of the deeds.

### 1. Under Washington law, deeds are construed against the grantor.

Washington law is clear that if there is any uncertainty as to what is being conveyed, deeds "will be construed against the grantor.'" *Ray v. King County*, 86 P.3d 183, 194 n.67 (Wash. App. 2004) (quoting 17 William B. Stoebuck, Washington Practice: Real Estate: Property Law§ 7.9, at 463 (1995).) Plaintiffs raised this rule of construction in their opening brief (Doc. 244 at 16), and Defendant has not disputed this point. The parties on both sides of this case have arguments about the deed language and the significance of subsequent events in order to understand if the parties to the transactions were intending to include or exclude the strip of adjacent right of way. To the extent that any deed or the plat referenced in a deed is subject to more than one interpretation, the deeds (and the plat) should be construed in a way against the grantor's theoretical interest in keeping the strip of

right of way for him or herself. *See Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*,126 P.3d 16, 26 (Wash. 2006).

## 2. Questions of fact concern the intent of the parties and the use of extrinsic evidence is permitted here.

Defendant admits that deed interpretation is a mixed question of fact and law (Doc 253 at 3), but is mistaken that "questions of fact" are limited only to questions as to what language is in the deeds, as if questions of fact relate only to the legibility of the documents. (*See* Doc. 253 at 3.) In Washington, questions of fact concern not only what "language was included in a deed" (*id.*), but also determining what the language meant, which may be done by examining extrinsic evidence, to discern the intent of the parties, as discussed below.

Defendant, however, cites *Sunnyside Valley Irrigation Dist. v. Dickie*, 73 P.3d 369, 372 (Wash. 2003)[1] to argue that extrinsic evidence is not allowed unless the deed is ambiguous, and that *Sunnyside* is more recent than the cases Plaintiffs cite. (Doc. 253 at 3.) But Defendant failed to grapple squarely with the 2017 decision, *Kelley v. Tonda*, 393 P.3d 824, 830 (Wash. Ct. App. 2017), *cited in* Doc. 244 at 9-10 (extrinsic evidence permissible "*regardless* of whether the language used in the writings is deemed *ambiguous*") (emphasis added). Nor did it address the recent decision in *Pelly v. Panasyuk*, 413 P.3d 619 (Wash. Ct. App. 2018), which discusses

---

[1] Defendant uses the signal "en banc" in its citations to Washington State Supreme Court cases. All Washington Supreme Court cases since 1969 have been en banc. *See* http://www.courts.wa.gov/education/?fa=education.supreme.

what is meant by "question of fact," and rejects the notion that the language in deeds need be ambiguous in order to consider extrinsic evidence.[2]

First, *Pelly* reaffirmed the mixed question of law and fact principle for deed interpretation: "What the original parties intended is a question of fact and the legal consequence of that intent is a question of law." *Id.* at 628-9; *see also Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 243 P.3d 521, 531, n.7 (Wash. 2d 2010) ("parties['] inten[tion] is a question of fact.

Second, the *Pelly* decision explains the Washington courts have adopted the "context rule" which "recognizes that the *intent* of the ... parties *cannot be interpreted without examining the context* surrounding the making of the contract" or deed,[3] including extrinsic evidence. *Pelly*, 413 P.3d at 629 (emphasis added; internal quotes and citations omitted). Importantly, under the context rule, extrinsic evidence listed by the *Pelly* court, such as the "circumstances surrounding the making" of the deed and "the subsequent conduct of the parties to the contract" is "*admissible regardless of whether the language in the document is ambiguous.*" 413 P.3d at 629 (emphasis added and citations omitted). In Washington law, then, questions of fact are directly tied in with the intent of the parties and extrinsic

_____

[2] Additionally, the seeming tension between *Sunnyside* case on the one hand, and the more recent *Pelly* case on the other, can be explained from their contexts. In the latter case, the question of whether extrinsic evidence was admissible, despite a lack of ambiguity in the deed language, was in dispute. *See Pelly*, 413 P.3d at 629-30; In contrast, in *Sunnyside*, the question of admissibility of extrinsic evidence was not contested, *see* 73 P.3d at 375, making the statement concerning excluding extrinsic evidence virtually *dictum.*
[3] In Washington, the "rules of contract interpretation apply to interpretation of an easement and a deed." *Pelly*, 413 P.3d. at 628 (multiple citations omitted).

4

evidence may be considered in circumstances such as here so long as not used to alter their meaning in some fashion or show a party's unilateral intent. *Id.*[4]

Defendant also quotes from *Harris v. Ski Park Farms, Inc.*, 814 P.2d 684, 686 (Wash. Ct. App. 1991), *aff'd*, 844 P.2d 1006 (Wash. 1993), for the idea that intent must be ascertained from reading the deed as a whole. (Doc. 253 at 4.) While true, *Harris* does not hold as Defendant implies that intent must be ascertained *only* from reading the deed. That would be contrary to the numerous more recent cases addressed above.

Finally, Defendant overlooks that this Court has already dealt with the impact of *Sunnyside Valley Irrigation* on deed interpretation, even before the *Pelly* decision:

> [T]he State of Washington Supreme Court rejected the requirement that ambiguity in the contract language must exist before allowing evidence of the "surrounding circumstance," in the case of railroad deeds. The *Harris* court instead "adopted the 'context rule' which succinctly stated is that 'extrinsic evidence is admissible as to the entire circumstances under which [a] contract [is] made, as an aid in ascertaining the parties' intent,' specifically adopting the Restatement (Second) of Contracts §§ 212, 214(c) (1981)." *Id.* (footnote omitted) (omissions in original).

*Beres v. United States*, 104 Fed. Cl. 408, 433 (2012) (multiple citations omitted).

Therefore, contrary to the Defendant's assertion that the Court "may not consider extrinsic evidence (Doc. 253, at 3), as explained in *Pelly*, the Court must consider

---

[4] While there are some cases, as Defendant notes, that extrinsic evidence is not considered unless there is ambiguity, the Washington Court of Appeals, in *Newport Yacht Basin Ass'n of Condominium Owners v. Supreme Northwest, Inc.,* 277 P.3d 18, 26 (Wash. Ct. App. 2012) explains that ambiguity is not required when construing deeds in railroad cases. Other cases, like *Pelly,* make no such distinction and consider the context regardless of ambiguity.

the context of the transaction because the parties' intent cannot be determined without it. 413 P.3d at 629.

### B. Plaintiffs own the land underlying the right of way even though their deed uses a measured distance to the right of way.[5]

### 1. The measured distances are not precise and thus are insufficient to overcome the presumption that the grantor was not intending to keep the strips of land.

In regard to whether the Plaintiffs own the fee underlying the right of way for all of those properties which for which Defendant uses *Roeder v. Burlington Northern, Inc.,* 716 P.2d 855 (Wash. Sup. Ct. 1986), Defendant does not dispute that the parties' intent controls. It does not dispute that, while the use of metes and bounds rebuts the centerline presumption, there is no corresponding presumption that the right of way was excluded. It is simply a matter for the Court reviewing all of the evidence to determine the intent of the parties.

However, Plaintiffs own the right of way because of the nature of the metes and bounds descriptions here and the rationale of the Court in *Roeder.* Defendant argues that all that *Roeder* requires for rebuttal of the presumption that the fee underlying the right of way is included is for the deed to "extend up to the edge of the right of way." (Doc. 253, at 5.) But the court was clear that it was not just a boundary reference to the edge of the right of way that would rebut the presumption, but that there is a measured distance, a metes and bounds

---

[5] This section addresses the Plaintiffs with the *Roeder* "issue," *i.e.*, the Schroeders, Spencers, Rossis, Brockways and Matrinez Plaintiffs.

description. *Roeder,* 716 P.2d 862 (when deed "also gives a metes and bounds description" presumption is rebutted).

Defendant acknowledges that the Rossi, Spencer, Brockway and Matrinez deeds refer to a distance which is "more or less" a certain distance, and the critical distance is to a water boundary which naturally fluctuates as the water line does. (Doc. 253 at 5.) Defendant asserts that the imprecision of the deeds does not evidence an intent to convey any of the right of way. But the presumption is that a conveyance bordered by a right of way extends to the centerline unless there is a precise description that excludes it, *i.e.,* metes and bounds. *Roeder,* 716 P.2d at 861. Metes and bounds descriptions that have no relation to the right of way do not rebut the centerline presumption.

The presumption that the grantor intended to convey the fee along with and as a part of the conveyance of the abutting land flows from the theory that the grantor did not intend to retain a narrow strip of land which could be of use only to the owner of the adjoining land. *Roeder,* 716 P.2d at 861 (footnote omitted). The rule is also intended to lessen litigation caused by the existence of narrow strips of land distinct in ownership from the adjoining property. *Id.*

The Court in *Roeder* found that the centerline presumption was rebutted because, "[a] boundary falling in the center of the rights of way is inconsistent with the careful metes and bounds descriptions in these deeds." *Id.* at 862. But here the descriptions use the "metes" of a certain number of feet (without any orientation or direction as is typical) and then repudiates any possible certainty by adding the

phrase "more or less." This is inconsistent with the "careful metes and bounds" which was sufficient to rebut the typical, normal presumption that landowners adjoining a right of way own the fee under the easement. *Id.*

Accordingly, the numeric distance in the plat or deeds is not the precise or careful description discussed in *Roeder* because the numeric distance here was a distance between the right of way and a moving water boundary. Plaintiffs cited *Hudson House, Inc. v. Rozman,* 509 P.2d 992 (Wash. 1973) for the unassailable proposition that the boundary for property that uses a waterbody moves as the waterbody moves. *Id.* Defendant argues that the fact that the western boundary fluctuates does not mean that the eastern boundary fluctuates. (Doc. 253 at 7.) The argument misses the point. The fact that the boundary fluctuates means that the distance between the two fluctuates. The west and east boundaries of the lots are monuments—the water on the west, and the right of way on the east. The number of feet between the two is mere surplusage because, as Defendant argues elsewhere (Doc. 253 at 12), monuments control over distances. *DD & L, Inc. v. Burgess,* 753 P.2d 561, 565 (Wash. Ct. App. 1988). And when the monument has width, the conveyance is to the centerline of the monument. *Id.* at 561 n.3.

Defendant argues that the "more or less" language in a deed is essentially meaningless. (Doc. 253 at 8.) Plaintiffs agree that the "more or less" language does not change the legal description—the property is still bounded by two monuments— the lake and the railroad right of way. The "more or less" phrase simply gives notice of the general distance between them. Plaintiffs' point is that a "more or less"

distance is not only different from the metes and bounds addressed in *Roeder*, but is inconsistent with the rationale of *Roeder* that a carefully-defined distance evidences an intent to convey only to that specified number of feet and not any part of the right of way. *Roeder*, 716 P.2d at 862.

Defendant appears to argue that the phrase "more or less" in the Rossi and Brockway deeds "does not qualify any of the boundary points that *are on the ROW*." (Doc. 253 at 8 (emphasis added).) Instead, it asserts, the "more or less" phrase qualifies as a call to the "western line of Government Lot 2." (*Id*.) The western line of Government Lot 2 is the lake. (Ex. 4 at 3.) Therefore, Defendant appears to argue that the number of feet, "more or less" is referring only to the lake. This argument is faulty for the simple reason that the number of feet, "more or less," is referring to the distance between *two points*: the lake and the right of way. Accordingly, the number of feet is not, as Defendant asserts, only referring to the "western line of Government Lot 2." (Doc. 253 at 8.)

Nor do Plaintiffs contend that the "more or less" phrase makes the "entire description suspect" as being legally insufficient to convey property. (Doc. 253 at 8 (citing *Davies v. Wickstrom*, 105 P. 454, 456 (Wash. 1909).) Actually, *Davies* was referring to a situation in *Stokes v. Curtis*, 105 P. 454 (Wash.1908), where, as with most references to "more or less," the case involved distances "more or less" between monuments—namely, streets and a railroad right of way. Given the longstanding rule that monuments prevail over metes and bounds—a rule in place when the Connell plat and all the deeds for all the Plaintiffs in this group were issued—

9

Plaintiffs own to at least the center of that monument, if not the full width because it is bounded by another right of way, the street. (Exhibit 3-J.)

**2. For all the Plaintiffs in this *Roeder* group, the Grantor's subsequent actions, which are consistent with an intent not to retain the right of way, supports Plaintiffs' ownership under *Kershaw*.**

*Kershaw* is clear that subsequent actions, or the failure to act as if the grantor retained the fee, is relevant to determining whether the grantor intended to convey the fee. 126 P.3d at 26. And, Defendant has no evidence that creates any triable issue of fact about any of the grantors' actions. Instead, Defendant argues that *Kershaw* is not applicable because it is not about the centerline presumption or metes and bounds descriptions. (Doc. 253 at 9.) Again, this misses the point. Defendant adds that Plaintiffs "argue that *Kershaw* modified *Roeder*'s holding on the centerline presumption." (Doc 253 at 5-6.) Plaintiffs do not. Rather, as to both points, *Kershaw* makes clear that in determining whether a grantor intended to keep an underlying fee in a right of way for him or herself, or intended to convey it with a grant of the adjacent property, a court can and should look at all the facts, including the subsequent conduct, to show there was no intent in the grantor to retain the fee underlying the right of way. 126 P.3d at 26. This was not at issue in *Roeder*. That *Kershaw* is not a "centerline presumption" case is immaterial. It is about the ultimate question regarding a grantor's intent to reserve or convey the fee underlying a right of way.

The Court in *Kershaw* found the subsequent history that the grantor never conveyed or did anything with the right of way to be evidence of intent by the

grantor to not retain the right of way. *Id.* That was the question in *Kershaw* and the same question in the present case. Did the grantors intend to keep the right of way for themselves? Defendant offers no evidence to show that the grantors took any actions to retain the right of way and withhold it from the purchasers of their property. Unlike the case upon which Defendant relies, *BHL Properties,* 135 Fed. Cl. 222, *cited in* Doc. 253 at 2, Plaintiffs have submitted evidence which confirms there was no intent to retain.

The one fact from *Kershaw* that Defendant uses to try to distinguish the case is that the grantor in *Kershaw* was a mother conveying to her son. (Doc. 253 at 10.) There is no logical reason derived from caselaw or societal norms that would suggest that mothers always or typically refrain from dividing property interests when conveying to their offspring. While the mother-son relationship was noted by the Court in *Kershaw*, it was one of other factors considered, and the court seemed more persuaded by the lack of evidence in the record evincing an intent to reserve the property. *See* 126 P.3d at 26 ("Moreover, unlike in *Harris,* there is no evidence in the record that Ora Kershaw intended to reserve any interest in the property nor that she later attempted to convey that interest.").

Defendant also argues that Plaintiffs' analysis that the grantor never sold the land subject to the right of way later is untenable because, if the grantor never sold the strip of land, it means he or she retained it (which is Defendant's position). (Doc. 253 at 9.) But Plaintiffs are not solely looking at the fact that the grantors never

sold. They never bequeathed it to anyone or used it in any way whatsoever, nor objected when used by Plaintiffs and their predecessors. (*See* Doc. 244, §I.B.1.)

### 3. Unique features of Plaintiffs' property transactions confirm there was no intent to reserve the right of way for conveyances.

### a. For the Spencers, Rossis and Brockways, Connell (the plattor) did not retain the fee underlying the right of way.

The question is whether the Connell unrecorded plat intended to create lots that excluded the right of way simply because there is a metes and bounds description— *i.e.*, distances to specific boundaries to the edge of the right of way. Defendant accuses Plaintiffs of speculating that the purpose of the metes and bounds description is to satisfy county tax assessors. (Doc. 253 at 10.) It provides no response to the cases that prohibited tax foreclosures on unrecorded plats without metes and bounds descriptions. (*Id.*) It criticizes Broadus for giving his opinion on this point without "personal knowledge about the transaction." But "expert testimony need not be based on personal knowledge." *Okerlund v. United States,* 53 Fed. Cl. 342, 346 (2002) (citation omitted). This is especially true with historical events when the expert has personal knowledge of the relevant documents because he has personally reviewed them. *See Katzin v. United States,* 124 Fed. Cl. 122 (2015). Tellingly, however, Defendant provides no testimony to rebut his statement despite its attorney attesting that it has retained surveyors for this case. (Doc. 253-1 at 4).

Despite not having any rebuttal testimony, the Government pivots to the notion that the plats themselves provide the best evidence of intention. (Doc. 253 at 10 (quoting *Fry v. King Cnty.*, 275 P. 547, 548 (Wash. 1929).) In so doing, Defendant

ignores that when a plat is not clear as to property boundaries, "surrounding circumstances may be considered to determine [the dedicator's] intention." *Roeder Co. v. Burlington Northern, Inc.*, 714 P.2d 1170, 1173 (Wash. 1986)[6]. Here, the plat is not clear because the centerline presumption has been part of Washington property law since at least since 1914. *Bradley v. Spokane & Inland Empire R.R.*, 140 P. 688 (Wash. 1914), and it was not until the other *Roeder* decision in 1986, that anyone should be concerned that the placement of distances on the plat might mean the right of way was excluded from the 1927 plat. (*See* Exhibit 3-F.)

Defendant also argues that Connell could have been clearer if he intended to convey the right of way with the lots. (Doc. 253 at 11.) Of course, hindsight always provides a clearer view. Nevertheless, the plat like the deeds identifies the railroad right of way, and whether he intended to exclude from the grantees and keep for himself is not certain from the identification of the right of way in the plat and deeds. As in *Kershaw*, it may have been simply to notify grantees of the significant nature of the easements that existed on the property. 126 P.3d at 26 ("While the deed purports to except [both the road and the railroad right of way], it could just as reasonably be interpreted to reference them because of the significant nature of the easements present"). And that is exactly what the court concluded there. *Id.*

---

[6] There are two separate decisions by the Washington Supreme Court decided the same year with the same case name—*Roeder Co. v. Burlington Northern, Inc.,* 714 P.2d 1170 (Wash. Sup. Ct. 1986) and *Roeder Co. v. Burlington Northern, Inc.*, 716 P.2d 855. These are separate cases which the court describes as "companion case[s]." 714 P.2d at 1172 n.1.

As to Connell's probate inventory, the Government argues that the absence of the right of way is "of no consequence." (Doc. 253 at 11.) Plaintiffs have no dispute with the cases Defendant cites and the proposition they assert—that absence from a probate inventory does not mean the decedent did not own the absent item. But it does suggest that Connell and his heirs did not consider the right of way to be an asset he possessed if he in fact intended to keep it for himself. Defendant provides no evidence to dispute that Connell did not deed any part of the right of way to anyone other than the purchasers of his lots, provides no evidence that Connell ever made use of the right of way, and provides no evidence that he believed he still owned it, contrary to its noticeable absence from his will. Nor does Defendant explain how purchasers of the lots would obtain access to their lots from the public road if they did not own the land underlying the railroad's easement. "In Washington, courts will presume that plat dedicators intend to provide convenient access to all lots in the plat." *Friends of Viretta Park v. Miller*, 940 P.2d 286, 295 (Wash. Ct. App. 1997) (citations omitted).

As in *Kershaw*, this all suggests that Connell was not withholding the right of way when he sold the platted lots. And, certainly, the Plaintiffs and their predecessors treated these parcels as their own with no one saying they should not.

**b. The Schroeders' legal description uses metes and bounds that does not corresponds to the border of the right of way; this fact distinguishes their situation from that in *Roeder*.**

In response to Plaintiffs' argument that the Schroeder deed references a distance to the right of way which is just as close to the centerline as it is the western border

(*See* Doc. 244 at 18; Ex. 3:W and 3:V), Defendant argues that the monument will control over inconsistent distances. (Doc. 253 at 12.) Plaintiffs agree. That simply means that the monument, the railroad right of way, controls over the definite distances in the deed. But Defendant ignores the rule that when a monument is used, like a stream, road or railroad line, the adjacent owner takes to the center of the monument. *DD & L, Inc. v. Burgess,* 753 P.2d 561, 562 n.3 (Wash. Ct. App. 1988). This is true even where, as here, the deed is referencing the "margin" of the railroad right of way. Ex. 3-V. *State v. Superior Ct. for Cowlitz Cnty.,* 146 P. 609 (1915) (course and distance to "edge" of water body, which is a monument, actually extended to the center of the slough). The Schroeder deed is unlike *Roeder* where the metes and bounds matched the edge of the right of way.

## C. The evidence permits only one reasonable inference: in Palmberg parlance "shorelands" adjoined the easterly edge of the railroad right of way.

As to the Plaintiffs with so-called "shorelands" issues, Defendant argues "the undisputed facts before this Court show that the land underlying the ROW was never 'shorelands'" and that the "only basis for [Plaintiffs'] claim to land underlying the ROW is their assertion that the term was used in a manner contrary to its normal definition." (Doc. 253 at 13.) The argument sets up a strawman. Defendant concedes the language "shorelands" and "adjoining" is ambiguous. (Doc. 253, at 16-17 ("the term "adjoining" does create some ambiguity" in the documents related to the partition proceedings).) But Plaintiffs contend that while ambiguous, the language itself strongly suggests the very usage that Plaintiffs have described. (Doc.

244, §I.B.2.) Moreover, Plaintiffs' claim is supported by scores of documents and uncontroverted facts where the only reasonable inference is that "shorelands" was a moniker used by the heirs and their successors for all lands west of the easterly boundary of the railroad right of way. (*See* Doc. 244 at 19-31.)

1. **The parties agree that the heirs of Palmberg owned land underlying the right of way up to and at the time of the partition hearing.**

Defendant does not dispute that as of the partition proceeding in 1945, the heirs to Bertha Palmberg, who had inherited all relevant lands in Government Lots 1 and 2, owned the lands under the right of way at issue here. (*See* Doc. 253 at 15-16 ("As of 1945, at the outset of the partition proceeding, it is undisputed that the Palmberg heirs owned land underlying the ROW itself.")

2. **As an *in rem* action, the partition proceeding itself necessarily included the right of way because all parties treated the Complaint as including all lands extending to the shorelands in Government Lot 1 and including the shorelands in Government Lot 2.**

While Defendant argues that the heirs of Bertha Palmberg were not dividing up all of the property in her estate, the preponderance of the evidence demonstrates otherwise. The partition action in 1945 sought to dispose of what was originally Palmberg Sr.'s[7] lands. Either that partition action sought to and did dispose of *all* lands in the Palmberg estate, or just lands to the east of the county road in Government Lots 1 and 2, and the submerged shorelands in Lot 2, leaving the lands between the two—lands under the railroad easement (and the county road and

---

[7] Defendant coined the names "Palmberg Sr." and "Palmberg Jr." to distinguish the father and son. (Doc. 253 at 13.) The nicknames are technically inaccurate (they did not share the same middle name) but Plaintiffs will use them too.

uplands between the easement and lake)—in a suspended state, remaining jointly owned without any disposition by the parties or the partition court. This latter inference is unreasonable considering all the circumstances.

The siblings and half siblings were fighting over ownership and in particular were upset with Bert Stares for taking money that was supposed to pay for taxes. He failed to do so, which led to the tax foreclosure. (*See* Doc. 244, Ex.3-II at 5). The Complaint alleges that "[t]hat the parties are joint owners of the following described property …" (Doc. 244, Ex.3-GG), *i.e.*, the allegation is that this is all the property, not just some of the property, that the parties jointly own. The right of way was right in the middle of land that was being partitioned. No answer filed suggests there was a parcel of land the heirs intended to retain joint ownership of. (*See* Exhibits 18-27.) This leads to the only reasonable conclusion that the parties to the partition believed that the right of way was included.[8] And this conclusion is consistent with the fact that the description of the lands used metes and bounds to

---

[8] Defendant states that the Palmberg heirs did not dispute the legal descriptions. (Doc. 253 at 16.) Of course not. They thought the legal descriptions described all the property that was jointly owned. The Answer by Maud Palmberg and Gertie Gorman Hughes sheds light on this issue. It admits the parties owned Parcels A and C, but denies joint ownership of Parcel B (which was the parcel to the east of the railway easement). In so doing, it states "[t]hat the property involved in this proceeding *is the property owned by the parents of the parties*… That after the close of the estate these defendants and the other defendants, while the property was still intact, gave to the plaintiff the taxes to pay upon the said property, relying upon plaintiff to pay the same. That after some time these defendants discovered that the plaintiff had misappropriated the money and had not paid the taxes, and as a result of which these defendants lost their interest in Parcel B of the property mentioned in the complaint, and same was sold for taxes and the same has become a total loss to these defendants, as well as the money they advanced to pay the taxes." (Ex. 22 (emphasis added); *see also* Ex. 3II-5. The parties understood that the property included all the land owned by their parents.

demarcate all lands to the east of the easterly border of the right of way with the so called "shorelands" "*adjoining*" the property with that border.

Additionally, Plaintiffs' predecessor in interest in Government Lot 2, J.A. Earley, later bought the so-called partitioned "shorelands" for more than eight times the going rate for actual shorelands at the time. (Doc. 244, Ex.3 at¶57 & n.12; *or* Doc. 244, Exs.3-JJ, FF, VV.) And in Government Lot 1, the owner from that proceeding was deemed to own the uplands to the shorelands. (*See* Doc. 244, at 25-27.)

Finally, before that partition action (and after), the heirs, as noted by the State DNR, routinely employed a "peculiar" phrase for describing the upland tracts, and the only possible inference is that the "peculiar" phrase was the use of the phrase "second class shore lands" that *adjoined* the easterly border of the right of way:

> This application [by the Palmberg heirs to purchase the shorelands adjacent to their lands in Government Lot 2] ... *has been given considerable study owing to the peculiar descriptions which have been used in describing the upland tracts.* …[P]lats show the railway right of way and the county road right of way mentioned in the descriptions and also show that the line of high water is located outside of the west line of the Northern Pacific right of way, and also outside of the government meander line.

(Doc. 244, Ex. 3 at ¶52 (pp.29-30), *or* Doc. 244, Ex. 3-EEE (Aug. 3, 1928 Office of Commissioner of Public Lands Report of Engineer).)

The uncontroverted evidence taken in whole overwhelmingly shows there can be only one reasonable inference—that "shorelands" here, which were "adjoining" lands east of the right of way, actually meant and means all lands to the west of the easterly line of the railroad right of way, and thus included the right of way itself:

• 1914 King County Engineers' survey map: shows uplands present to west of railroad easement (Doc. 244, Ex. 3, ¶52 & Ex. 3-RRR), as later confirmed in a careful review in 1928 by the State. (Ex. 3-EEE.)

• 1919 Probate on Bertha Palmberg estate: the probate of the estate shows the Palmbergs using metes and bounds to describe, incorrectly, the railroad right of way as being in the lake—which would have meant the right of way was on the shorelands, which they were not. (*Id.*, Ex. 3 ¶51 & Ex.3-DD.) Thus, in the heirs' minds, "shorelands" included the right of way itself.

• 1928 State Office of Commissioner of Public Lands Report: in the process of carefully determining whether the heirs owned the uplands, the engineer noted the parties involved—i.e., the heirs and their representatives—had a "peculiar" way of describing the upland tracts. (Doc. 244, Ex. 3 ¶52 & Ex. 3-EEE-1.)

• 1930 King County map: shows uplands to the west of the right of way. (*Id.*, Ex. 3 ¶52 & Ex. 3-SSS.)

• 1940 Deed issued for actual shorelands in Government Lot 2: the heirs paid $395.00 for the shorelands in Government Lot 2. (*Id.*, Ex. 3 ¶56, n.11 & Ex.3-FF.)

• 1945 Partition complaint: Palmberg heir files suit to partition lands owned by the six heirs. (*Id.*, Ex.3-GG-2.)

• 1945 Partition proceeding: describes "shorelands" as land adjoining property which is described using metes and bounds to the *easterly border—i.e,* the far side—of the railroad easement. (*Id.*, Ex. 3-GG.)

• 1946 Bill of Particulars Title report: examined the same three parcels described in the Complaint, and concluded that the six heirs owned the "second class shorelands" which, again, used metes and bounds to describe these shorelands as "adjoining" the easterly edge of the railroad right of way. (*Id.*, Ex. 3-HH (Washington Title Insurance Company, November 19, 1946).)

• 1949 Partition Findings of Facts and Conclusions Lot 2: The court set forth the same language in the Title Report, wherein "shorelands" "adjoining" the easterly edge of the right of way were vested in the six heirs. The court ordered the sale of these "shorelands." (*Id.*, Ex. 3-II at 2, 7-8.)

• J.A. Earley "shorelands" purchase in Lot 2 in 1949: Earley paid $6,600, which would be a value of $421.25 per chain, if he had been, in fact, buying merely true shorelands. (*Id.*, Ex.3-JJ:6-7.) In comparison, the State sold the true "shorelands" to the heirs in 1940 for $395.00, or approximately $25 per chain (*Id.*, Ex.3-FF);

and in 1951 Gertie Hughes paid $50 per chain to the State for true shorelands. (*Id.*, Ex.3-VV.)

• Government Lot 1 owner was deemed by the State to own lands abutting the shorelands: Presumably still aware of the "peculiar" manner in which the uplands were described as "shorelands" by the Palmberg family, Gertie Hughes (predecessor to Hughes Estate Plaintiff) was deemed the abutting owner of the uplands to shorelands in Government Lot 1. Additionally, her deed from Simpson, like the deed Simpson received in the partition sale, did not use a metes and bounds description. (Ex-3-41; Ex. QQ and Ex. RR.)

• Rose Earley, widow of J.A. Earley, uses materially the same language from the partition court to deed title to the Plaintiffs and/or their predecessors in Lot 2: Rose Earley sold parts of Government Lot 2 wherein "shorelands" was described as "adjoining" the easterly edge of the railroad right of way. (*Id.*, Ex.3-MM (Hughes Plaintiffs' predecessor); Ex.13-O (Collins Plaintiffs' predecessor); Ex. 13-Y (Freedman Plaintiffs' predecessor); Ex.13-X (Barrett Plaintiff).)

• J.A. Earley's successors in interest: all successors in interest party to this action treated the lands west of the easterly edge of the railroad right of way as their own and no one ever came forward to suggest the contrary. (*Id.*, Exs. 11 (B. Nelson Decl.), 12 (Hughes Decl.), 14 (Collins Decl.), 15 (Barrett Decl.), 16 (Freedman Decl.).)

• 1982 King County Assessor catches the "shorelands" misnomer commonly used by others in this area: the King County Assessor noted the property description is "only as shore lands" but the "*westerly line of the tract ran a course that was probably once the easterly line of the right-of-way*" and *[j]udging from similar descriptions in the area*, our feeling was that *the shore line and the railroad right-of-way was assumed to be the same during the early years of property development* along the shore of the lake." (*Id.*, Ex. 3-PP (emphasis added).)

• Defendant has failed to provide any evidence of intent on behalf of the grantors, the heirs in the partition proceeding to reserve the railroad right of way.

In an effort to counter the overwhelming evidence, as to Government Lot 2, Defendant uses the J.A. Earley corrective deed to say that a different inference should be drawn. (Doc. 253 at 17.) Defendant is right that the corrective deed that was issued to Earley did not include the same "shorelands" nickname as in all the previous partition proceeding documents, title work, or related documents.

Plaintiffs have not located any historical documents to explain what was in Earley's mind at the time he sought that "correction" other than he believed the original deed was ambiguous. (Doc. 244, Ex. JJ.) Probably, he was of the same "peculiar" mindset as the heirs was noted by the State to have, which was they seemed to erroneously believe the "shorelands" reached all the way to the easterly edge of the railroad right of way, which first showed up in the Bertha Palmberg estate proceedings. However, notably, Earley paid *eight times as much* for the lands he purchased in that transaction as was paid by Gertie Hughes two years later for actual shorelands in Government Lot 1, and more than *sixteen times as much* as the Palmberg heirs paid for the actual shorelands in 1940 in Government Lot 2. The Court in *Brown v. State,* 924 P.2d 908, 912 (Wash. 1996), teaches it is appropriate to consider the amount of consideration paid in determining what was actually conveyed. It would be unreasonable to infer from these facts that Earley was purchasing the true shorelands alone at such a price.

Further, as detailed above, just a few years later, Earley's widow began selling off sections of waterfront parcels to Plaintiffs and their predecessors in interest, where the original "shorelands" nickname was used to denote all lands up to the easterly border of the right of way, thus the terms in the deeds were materially identical to that used in the partition proceeding. And this was later caught when the King County Assessors took a closer look at the properties in this area.

### 3. Later conveyances in Government Lot 1 confirm the right of way is owned by the Hughes Estate and the Nelsons.

The reference to shorelands as including any uplands and the right of way is equally applicable to Government Lot 1, but there are additional reasons, largely unaddressed by the Defendant, establishing that the Hughes Estate owns the right of way in Government Lot 1.

Defendant asserts that Government Lot 1 is like the property conveyed in Government Lot 2, namely that "the property that Mr. Simpson purchased described the property he received as being east of the "'northeasterly line of said right-of-way.'" (Doc. 253 at 20.) But there was no measured distance from Simpson's lot to the railroad right of way—nothing to rebut the presumption that Simpson received the fee underlying the right of way to at least the centerline.

As to the westerly side of the right of way, Defendant argues that when Gertie Hughes purchased the shorelands, she did not acquire the right of way for two reasons: First, Defendant argues it is not clear what information the Public Lands Commissioner was relying upon when the shoreland property was sold to Ms. Hughes. (*Id*. at 22.) Maybe so. But it is clear that the state was treating Simpson and Ms. Hughes as the adjoining upland owners and not treating the six Bertha Palmberg heirs as the owners, as would be the case if the right of way was somehow left out of the partition proceeding. (A fact which also supports Plaintiffs' analysis concerning Government Lot 2, given the absence of any evidence suggesting Lot 2 was treated differently from Lot 1 in the partition.)

Second, Defendant argues that Simpson described his property in his waiver of a preference rights in the same way as in the partition proceeding and his deed—i.e., described it as extending to the northeast line of the right of way. (Doc. 253 at 21-22.) Defendant asserts that it is unknown whether the Public Land Commissioner relied on something else (although there is no evidence of anything else) and the determination must be in error. (Doc. 253 at 22.) While it would be erroneous for the state to sell land it did not own, this sale evidences that the state, Simpson and Hughes—all of the parties involved—believed that Simpson, and then Hughes, was the adjacent upland owner, which meant the owner of the right of way. And as to whether Gertie Hughes conveyed the right of way to her son with her sale of the shorelands or any other sale, is immaterial. The Hughes Estate is the only heirs of the estate of Gertie Hughes. (*See* Second Declaration of Beth Nelson.)

Finally, the tax assessor confirms years ago what Plaintiffs are claiming—that the "shorelands" described in deeds actually extended to the eastern side of the railroad right of way, which means it includes all of the right of way. (*See* Ex. 3-PP.)

## II. If Not by Their Deeds, Plaintiffs Have Acquired Title to the Fee Underlying the Railroad Right of Way by Adverse Possession.

### A. Adverse possession of a railroad right of way is permissible in this context.

#### 1. Federal law does not preempt Plaintiffs' state law adverse possession claims under ICCTA and Defendant has failed to meet its burden.

Defendant is mistaken that STB "precedent unambiguously stand[s] for the proposition that state law adverse possession claims are preempted under ICCTA." (Doc. 253 at 23.) Adverse possession claims are preempted under ICCTA *if and only*

*if* such possession would interfere with the nation's rail network, and the burden is on Defendant to prove it. (*See* Doc. 244, at 33-35 and cases cited therein.)

Defendant states that Plaintiffs "ignore the holding of *Jie Ao* [*and Xin Zhou—Petition for Declaratory Order*, FD 34439, 2012 WL 2047726 (STB served June 6, 2012).]" (Doc 253 at 24.) But Plaintiffs addressed the decision in their brief in conjunction with *B & S Holdings, LLC v. BNSF Railway Co.*, 889 F. Supp. 2d 1252 (E.D. Wash. 2012), in which the district court adopted the *Jie Ao* reasoning of the STB. (Doc. 244 at 33). The circumstances in *Jie Ao* are so clearly inapplicable here, like those of Defendant's other cases,[9] that it warranted little discussion. But Plaintiffs reply briefly to Defendant's new *Jie Ao* arguments.

First, Defendant misuses *Jie Ao* by arguing as if the facts therein began and ended with "adverse possession of a 'strip of rail-banked ROW that is within the national rail network system and has not been abandoned.'" (Doc. 253 at) In *Jie Ao*, the STB was plainly focused on whether (1) there was *sufficient evidence* before it to (2) substantiate the allegation that permitting the operation of state law to result in the adverse possession of fee title to railroad strips *would sever those strips from the nation's rail network. See* 2012 WL 2047726 at *1, *3.

---

[9] Defendant cites two new "adverse possession" cases (Doc. 253 at 25) but they are equally inapt as Defendant's previous cases because they again deal with proven threats of interference with railroad operations—such proof is absent here. *See Wedemeyer v. CSX Transp., Inc.*, No.13-00440, 2015 WL 6440295, at * 5 (S.D. Ind. Oct. 20, 2015) ("there is no material question of fact that [the operation of state law] would have the effect of preventing or unreasonably interfering with railroad transportation") (citation and internal quotation omitted); *see also 14500 Ltd. v. CSX Transp., Inc.*, No. 12-1810, 2013 WL 1088409, at *4 (N.D. Ohio Mar. 14, 2013) ("the evidence presented demonstrates that the taking of Defendant's property would affect railroad transportation in the future.").

Second, Defendant's analysis concerning the two-part holding in *Jie Ao*, "distinguish[ing] fee title through adverse possession of a railway corridor from a prescriptive easement" (Doc. 253 at 24), is upside down. The different treatment of the two claims in *Jie Ao* demonstrates that the operation of state law to permit the continued use of the right of way in the absence of proof of interference with railroad operations, is not preempted; only rights which would wrest exclusive control away from the STB are. Here, Plaintiffs' adverse possession claims seek title which have been and always will be subject to the railbanking and to STB's power to return the right of way to railroad operations.

Third, Defendant characterizes Plaintiffs' statements concerning lack of interference with railroad operations as "conclusory." (Doc. 253 at 23.) But the burden rests on Defendant to prove that preemption is warranted, and not on Plaintiffs to prove it is not. *Reece v. Good Samaritan Hosp.*, 953 P.2d 117, 120 (Wash. App. Ct. 1998) ("party claiming federal preemption *bears a heavy burden of" proof*.) (internal quotation and citation omitted; emphasis added).[10] Defendant has failed to meet its burden.

Further, Plaintiffs and their predecessors have occupied the right of way thirty years or longer, and that occupation has not interfered with railroad operations (regardless of whether they owned it by title or not), as is apparent from their

---

[10] *See also Franks Investment Co. v. Union Pac. R.R. Co.*, 593 F.3d 404 (5th Cir. 2010) (providing extensive analysis of preemption of state law under the ICCTA); *and id.* at 413 (quoting from brief filed therein by the STB: "state law actions 'may be preempted as applied—that is, *only if* they would have the effect of unreasonably burdening or interfering with rail transportation, *which involves a fact-bound case-specific determination.*'") (emphasis added).

declarations describing their use and occupation as well as from the lack of any evidence or allegations to the contrary. Moreover, any Plaintiffs who own property in this case are entitled to compensation for the very reason that they are prevented from the exclusive use of their property and are prevented from interfering with continued federal control over their property despite the change in use of the right of way. *E.g.*, *Preseault v. I.C.C.*, 494 U.S. 1, 22 (1990) (O'Connor, J., concurring) (railbanking "burdens and defeats the property interest rather than suspends or defers the vesting of those property rights.").

## 2. State law permits Plaintiffs' adverse possession claims.

Following are Plaintiffs' responses to Defendant's arguments (Doc. 253 at 25-29) on each of the four points raised in Plaintiffs' opening brief (Doc. 244 at 36-42), distinguishing *Kiely v. Graves*, 271 P.3d 226, 230-31 (Wash. 2012).

### a. Railroad right of ways are different from public streets.

First, Defendant argues that "a fee owner does not have a greater present possessory interest in a railroad easement than in a public street." (Doc. 253 at 5.) This is clearly wrong, as shown by the decision in *Veach v. Culp*, in which the court expressly rejected a materially identical argument—namely, it rejected the argument that a "railroad right-of-way, whether in fee or an easement, is entitled to exclusive possession," and permitted any uses which would not interfere with railroad operations. 599 P.2d 526, 528 (Wash.1979). This is in contrast to the facts and analysis in *Kiely*, which dealt with enforcing RCW 7.28.090: "[b]ecause it is not

permissible to encroach upon a public easement, it is not permissible to adversely possess the underlying fee interest." *Kiely*, 271 P.3d at 234 (*See* Doc. 244 at 37-38).

Defendant also relies on selective quotations from *Hanson Indus., Inc. v. County of Spokane*, 58 P.3d 910 (Wash. Ct. App. 2002) and *Kershaw v. Sunnyside Ranches Inc. v. Yakima Interurban Lines Ass'n,* 126 P.3d 16 (Wash. 2000), for its exclusive use argument (Doc. 253 at 26), but the analyses in both cases do not overcome the ruling in *Veach*, 599 P.2d at 528 (railroad right of way is not in the exclusive possession of the railroad company). In *Hanson*, the court was construing a railroad deed to determine if it conveyed an easement or fee title, and Defendant's quotation came from the court rejecting the argument that the reservation of crossing rights implied conveyance of a fee. *Hanson Indus.*, 58 P.3d at 917. And in *Kershaw*, the quotation came from the court's examination of whether underground cables in the right of way were a trespass on the servient estate owner's lands or were permitted under the incidental use doctrine (which allows railroads to use easements for any incidental activities that do not interfere with railroad operations). 126 P.3d at 26-27. Accordingly, in neither *Hanson* nor *Kershaw* were the courts addressing the issue of exclusive use in the context presented here, as was done directly in *Veach*.

Finally, in this first point, Defendant fails to distinguish *Veach* and instead argues that the "use is not sufficiently hostile to establish adverse possession." (Doc. 253 at 26; *see also id.* at 27.) To be clear, this argument goes to the merits of adverse possession rather than to whether Washington state law permits adverse possession of fee title subject to a railway easement. But the argument is conclusory. To the

extent Defendant is under the impression that occupation and use of the right of way must necessarily fail to meet the hostile element of adverse possession in order to avoid ICCTA preemption issues, it is mistaken. The adverse use Plaintiffs described, such as planting and maintaining gardens, placing picnic tables, installing retaining walls, and so on, are all consistent with a hostile claim of owning the underlying fee (*see* Doc. 244 at § II.C), and none of those uses would "unreasonably burden[] or interfer[e] with rail transportation." *See Franks Investment Co.*, 593 F.3d at 413 (quoting STB brief). While the railroad had no reason to be alarmed, anyone who believed they owned land subject only to railroad use should have been aware of a hostile claim by the open and notorious occupation and uses that were manifestly not railroad related.

Defendant notes that railroads "enjoy a substantial right regardless of the nature of its title." (Doc. 253 at 26.) True. It includes the right to traverse land carrying millions of tons of freight at multiple speeds and with multiple train cars. It is far more substantial than a residential driveway. That does not mean that its rights are exclusive to a point where the servient owner is immune from adverse possession claims. *Cf. Veach*, 599 P.2d at 528 (rejecting *dicta* and citing precedent).

### b. Wash. Rev. Code §7.28.090 does not prohibit adverse possession claims against a railroad easement.

Second, Defendant contends that *Kiely* "is not limited to land owned by the government" because Wash. Rev. Code § 7.28.090 bars, *inter alia*, "lands held for any *public purpose*." (Doc. 253 at 27, quoting and adding emphasis to the statute) But Defendant ignores the fact that the court in *Kiely* explained that in Wash. Rev.

Code § 7.28.090, "legislature must have intended th[at] clause to refer to land held by the government." 271 P.3d at 232; (*see also* Doc. 244 at 39.)

And the statement in *Lawson v. State*, 730 P.2d 1308, 1311 (Wash. 1986), that "[a] railroad is a public highway, created for public purposes" (Doc. 253 at 27), fails to control on the merits. In *Lawson*, the issue was the constitutionality of a state statute authorizing a change in the use of a railroad right of way to a public non-railroad use without compensation to holders of reversionary interests in the right of way. The court agreed a railroad right of way has occasionally been described as a "public highway," but concluded that label did not put it on the same stature as publicly-owned highway. *Id*. Unlike typical public highways, a railroad right of way is not a perpetual public easement.

Regardless of whether a railroad easement has been described as a public highway, it is held by a private party in something less than fee simple, not "held by the government." *Kiely,* 271 P.3d at 232. And while Wash. Rev. Code § 7.28.090 was enacted in the 1880s, not a single case has applied it to privately-owned railroad rights of way. In fact, the Washington Supreme Court allows adverse possession against a railroad. *See Netherlands Am. Mortg. v. E. Ry. & Lumber Co.*, 252 P. 916, 917 (Wash. 1927); *Northern Pac. Ry. Co. v. Ely,* 65 P. 555 (Wash. 1901).[11] And, while not specifically addressing Wash. Rev. Code § 7.28.090, the court in *Ely* rejected the notion that railroad property should be exempt from adverse possession because it

_____

[11] *Ely* was overruled by the United States Supreme Court on the grounds that adverse possession would not lie because of a federal statute validating only certain Northern Pacific Railroad grants from the federal government. 197 U.S. 1 (1905). None of these Plaintiffs' properties involve federal grants to the Northern Pacific.

is a "public highway." *Id.* at 558 ("A railroad is not a public highway in the sense that it belongs to the people.") (internal quotation and citation omitted).

Accordingly, Wash. Rev. Code § 7.28.090 simply does not apply to this case.

### c. Any owner of the fee underlying the railroad right of way has present possessory rights.

Third, Defendant argues that Washington law departs from common law and that the owner of a fee burdened with a railroad easement does not have a present possessory interest. To be sure, Defendant correctly quotes from Washington cases which occasionally coin fee title underlying easements as "reversionary interests." (Doc. 253 at 28). But, as is evident from a reading of Defendant's cases, the "reversionary interests" phrase is a common, shorthand way of referring to the fact that once the easement is abandoned, the servient estate is freed of its former burden. *See Brown v. State*, 924 P.2d 908 (Wash. 1996); *Lawson*, 730 P.2d at 1315; *King City v. Squire Inv. Co.*, 801 P.2d 1022 (Wash. Ct. App. 1990). It is not true, however, that any of these cases intended to depart from common law rules on property interests, such that the owner of a fee underlying a railroad easement has no present right to use the land. This is exemplified in *Veach*—the owners of the underlying fee have a present right to the use their properties which are subject to a railroad easement, which would not be permitted if they held purely reversionary interests that arise only upon a reverter. *See* 599 P.2d at 528 (stating the "well established" rule that "the servient owner retains the use of an easement so long as that use does not materially interfere with the use by the holder of the easement.").

### d. There are real distinctions between the overlying easement and the underlying fee.

Fourth, Defendant argues that, "as in *Kiely*, here 'there is no practical distinction between the overlying easement and underlying fee.'" (Doc. 253 at 28 (quoting *Kiely*, 271 P.3d at 234)). The argument is somewhat convoluted but appears to be revisiting the arguments it made as to the second point, namely that any encroachments would, "by definition[,] interfere with the actual and potential use of the easement" and therefore interfere with the railroad's "actual and potential use." (*Id.* at 28-29.) But the argument fails to squarely address the analysis set out by Plaintiffs on this fourth point (*see* Pls.' Br. at 41-42), and fails to grapple with the holding in *Veach* permitting landowners to use and occupy their lands subject to railroad easements so long as it doesn't interfere with ongoing or future railroad use. In light of *Veach*, *Kiely* simply cannot extend to the analysis here.

### B. Plaintiffs have met the requirements for proving title by adverse possession.

Defendant provides little in response to the merits of Plaintiffs' adverse possession motion other than to request unlimited time to undertake discovery. *See* §III, below. Plaintiffs respond briefly to the abbreviated arguments it did make.

Defendant argues that the private use of the right of way was "not sufficiently hostile to establish adverse possession." (Doc. 253 at 26.) But Defendant confuses to whom the adverse possession applies. Plaintiffs' uses was hostile to the underlying landowner, not the railroad. *See also* §II.A.2.a, above. For instance, if Connell (the

original grantor in some of the southern properties at issue) or his heirs had still owned the right of way adjacent to Plaintiffs' homes, their types of uses—regular in frequency and physically obvious to any passerby—are the kinds of uses the owner of the land would make. Anyone else claiming ownership of the fee should have realized that a basketball court, treehouse or children's play yard was not a use by the railroad exercising its easements rights. The same is true for all these Plaintiffs.

Defendant argues that adverse possession needed to have been accomplished in a ten year period before the date of taking, September 18, 1998. (Doc. 253 at 31.) Plaintiffs agree. But then it asserts that "[by] their own admission, many of the alleged uses occurred well after 1988, which, at best, would create a genuine issue of material fact in Plaintiffs' cross-motion." (*Id.*) Of course, many of the uses occurred "after 1988," but up until September 18, 1998, any uses are relevant. Moreover, the assertion that some uses occurred before 1988 and some after does not in itself create any genuine issue of material fact as Defendant argues. Evidence may have the potential to create issues of fact but Defendant provides none whatsoever.[12] Defendant asserts "[w]hether any of these uses have been interrupted for any length of time still remains an open factual question." (Doc. 253 at 32.) There is no open factual question because there is no evidence of interruption.

Defendant also claims that the uses by Plaintiffs might merely be neighborly accommodations and insufficiently hostile. (Doc. 253 at 32 (*citing Crites v. Koch*, 741

---

[12] Defendant asserts that declarations, like that of Doug McCallum (Doc. 244 Ex.8), do not specify the time frames of use. To the contrary, he describes the uses as extending all the way back to the early 1970s. *Id.*

P.2d 1005, 1009 (Wash. Ct. App. 1987).) In *Crites*, farmers turning tractors around on neighboring property was a common neighborly accommodation in that area and thus was not hostile use. *Id*. Defendant provides no evidence of common neighborly accommodations in Plaintiffs' neighborhood to allow others to pave over their land and construct basketball courts or install gated fences.

Defendant also argues that "it is unclear, for example, whether a boulder and blackberry bushes require any maintenance at all." (Doc. 253 at 32.) But erecting an improvement, like placement of boulders in the case of Spencer (Doc. 244 Ex.5 at 2), or significantly recontouring the ground by filling in a 20 foot gully in the case of the Schroeders (Doc. 244 Ex.9 at 2), shows they have possessed the right of way and treated it as if it were their own.

## III. Plaintiffs Do Not Oppose Defendant's Request for a Delay Pursuant to RCFC 56(d), But Request the Scope and Time for Discovery not be Open-Ended.

Defendant argues that summary judgment on the question of Plaintiffs' ownership of the disputed parcels based on historical adverse possession of these parcels should be denied in order to conduct additional discovery pursuant to RCFC 56(d). (*See* Doc. 253, at §III.A.) Plaintiffs do not oppose Defendant's request for more time to conduct discovery, but request the Court defer considering Plaintiffs' motion rather than denying it. As explained below, Plaintiffs also request that the delay to allow time for this discovery be limited to two months or less and that the scope of discovery be limited to the threshold question of whether these properties were historically adversely possessed.

## A. Requisite elements entitling a party reprieve from a summary judgment determination in order to conduct additional discovery.[13]

A party is only entitled to relief under RCFC 56(d) if it has met a five-part set of prerequisites as set forth in *Theisen Vending Co. v. United States*, 58 Fed. Cl. 194, 198 (2003) (collecting authority for requisite elements to be met under RCFC 56(d)).

### 1. The first requirement: specify the particular factual discovery being sought.

It is unclear whether the Roberts Declaration satisfies the first requisite. The Declaration merely asserts that discovery is needed on each of the elements of adverse possession and on the specific location of any adverse use. (Doc. 253-1, at 5-6.) At the end, the declaration lists the various types of discovery offered by the rules (Doc. 253-1, at 7) which does not provide the specificity to which the test from *Theisen Vending* was referring. There is no indication of who Defendant seeks to depose, what additional documents it needs or the nature of the interrogatories it needs to ask, thus it lacks the specificity needed for the Court to weigh the bona fides of the request or the likelihood that a factual dispute will surface.[14]

### 2. The second requirement: explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact.

Arguably, the second requirement is not met. There is no explanation in the Roberts Declaration how any of the unspecified discovery is likely to create a genuine issue of material fact for which a trial would be necessary. *E.g.*, *Jackson v.*

---

[13] A review of the requisite elements is useful when considering the appropriate scope and breadth of any further discovery.

[14] Defendant does dedicate three pages in its brief to this first element (Doc. 253, at 31-34); if a party's brief may be substituted for a declaration under 56(d), this element might be satisfied.

*United States*, 122 Fed. Cl. 376, 380 (2015). Instead, the Declaration provides only a vague connection between additional information and the ability of "the United States to develop and present evidence that responds to Plaintiffs' adverse possession claims." (*See* Doc. 253-1 at ¶¶14,16.)

### 3. The third requirement: provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue.

The third requirement appears likewise unsatisfied. In the Roberts Declaration there appears to be no factual predicate for any belief that there is a genuine issue as to, for instance, whether the Rossi Plaintiffs built their basketball court and garden when they did in the early 1980s and used it regularly ever since, or whether any of the other Plaintiffs' testimony concerning acquisition of title by adverse possession is false. Accordingly, Defendant is effectively speculating at this point that it might discover evidence to counter one or more of Plaintiff's claims. If so, Defendant's request for more discovery might be viewed somewhat as a "fishing expedition" in hopes of finding some evidence to counter Plaintiffs'. *See Theisen Vending*, 58 Fed. Cl. at 198 (citation omitted) *see also id.* ("a litigant's speculative hope of finding some evidence" is insufficient) (citation omitted).

In addition, Defendant seems largely focused on the footprint of the adverse possession, namely on whether the full width was possessed or just a portion of it. (*See, inter alia,* Doc. 253; Roberts Decl., Doc. 253-1, at 3 (attesting more discovery is needed to determine "the specific areas of the right-of-way allegedly used by plaintiffs or their predecessors in interest"); *see also* Doc. 253, at 33-34.) That

question—how much was used—goes to the question of damages and not to the question of whether the Plaintiffs owned property on the date of the taking. And as to the footprint of the taking, there ultimately may be no genuine issue of fact warranting trial if the facts speak for themselves.

### 4. The fourth requirement: recite the efforts previously made to obtain those facts.

Defendant overlooked this requirement. Defendant has undertaken no discovery since the Plaintiffs' motion was filed on February 2, 2018.

### 5. The fifth requirement: show good grounds for the failure to have discovered the essential facts sooner.

Defendant's grounds for failing to discover facts that it claims are essential is that it did not realize it needed to.[15] Plaintiffs therefore note that it is not the case here that "the nonmoving party has not had the opportunity to discover information that is essential to his opposition" (Doc. 253 at 30 *citing Anderson*, 477 U.S. 242 at 250 n.5.) In fairness, however, Defendant assumed that the briefing would be limited to the merits of the legal issues and it did have grounds for that belief. Initially, that was Plaintiffs' plan, too. But Plaintiffs changed their minds for three reasons: (1) they wished to avoid further delays and have the threshold issue of

---

[15] In support of its contention that it did not realize it needed to conduct discovery, the Roberts Declaration refers to a conference call with the Court where she recalled "the Court discouraged the parties from including issues in summary judgment briefing that would warrant further factual development through discovery." (Doc. 253-1 ¶10.) Plaintiffs' counsel had a different recollection—that the Court encouraged the parties to continue with discovery, but discouraged the parties from filing motions for summary judgment that were not really suited for resolution by summary judgment motions. Plaintiffs are still of the view that there is and will be no genuine issue of material fact necessitating trial.

whether the Plaintiffs had a legally cognizable interest in the property in 1998, *e.g.*, *Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90, 94 (1991), resolved in one proceeding; (2) they believed discovery for this issue should be fairly straightforward and that the matter could be resolved through summary judgment, and (3) they did not want to open the door to another claim that the Court could not resolve legal questions concerning adverse possession because it would merely be advisory.[16] After all, the Plaintiffs were filing a cross-motion, not merely opposing Defendant's motion, and assumed Defendant could always initiate discovery upon receipt of Plaintiffs' motion, filed February 2.

**B. If the Court grants Defendant's request, Plaintiffs request the Court enter a ruling limiting the scope of and time for discovery, and that Defendant be required to respond to Plaintiffs' cross-motion within one month after the end of that discovery period.**

While Plaintiffs do not oppose a delay in ruling on Plaintiffs' cross-motion for summary judgment on the issue of whether Plaintiffs have a cognizable ownership interest via adverse possession, they request that (1) discovery be limited in scope to facts that go to that question, (2) the delay for discovery be limited to three months, (3) the Defendant be required to respond to Plaintiffs' cross motion within that three month period, and, (4) contemporaneously with that filing, or on a schedule

---

[16] In its opposition to the Court ruling on its jurisdiction over a takings claim predicated on ownership via historical adverse possession, the Defendant argued the Court lacked jurisdiction because Plaintiffs had not "pled any facts that would allow defendants or the Court to ascertain whether they have even asserted a valid adverse possession claim." (*See* Doc. 205 at 1.) Plaintiffs did not want to leave that argument open to Defendant  again.

set by the Court, the parties jointly file a set of undisputed facts relating to the question of adverse possession.

Plaintiffs request a limit on the scope of discovery during this period because a large part of Defendant's focus is on matters that reach beyond the threshold question of whether Plaintiffs have a legally cognizable property interest. Defendant argues it needs more "essential" information in order to nail down the specific square footage and specific location within the right of way of the property possessed, including the commissioning of a surveyor. *See*, §III.A.3, *supra*. If this were a quiet title action, Plaintiffs agree discovery about such matters would be essential. But here, where the briefing is to be on the threshold question of whether Plaintiffs had any legally cognizable interest in the property in 1998, the parties and Court need not struggle with creating specific metes and bounds descriptions or identifying the square footage at issue. Rather, the question will be whether or not the land was adversely possessed by September 1998, and the diagrams provided by each of the Plaintiffs, attesting to the footprint of the occupation of the lands subject to the easement, may offer the beginning and ending to resolve that question for purposes of the pending motion. *See* Pls.' Ex. 28 (all of Plaintiffs' diagrams of occupation consolidated).

Plaintiffs do not expect that a dispute will materialize on the question of whether at least some part of the right of way had been occupied for at least ten years by September, 1998. Defendant should be able to satisfy itself on that question through depositions or more written discovery. And if the Court rules in

favor of Plaintiffs on the question of ownership, then highly likely the question of square footage (i.e., damages) could be dealt with informally between the parties.

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court grant their cross-motion for partial summary judgment as follows: For those Plaintiffs whose properties abut the subject railway easements which Defendant contends have so-called *Roeder* issues—Plaintiffs do *not* have any *Roeder* "issue" because the evidence shows the presumption that the grantor did not retain the railroad strip has not been rebutted—Plaintiffs request the Court rule that Plaintiffs own the land at least to the center-line of the right of way if not to the abutting county road.

For those Plaintiffs whose predecessor in interest was Palmberg, Sr., and who have title to so-called "shorelands," Plaintiffs request the Court rule that through their title to their properties, they acquired ownership in the full width of the lands subject to the railway easement that abut and burden their properties consistent with the treatment of their ownership by all parties for the last several decades.

In the alternative, if the Court denies Plaintiffs the relief they seek in either of these two groups, Plaintiffs request the Court grant their motion for partial summary judgment, and deny Defendants' motion, on the grounds that, (1) the ICCTA does not preempt state law absent proof of interference with present or future railroad operations, which Defendant has failed to submit, and (2) state law permits adverse possession of servient lands subject to railroad easements. Plaintiffs also contend they have submitted evidence sufficient to establish title by

adverse possession entitling them to partial summary judgment that they have a property interest in the right of way.

But if the Court grants Defendant the relief it seeks under §III of its brief—which Plaintiffs are not completely opposing, Plaintiffs request the Court merely defer judgment on the merits of Plaintiffs' adverse possession claim of ownership, rather than denying it, and propose the Court permit three months for additional discovery, and order Defendant file its opposition to the summary judgment motion within that three month period. Additionally, so that the Court can determine whether the dispute is amenable to being resolved through summary judgment proceedings, the Court could order the parties to file joint undisputed facts. Plaintiffs request that this proposed schedule be ordered by the Court in such a manner that the parties can simply supplement the briefing currently before the Court within three months of setting the schedule. An open-ended delay is not appropriate for speedy resolution of these cases.

Respectfully submitted this 9th day of May, 2018.

ACKERSON KAUFFMAN FEX, PC
s/
Cecilia Fex
Ackerson Kauffman Fex, P.C.
1300 Pennsylvania Ave. NW, Suite 700
Washington, D. C. 20004
Phone: (202) 594-6825
Fax: (202) 789-7349
e-mail: fex@ackersonlaw.com
*Attorney of Record for the following consolidated Plaintiffs:*
*Brown, et al.; Collins, et al.;*
*Estate of Pearl Welch, et al.;*
*Waverly Hills Club, et al.*

STEPHENS & KLINGE LLP
s/
Richard M. Stephens
Stephens & Klinge LLP
10900 NE 8th Street, Suite 1325
Bellevue, WA 98004
Phone: (425) 453-6206
e-mail: stephens@sklegal.pro
*Attorney of Record for the following Consolidated Plaintiffs:*
*Beres; Ritzen, et al.; Morel, et al.;*
*Klein.; Chamberlin, et al.; Nelson, et al.;*
*Lane; Peterson, et al.; Schroeder,; Manning, et al.; and Spencer, et al.*