# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WARREN BERES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 03-785L, 04-1456L, 04- |
| v. | ) | 1457L, 04-1458L, 04-1459L, 04- |
| | ) | 1463L, 04-1465L, 04-1466L, 04- |
| UNITED STATES, | ) | 1467L, 04-1468L, 04-1469L, 04- |
| | ) | 1471L, 04-1472L, 04-1473L, 04- |
| Defendant. | ) | 1474L |
| | ) | |
| | ) | The Honorable Marian Blank Horn |
| | ) | |

---

### Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment

---

ACKERSON KAUFFMAN FEX, PC
Cecilia Fex
Ackerson Kauffman Fex, P.C.
1300 Pennsylvania Ave. NW, Suite 700
Washington, D. C. 20004
Phone: (202) 594-6825
Fax: (202) 789-7349
e-mail: fex@ackersonlaw.com
*Attorney of Record for the following
consolidated Plaintiffs:
Brown, et al.; Collins, et al.;
Estate of Pearl Welch, et al.;
Waverly Hills Club, et al.*

STEPHENS & KLINGE LLP
Richard M. Stephens
Stephens & Klinge LLP
10900 NE 8th Street, Suite 1325
Bellevue, WA 98004
Phone: (425) 453-6206
e-mail: stephens@sklegal.pro
*Attorney of Record for the
following consolidated Plaintiffs:
Beres; Ritzen, et al.; Morel, et al.;
Klein; Chamberlin, et al.; Nelson,
et al.; Lane; Peterson, et al.;
Schroeder; Manning, et al.; and
Spencer, et al.*

**Originally filed February 2, 2018
Refiled September 13, 2018**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

STANDARD FOR SUMMARY JUDGMENT ........................................................................3

STATEMENT OF FACTS .....................................................................................................4

    I.   Parcels with the *Roeder* Issue ....................................................................................5

    II.  Parcels with the Shorelands Issue ..............................................................................6

ARGUMENT .........................................................................................................................8

    I.   Plaintiffs' Ownership of the Right of Way Derives from the Titles to Their Properties Which Abut the Right of Way....................................................................................................8

      A.  Recent Washington Supreme Court decisions on potential reservations of rights of way and long-standing principles of deed construction support partial summary judgment for the Plaintiffs. ...............................................................................................9

        1.  When construing deeds, courts consider any evidence presented, regardless of whether the deed is ambiguous or clear....................................................................................9

        2.  Subsequent actions taken by original grantors and successors in interest are relevant to the inquiry of intent..........................................................................................10

        3.  Roeder confirms that determining whether a conveyance includes the fee underlying a right of way depends on intent of the parties. .............................................................11

      B.  The deeds themselves or the circumstances in which they were conveyed establish Plaintiffs' predecessors in interest had no intention of retaining the right of way when conveying the adjoining lands....................................................................................13

        1.  All Plaintiffs with the so-called Roeder issue submit evidence establishing they, not others, own the right of way, and some Plaintiffs have deeds materially different from the metes and bounds in Roeder...................................................................................13

          a.  The Spencer, Rossi, and Brockway Plaintiffs. .......................................................13

          b.  The Schroeder Plaintiffs. ........................................................................................17

          c.  The Matrinez Plaintiff ............................................................................................18

         2.  The "second class shorelands" grant in the Plaintiffs' deeds conveyed both uplands and the servient estate to the right-of-way easement...................................................................19

          a.  As of 1944, the Palmberg heirs, Plaintiffs' predecessors, owned (1) the uplands in Government Lot 1, including the fee underlying the right of way, and (2) both the uplands and shorelands in Government Lot 2, including the fee underlying the right of way. .......................................................................................................................20

          b.  In 1945, the Palmberg property was the subject of a partition action which used the phrase "second class shorelands" to mean all lands from the lake to the east border of the railway, thus including the right of way itself. ............................................22

    c.   The partition action resulted in the sale of the "second class shorelands" to Plaintiffs' predecessors in title, in which sale the shorelands continued to be treated as including all lands to the eastern edge of, and therefore including, the right of way...................24

    d.   The subsequent history of these properties shows the Shoreland Plaintiffs received and retained, through their titles, fee interest in lands nicknamed "second class shorelands"—i.e., the shorelands, uplands, and right of way...........................................25

       (i)   The Hugheses received and retained all lands in the partition action in Government Lot 1 except for the part later deeded east of the right of way..................................25

      (ii)  The rest of the Plaintiffs, in Government Lot 2, trace their ownership of the right of way back to Earley, who purchased the "second class shorelands" – i.e., the shorelands, uplands, and right of way – in the partition action. ................................28

     (iii) Additional evidence confirms title in the right of way had transferred to Plaintiffs' predecessors and to Plaintiffs themselves.......................................................29

II.  If Their Title Failed to Convey the Fee Interests Underlying the Right of Way, then Plaintiffs or Their Predecessors Adversely Possessed the Fee Title Subject to the Railroad Easements Before September 18, 1998...........................................................................................31

  A.  The ICCTA does not preempt adverse possession of the underlying fee title to property that is burdened by a railroad easement if the adverse possession has no impact on and does not interfere with railroad operations or the STB's regulatory authority over the corridor at issue. ......................................................................................................32

  B.  Plaintiffs' claims that they own the land underlying the railroad right-of-way easement is not barred by Washington law concerning adverse possession claims against a municipality. .....35

  C.  Plaintiffs obtained fee title underlying the easement pursuant to adverse possession if they did not acquire the property pursuant to their deeds. ..........................................................42

    1.  Washington State law on adverse possession ...............................................................42

      a.  Element one: open and notorious use...................................................................43

      b.  Element two: actual and uninterrupted possession ...........................................45

      c.  Element three: exclusivity of use .......................................................................46

      d.  Element four: hostile use....................................................................................47

      e.  Statute of limitations to challenge adverse possession ....................................48

      f.  Scope of the adverse possession .......................................................................48

    2.  Plaintiffs' evidence shows that under Washington State law they (or their predecessors) satisfied the elements of adverse possession to the subject properties on or before September 18, 1998.....................................................................................................49

      a.  Donna Marie Raab Matrinez..............................................................................49

      b.  Clifford and Kathy Schroeder............................................................................50

      c.  John and Carolyn Rossi.......................................................................................51

      d.  Raymond and Lael Spencer.................................................................................51

e.  Reid and Susan Brockway................................................................................53

f.  Robert and Beth Nelson and the Hughes Estate...............................................53

g.  Vannessa and Mike Collins.............................................................................54

h.  Don Barrett......................................................................................................56

i.  Judith and Howard Freedman..........................................................................57

CONCLUSION.................................................................................................................59

**TABLE OF EXHIBITS**

| Ex. No. | Att'mt No. | Description | Claimant(s) or Issue | Date |
|---|---|---|---|---|
| 1 | | Table of Plaintiffs | | |
| 2 | | Maps and Visual Illustrations | | |
| 3 | | Declaration of Charles A. Klinge in Support of Plaintiffs' Opposition and Cross Motion Re: Chain of Title | | |
| | A | Fidelity Title Report | Spencer | 12/29/2017 |
| | B | Fidelity Title Report | Rossi | 12/28/2017 |
| | C | Fidelity Title Report | Brockway | 12/28/2017 |
| | D | Deed: Zacuse to Cook | Spencer Group | 1/27/1919 |
| | E | Deed: Cook to Anderson | Spencer Group | 12/29/1919 |
| | F | Connell's Plat Map ver. 1 | Spencer Group | March, 1927 |
| | G | Connell's Plat Map ver. 2 | Spencer Group | March, 1927 |
| | H | Deed: McCarty to Spencer | Spencer | 8/17/1992 |
| | I | Deed: Dargitzes to Rossi | Rossi | 7/20/1983 |
| | J | Deed: Hennings to Brockway | Brockway | 3/26/1973 |
| | K | Deed: Ebright to Kuhnert | Raab | 11/9/1934 |
| | L | Deed: Kuhnert to Jennings | Raab | 6/23/1936 |
| | M | Deed: Jennings to Peterman | Raab | 4/29/1943 |
| | N | Deed: Peterman to Sprague | Raab | 2/27/1947 |
| | O | Survey by Orland L. Anderson | Raab | 1/19/1967 |
| | P | Deeds: Raab to Donna Raab | Raab | 12/22/1992 |
| | Q | Deed: Tallentire to King County | Schroeder | 4/8/1908 |
| | R | Deed: Tallentire to Johnson | Schroeder | 2/5/1909 |
| | S | Probate: Otto Johnson | Schroeder | 10/20/1927 |
| | T | Guardianship: Anna Johnson | Schroeder | 10/16/1956 |
| | U | Guardianship: Anna Johnson | Schroeder | 6/19/1961 |
| | V | Deed: Johnson to Williams | Schroeder | 7/24/1961 |
| | W | Survey | Schroeder | 4/2/2003 |
| | X | Deed: Gladd to Hooper; Diagram | Schroeder | 1/21/1964 |
| | Y | Deed: Gladd to Griswold; Diagram | Schroeder | 4/10/1963 |
| | Z | Diagram | Schroeder | --- |

| Ex. No. | Att'mt No. | Description | Claimant(s) or Issue | Date |
|---|---|---|---|---|
| 3 | AA | Fidelity Title Report | Shorelands | 12/2/2014 |
|  | BB | Diagram: Government Lot 2 | Shorelands | --- |
|  | CC | Deed: Bertha Palmberg to King County | Shorelands | 9/29/1914 |
|  | DD | Probate: Bertha Palmberg to King County | Shorelands | 10/30/1919 |
|  | EE | Lawyers and Realtors Title Report | Shorelands | 7/19/1928 |
|  | FF | Deed: State of Washington to Palmberg et al. | Shorelands | 3/15/1940 |
|  | GG | Partition Lawsuit: Complaint | Shorelands | 11/3/1945 |
|  | HH | Washington Title Report | Shorelands | 11/19/1946 |
|  | II | Partition Lawsuit: Findings | Shorelands | 1/21/1949 |
|  | JJ | Partition Lawsuit: Referee's Return of Sale | Shorelands | 5/14/1949 |
|  | KK | Deed: Referee's Corrected to J.A. Earley | Shorelands | 8/16/1949 |
|  | LL | Real Estate Contract: Earley to Hughes | Nelson/Hughes | 4/19/1962 |
|  | MM | Deed: Earley to Hughes | Nelson/Hughes | 7/12/1976 |
|  | NN | Tax Assessor eReal Property: Parcel 9042 | Nelson | 5/4/2017 |
|  | OO | Tax Assessor eReal Property: Parcel 9085 | Hughes | 5/4/2017 |
|  | PP | Letter: Assessor to Rodgers | Nelson/Hughes | 6/10/1/982 |
|  | QQ | Deed: Referee to Simpson | Hughes | 6/8/1949 |
|  | RR | Real Estate Contract: Simpson to Hughes | Hughes | 11/23/1962 |
|  | SS | Deed: Hughes, G.G. to Hughes, W.F. | Hughes | 4/11/1956 |
|  | TT | State DNR: Waiver of Preference Right | Hughes | 7/28/1950 |
|  | UU | State DNR: Order | Hughes | 7/30/1951 |
|  | VV | Deed: State of Washington to Hughes, G.G. | Hughes | 9/19/1951 |
|  | WW | Deed: Hughes, G.G. to Hughes, W.F. | Hughes | 6/14/1966 |
|  | XX | Deed: Hughes, G.G. to Hughes, W.J. | Hughes | 3/21/1978 |
|  | YY | Survey | Hughes | 3/5/1987 |
|  | ZZ | Deed: Hughes, W.F. to Hughes, W.J. | Hughes | 12/8/1987 |
|  | AAA | Survey | Hughes | 10/11/1987 |
|  | BBB | Deed: Hughes, W.F. to Hughes, W.J. | Hughes | 9/22/1988 |

| Ex. No. | Att'mt No. | Description | Claimant(s) or Issue | Date |
|---|---|---|---|---|
| 3 | CCC | Deed: Hughes, W.F. to Hughes, W.F. | Hughes | 9/22/1988 |
| | DDD | Deed: Hughes, W.F. to Kao Family Ptn. | Hughes | 5/24/1989 |
| | EEE | State DNR, Commissioner of Public Lands, Engineer's Report | Shorelands | 8/3/1928 |
| | FFF | State DNR, Shoreline Activity Register | Shorelands | --- |
| | GGG | Deed: Referee to J.A. Earley | Shorelands | 6/17/1949 |
| | HHH | Partition Lawsuit: Petition for Corrected Deed | Nelson/Hughes | 8/12/1949 |
| | III | Assessor Map Book | Nelson/Hughes | --- |
| | JJJ | Assessor Map Book | Nelson/Hughes | --- |
| | KKK | Assessor Map Book | Nelson/Hughes | --- |
| | LLL | Tax Assessor eReal Property: Parcel 9071 | Hughes | 12/22/2017 |
| | MMM | Diagram | Hughes | --- |
| | NNN | Diagram | Hughes | --- |
| | OOO | Probate: William A. Connell | Spencer Group | 1/24/1928 |
| | PPP | Aerial Photo | Spencer Group | 5/11/1953 |
| | QQQ | Probate: Lotta M. Ebright | Matrinez | 8/27/1959 |
| | RRR | Map: Portion King Co. Eng. Survey No. 1136A | Shorelands | 6/10/1982 |
| | SSS | Map: Portion King Co. Eng. Survey No. 1136B | Shorelands | 8/25/1930 |
| | TTT | Assessor Tax Roll: Parcel 9085 | Hughes | 1980-1981 |
| | UUU | Assessor Tax Roll: Parcel 9042 | Nelson | 1980-1981 |
| | VVV | Diagram: Government Lot 2 | Shorelands | --- |
| | WWW | Assessor Tax Roll: Parcel 9071 | Hughes | 1980, 1986 |
| | XXX | Aerial Photo | Raab | 5/11/1953 |
| | YYY | Deed: Connell to Breckberg | Spencer Group | 8/8/1923 |
| | ZZZ | Deed: Stangroom to Byco; Short Plat | Nelson/Hughes | 1978-1979 |
| 4 | | Declaration of Jerry Broadus | Shorelands | |
| | A | Curriculum Vitae of Jerry Ray Broadus | | |
| 5 | | Declaration of Ray Spencer | Spencer | |
| | A | Schematic | Spencer | |
| | | | | |
| 6 | | Declaration of Carolyn Rossi | Rossi | |

| Ex. No. | Att'mt No. | Description | Claimant(s) or Issue | Date |
|---------|-----------|-------------|---------------------|------|
| 6 | A | Photo | Rossi | |
| | B | Photo | Rossi | |
| | C | Photo | Rossi | |
| | D | Schematic | Rossi | |
| 7 | | Declaration of Reid Brockway | Brockway | |
| | A | Photo | Brockway | |
| | B | Schematic | Brockway | |
| | C | Photo | Brockway | |
| 8 | | Declaration of Doug McCallum | McCallum | |
| 9 | | Declaration of Clifford Schroeder | Schroeder | |
| | A | Photo | Schroeder | |
| | B | Photo | Schroeder | |
| | C | Photo | Schroeder | |
| | D | Schematic and Aerial Imagery | Schroeder | |
| 10 | | Declaration of Donna Marie Raab Matrinez | Matrinez | |
| | A | Schematic and Aerial Imagery | Matrinez | |
| | B | Photo | Matrinez | |
| | C | Photos | Matrinez | |
| | D | Photo | Matrinez | |
| 11 | | Declaration of Beth Nelson | Nelson/Hughes | |
| 12 | | Declaration of William Hughes | Nelson/Hughes | |
| | A | Photo | Nelson/Hughes | |
| | B | Photo | Nelson/Hughes | |
| | C | Photo | Nelson/Hughes | |
| | D | Photo | Nelson/Hughes | |
| | E | Schematic and Aerial Imagery | Nelson/Hughes | |
| 13 | | Declaration of Vicki E. Orrico | | |
| | A | Deed: Referee's Corrected to J.A. Earley | Shorelands | 8/11/1949 |
| | B | Contract: R. Earley to Barrett | Barrett | 11/29/1961 |
| | C | Deed: R. Earley to Barrett | Barrett | 12/1/1961 |
| | D | Lot line adjustment | Barrett | 12/17/1987 |
| | E | Historic Assessor's records | Barrett/Collins | 1980-1998 |

| Ex. No. | Att'mt No. | Description | Claimant(s) or Issue | Date |
|---|---|---|---|---|
| | | | Freedman | |
| 13 | F | Contract: R. Earley to Barrett | Freedman | 5/31/1962 |
| | G | Deed: R. Earley to Barrett | Freedman | 6/15/1962 |
| | H | Contract: Barrett to Zylstra | Freedman | 3/13/1970 |
| | I | Deed: Barrett to Zylstra | Freedman | 3/27/1970 |
| | J | Contract: Zylstra to Lewis | Freedman | 10/15/1971 |
| | K | Deed: Zylstra to Lewis | Freedman | 10/15/1971 |
| | L | Deed: N. Lewis to B. Lewis. | Freedman | 6/21/1984 |
| | M | Deed: Lewis to Freedman | Freedman | 10/10/1988 |
| | N | Correction Deed: Lewis to Freedman | Freedman | 4/30/1991 |
| | O | Deed: Estate of R. Earley to J. Earley | Collins | 9/14/1981 |
| | P | Boundary Line Agreement | Collins | 1/14/1983 |
| | Q | Boundary Line Agreement | Collins | 1/17/1983 |
| | R | Deed: Earley to Z. Short | Collins | 2/18/1983 |
| | S | Deed: Short to Collins | Collins | 9/26/1989 |
| | T | Deed: D. Collins to V. Collins | Collins | 11/14/1991 |
| | U | Deed: V. Collins to D. & V. Collins | Collins | 11/31/1992 |
| | X | Plat showing location of Barrett lot | Barrett | --- |
| | Y | Plat showing location of Freedman lot | Collins | --- |
| | Z | Plat showing location of Collins lot | Collins | --- |
| 14 | | Declaration of Mike Collins | Collins | |
| | A | Schematics and Aerial Imagery | Collins | |
| 15 | | Declaration of Pamela Barrett | Barrett | |
| | A | Power of Attorney | Barrett | |
| | B | Deed: R. Earley to Barrett | Barrett | |
| | C | Schematic and Aerial Imagery | Barrett | |
| | D | Hydraulic Fisheries Approval | Barrett | |
| 16 | | Declaration of Howard Freedman | Freedman | |
| | A | Schematic and Aerial Imagery | Freedman | |
| 17 | | Declaration of Barry Lewis | Freedman | |

TABLE OF AUTHORITIES

Cases

*Albee v. Town of Yarrow Point,*
   445 P.2d 340 (Wash. 1968) ........................................................................................19
*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)................................................................................................3
*B & S Holdings, LLC v. BNSF Ry. Co.,*
   889 F. Supp. 2d 1252 (E.D. Wash. 2012) ....................................................... 33, 34
*Baxter-Wyckoff Co. v. City of Seattle,*
   408 P.2d 1012 (Wash. 1965) ....................................................................................41
*Beres v. United States,*
   97 Fed. Cl. 757 (2011).........................................................................................20
*Berg v. Hudesman,*
   801 P.2d 222 (1990)................................................................................................9
*Bryant v. Palmer Coking Coal Co.,*
   936 P.2d 1163 (Wash. App. 1997)........................................................................47
*Buffalo Southern Railroad Inc. v. Village of Croton-on-Hudson,*
   434 F. Supp.2d 241 (S.D.N.Y. 2006) ...................................................................33
*Chaplin v. Sanders,*
   676 P.2d 431 (Wash. 1984) ..........................................................................passim
*Crites v. Koch,*
   741 P.2d 1005 (Wash. App. 1987)........................................................................46
*Davidson v. State,*
   802 P. 2d 1374 (Wash. 1991) ................................................................................21
*Doyle v. Hicks,*
   897 P.2d 420 (Wash. App. 1995)..........................................................................43
*Earnheart v. Carlson,*
   736 P.2d 1106 (Wash. App. 1987)........................................................................34
*El Cerrito, Inc. v. Ryndak,*
   376 P.2d 528 (Wash. 1962) ....................................................................................36
*First Fed. Sav. Bank of Hegewisch v. United States,*
   52 Fed. Cl. 774 (2002)............................................................................................3
*Franks Inv. Co. LLC v. Union Pac. R. Co.,*
   593 F.3d 404 (5th Cir. 2010)......................................................................... 34, 35
*Froland v. Frankland,*
   431 P.2d 188 (Wash. 1967) ..........................................................................passim
*Ghione v. State,*
   175 P.2d 955 (Wash. 1946) ..............................................................22, 25, 27
*Gorman v. City of Woodinville,*
   283 P.3d 1082 (Wash. 2012) ..................................................................................36

*Granite Beach Holdings, LLC v. State ex rel. Dep't of Nat.,*
   Res., 11 P.3d 847 (Wash. 2000) ...................................................................8

*Harris v. Ski Park Farms, Inc.,*
   844 P.2d 1006 (Wash. 1993)...................................................................10

*Hovila v. Bartek,*
   292 P.2d 877 (Wash. 1956) ...........................................................43, 47

*Howard v. Kunto,*
   477 P.2d 210 (Wash. App. 1970)...........................................................45

*Hudson House, Inc. v. Rozman,*
   509 P.2d 992 (Wash. 1973) ...................................................................16

*In re Davis,*
   170 F.3d 475 (5th Cir. 1999)...................................................................34

*ITT Rayonier, Inc. v. Bell,*
   774 P.2d 6 (Wash. 1989)...................................................................42

*Kelley v. Tonda,*
   393 P.3d 824 (Wash. 2017) ...........................................................9, 10

*Kershaw v. Sunnyside Ranches Inc. v. Yakima Interurban Lines Ass'n,*
   126 P.3d 16 (Wash. 2000) ...........................................................passim

*Kiely v. Graves,*
   271 P.3d 226 (Wash. 2012) ...........................................................passim

*Krona v. Brett,*
   433 P.2d 858 (Wash. 1967) ...........................................................43, 44, 45

*Lee v. Lozier,*
   945 P.2d 214 (Wash. App. 1997)...........................................................45

*Leo Sheep Co. v. United States,*
   440 U.S. 668 (1979).....................................................................................8

*Lilly v. Lynch,*
   945 P.2d 727 (Wash. App. 1997)...........................................................45, 46, 47

*Lloyd v. Montecucco,*
   924 P.2d 927 (Wash. App. 1996)...........................................................48, 49

*Mall, Inc. v. City of Seattle,*
   739 P.2d 668 (1987)...................................................................37

*Massey v. Del Labs., Inc.,*
   118 F.3d 1568 (Fed. Cir. 1997)...........................................................3, 4

*Muerling v. Colsen,*
   39 P. (Wash. 1914) ...................................................................14

*Napier v. Runkel,*
   114 P.2d 534 (Wash. 1941) ...................................................................14

*Northlake Marine Works, Inc. v. Seattle,*
   857 P.2d 283 (Wash. App. 1993)...........................................................15

*Noyes v. Douglas,*
   81 P. 724 (Wash. 1905)...................................................................45

*Preseault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) ................................................................40
*Riley v. Andres,*
    27 P.3d 618 (Wash. App. 2001) ..........................................................43, 44
*Roeder Co. v. Burlington N., Inc.,*
    716 P.2d 855 (Wash.1986) ...........................................................passim
*Sengfelder v. Hill,*
    58 P. 250 (Wash. 1899) ...................................................................14, 16
*Shelton v. Strickland,*
    21 P.3d 1179 (Wash. App. 2001) ........................................................48, 51
*State v. Lundquist,*
    374 P.2d 246 (1962) ..........................................................................39
*Union Pac. R. Co. v. Chicago Transit Auth.,*
    647 F.3d 675 (7th Cir. 2011) ...............................................................33
*Veach v. Culp,*
    599 P.2d 526 (Wash. 1979) .......................................................38, 40, 41
*Wisconsin Cent. Ltd. v. City of Marshfield,*
    160 F. Supp. 2d 1009 (W.D. Wis. 2000) .................................................33

Statutes

49 U.S.C. § 10501(b) (ICCTA) ...................................................................2
Wash. Rev. Code § 35.79.040 ..................................................................37
Wash. Rev. Code § 4.16.020 ...............................................................42, 48
Wash. Rev. Code § 7.28.090 ....................................................................39
Wash. Rev. Code § 7.52.010 ....................................................................22
Wash. Rev. Code § 79.105.060 (17) ..........................................................20

Other Authorities

Washington Practice: Adverse Possession and Related Doctrines—§8.9—8.18 (2012)............45-49

# INTRODUCTION

This dispute concerns the ownership of strips of land underlying one hundred foot-wide railroad right-of-way easements which Plaintiffs contend they own and Defendant contends they do not.

For over a decade and, in some cases, up to half a century or longer, prior to the date of taking, the Plaintiffs and their predecessors in interest had used and occupied all or parts of these strips of land.[1] They did so in the belief that they owned not just the abutting properties on which they paid taxes, but they owned the servient estate burdened by the railroad easements as well. During this same period, never did a phantom, absent third-party landowner say or do anything to suggest that they had hung onto the servient estate under the right of way when deeding Plaintiffs' properties. This is because the Plaintiffs are the servient owners of fee interest to the subject property through the recorded title in these properties. But if the title to their abutting lands somehow failed to convey fee ownership in the railroad strip, then the Plaintiffs or their predecessors in interest adversely possessed these strips and were fee owners of them as of September 18, 1998—the date the United States took their property interests without paying just compensation.[2]

---

[1] For a complete list of the Plaintiffs whose property interests remain at issue in this briefing, see Table of Plaintiffs, Ex. 1, which lists the Plaintiffs and the specific issues for each, and separately lists those who are not included in the parties' cross-motions for partial summary judgment. As also detailed in that Table, certain Plaintiffs have settled their claims, or settled the question of title, rendering the arguments in the Defendant's brief as to those claims moot. All references to "Plaintiffs" herein go only to the Plaintiffs who are moving for partial summary judgment; all other Plaintiffs in this case are not referenced in this brief.

[2] *See Burlington N. & Santa Fe Ry. Co.-Abandonment Exemption-in King Cnty., WA*, STB Docket No. AB-6 (Sub. No. 380X), 1998 WL 638432 (S.T.B. Sept. 18, 1998) ("NITU").

The Defendant nonetheless argues that Plaintiffs do not own these strips of land because (1) a metes and bounds description was used that, it argues, excluded the right of way or (2) Plaintiffs' deeds convey "second class shorelands" which, Defendant contends, must necessarily exclude the right of way. But Defendant makes its case in a vacuum, void of any nuanced understanding of the terms of the deeds or the context in which the material terms were drafted. Defendant also fails to apprehend that the overwhelming evidence shows there are no bona fide third-party owners out there who ever claimed interest in these properties, and Defendant certainly offered no evidence to suggest the contrary. Context and subsequent events are material under Washington law when construing any deed—whether clear or ambiguous—and when those factors are applied here, they inexorably lead to the conclusion that Plaintiffs' deeds conveyed fee title underlying the railroad easements.

Defendant also seeks a ruling that Plaintiffs cannot obtain title via adverse possession on the theory that the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10501(b) (ICCTA), preempts all adverse possession claims, and because Washington law, it argues, does not allow adverse possession of reversionary interests. But the ICCTA would only preempt adverse possession if it interferes with railroad operations or the STB's regulatory authority over the corridor, neither of which is the case here. And Defendant misapplies a Washington case that deals strictly with government-held land for public purposes to argue that adverse possession is not possible, while ignoring that the reasoning therein does not apply in the context of a railroad right of way.

Plaintiffs will address these issues in the order presented by the Defendant and cross-move for a partial summary judgment ruling that these Plaintiffs own fee title to the land underlying the right of way.

## STANDARD FOR SUMMARY JUDGMENT

Plaintiffs concur with the Defendant's discussion of the standard of review and add the following:

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "genuine" dispute is one that "may reasonably be resolved in favor of either party," *id.* at 250, and a fact is "material" if it has the potential to significantly alter the outcome of a case under the governing law. *Id.* at 248. But, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.*

When considering cross-motions for summary judgment, the Court must evaluate each motion in its own right and resolve any reasonable inferences against the party whose motion is being considered. *First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774, 780 (2002). Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citation omitted). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* And "[e]ach party carries the burden on its own motion to show entitlement to judgment

as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id*.

## STATEMENT OF FACTS[3]

This dispute concerns eleven segments of right-of-way strips, each of which is 100 feet wide and each of which abuts a different property immediately to the west of the right of way.[4] Five of the parcels are in dispute because the Plaintiffs' deeds include metes and bounds descriptions to the right of way boundary (with one exception) that, Defendants contends, deprived them of ownership of the right of way; this has sometimes been referred to by the Parties as a "*Roeder*" issue.[5] These five properties are owned by five sets of Plaintiffs: the Spencer, Rossi, Brockway, Schroeder, and Matrinez, Plaintiffs. The remaining six parcels do not have a *Roeder* issue but are in dispute because the Plaintiffs' deeds use the term "shorelands" in the conveyances.[6] These six properties are owned by five sets of Plaintiffs: the Hughes Estate (two parcels), Nelson, Freedman, Barrett, and Collins Plaintiffs. Thus, there are eleven right-of-way segments that the Defendant argues must

---

[3] The facts supporting Plaintiffs' ownership of the right of way are extensive and, Plaintiffs propose, should be uncontroverted. A complete discussion of the facts, along with the citations to the exhibits, are provided in the sections below addressing the specific issues in dispute so that they can be understood in context with the legal analysis. This abbreviated statement of facts is to provide context for the arguments which follow.

[4] *See* Ex. 2, attachments showing the general vicinity, the approximate location of all eleven properties, and enlarged views of the locations of the properties.

[5] Deeds containing metes and bounds descriptions have the so-called "*Roeder* issue" because of *Roeder Co. v. Burlington N., Inc.*, 716 P.2d 855 (1986), which construed deeds with metes and bounds and concluded that the specific metes and bounds in the deed in that case rebutted the usual presumption that an abutting owner owned to the centerline of an adjoining right of way, as was discussed in part in Defendant's Brief. *E.g.*,U.S. Mem. at 11.

[6] Older authorities use the phrase "shore lands" while more recent authorities use the single word "shorelands."

necessarily be owned by third-party landowners because, it contends, they are not owned by Plaintiffs.

None of these Plaintiffs, all of whom have treated these right-of-way parcels as their own, have ever known or heard of any third-party owner claiming that they, not the Plaintiffs, own the right of way. Additionally, in preparation for the summary judgment motions in this dispute, Plaintiffs undertook extensive title research not only on their own chains of title on the eleven sets of properties in dispute, but on the chains of title of third-party successors-in-interest to determine if any had recorded instruments pertaining to the right-of-way segments which would suggest that they, not Plaintiffs, were the true owners. Plaintiffs found no evidence of any such third-party recordings.[7]

## I.     Parcels with the *Roeder* Issue

As to the five parcels with the *Roeder* issue, the facts relevant to the Plaintiffs' claims diverge into effectively three sets: First, for the Brockway, Rossi, and Spencer Plaintiffs, the metes and bounds first showed up when properties were platted for development. As will be discussed, below, those metes and bounds were required by the County Assessor when platting the development, and the grantors who first used a metes and bounds reference did not use, sell or bequeath the right of way as if they kept it. Additionally, the "metes and bounds" used in these grants were not of the same type as the "metes and bounds" used in the *Roeder* case, and the difference matters.

---

[7] *See* Ex. 3 (Klinge Decl.), ¶ 13 (re Spencer), ¶ 16 (re Rossi), ¶ 20 (re Brockway), ¶ 34 (re Matrinez), ¶ 46 (re Schroeder), ¶ 66 (re shorelands).

Second, the Schroeders have a metes and bounds reference, but the metes and bounds description is not co-terminous with the right of way's edge, and in fact overlaps the right of way. Additionally, the grantor never used, sold or bequeathed the right of way that would suggest an intent to keep the right of way.

And, third, Ms. Matrinez has a metes and bounds reference in her deed, but extrinsic evidence likewise shows an absence of indicia that the grantor was reserving the right of way and not conveying it with the property.

## II.    Parcels with the Shorelands Issue

As to the Shorelands issue, which concerns six sets of parcels, the material facts are common to all five sets of Plaintiffs in this group. Alfred Palmberg, Plaintiff Beth Nelson's great-grandfather, was the original owner of all lands in Government Lots 1 & 2 (along with lands in other lots, which are not at issue here).[8] In 1887 he deeded to the railroad a 100-foot-wide easement across his property. At the time of that conveyance, Palmberg owned the uplands but had not yet acquired the shorelands from the State, which were and are defined as submerged lands along the borders of lakes and rivers. The right of way grant skirted the shorelands in Government Lot 2, and was constructed within approximately 20 years of the Palmberg grant.

Palmberg died in 1908, and his wife, Bertha, died in 1918, leaving all the remaining, undivided property to her six children, three of whom were from another marriage. The property was situated in Government Lots 1 and 2. In 1928, their son, Alfred W. Palmberg, applied to purchase the shorelands adjoining Government

---

[8] *See* Ex. 2, p. 3, map showing Palmberg patented lands in Government Lots 1 and 2 relevant to the properties with shorelands issues.

Lot 2 from the State of Washington. Only upland owners—the owners of land immediately next to the shorelands—had first rights to buy shorelands from the State. The application was granted and in 1940 the State executed a deed to the six Palmberg heirs. So, as of 1940, the six Palmberg heirs owned both the uplands and shorelands in Government Lot 2 and all the uplands in Government Lot 1.

In 1945—and this is where the "shorelands" misnomer showed up in Plaintiffs' chain of title—one of the heirs, Bert Stares (Bertha's son from another marriage, hence the different last name), filed a partition action in order to split the remaining Palmberg property between the six heirs. In that partition action, the east border of the railroad right of way became a demarcation line for what was being partitioned. The court ultimately determined that all the Palmberg-heir lands to the east of the railroad right-of-way border in Government Lot 2, were owned by Annie Stangroom, one of the heirs, because she had purchased the land after a tax foreclosure. The rest—all lands west of the east line of the railroad right of way, and thus the fee in the right of way itself—went to the rest of the siblings. And in that partition action, and ever thereafter, all the lands west of the east railway border were called "second class shorelands." Ex. 3-VVV (Klinge Decl.) (light gray area).

Accordingly, in the circumstances of this case, "second class shorelands," was a catch-all, albeit misleading, phrase that actually included some uplands (which explains why the Plaintiffs and their predecessors have paid taxes on the uplands since 1981 when the tax assessor caught the misnomer), *and* the right of way itself. That same misnomer was repeated in successive conveyances, up to and including the conveyances of the "second class shorelands" to the Plaintiffs in this shorelands group.

7

Consistent with the above history, on all eleven parcels, for two decades or longer leading up to the date of the taking and thereafter, the Plaintiffs and their predecessors built homes, built shelters, built fire pits, groomed, weeded, cleared, landscaped, played on, parked on, and otherwise treated the right of way as their own property, subject to the railroad's right to use the easement to operate trains.

## ARGUMENT

### I.    Plaintiffs' Ownership of the Right of Way Derives from the Titles to Their Properties Which Abut the Right of Way.

The overarching goal of property law in Washington is for courts to effectuate the intent of the parties to property conveyances. *Kershaw v. Sunnyside Ranches Inc. v. Yakima Interurban Lines Ass'n,* 126 P.3d 16, 25–26 (Wash. 2000). And, subsumed in that goal, for the certainty of titles, reservations from grants generally are not implied. *Granite Beach Holdings, LLC v. State ex rel. Dep't of Nat. Res.,* 11 P.3d 847, 853 (Wash. 2000) (citing *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979)). The Defendant's statement that there is no need to identify who owns the property it contends Plaintiffs do not own, U.S. Mem. 12, fn. 5, is at odds with the underlying policies driving Washington law on resolving property disputes. It may not be necessary to identify which of John Smith or Jane Doe owns the land if a Plaintiff does not own it, but the inability to assign the rights to anyone other than a Plaintiff means the Defendant's reasoning is inherently inconsistent with the overarching goal of Washington law which looks for certainty in title. The Defendant's flawed reasoning is exemplified in its criticism of Plaintiffs for not identifying the landowners to whom the Plaintiffs' actions were adverse. U.S. Mem. 29. Plaintiffs identified no other landowners because there are none. But

hypothetically, if there were, then Plaintiffs' actions would have been more than sufficient to put them on notice and bring them out of the woodwork. So, when the Defendant identifies no alternative owner of the fee that is subject to the easement, the Defendant loses faith with the overarching goal of Washington law to cleanly assign all property to someone.

## A. Recent Washington Supreme Court decisions on potential reservations of rights of way and long-standing principles of deed construction support partial summary judgment for the Plaintiffs.

General principles of deed construction apply to both the *Roeder* and Shorelands issues. Washington cases instruct that when the parties provide evidence, it shall be used to construe deeds regardless of whether their terms are deemed clear or ambiguous. Furthermore, the cases support a finding that the types of evidence Plaintiffs provide here establish fee ownership of the abutting rights of way.

### 1. When construing deeds, courts consider any evidence presented, regardless of whether the deed is ambiguous or clear.

The intent of the parties can be determined from evidence outside the document being considered:

> Writings are one indication of the parties' intent, but are not necessarily determinative of that intent. Indeed, this is why writings—not contracts—are reformed to reflect the true intent of the parties.

*Kelley v. Tonda*, 393 P.3d 824, 830 (Wash. 2017) (construing a railway deed) (citations omitted). And this is true regardless of whether the language used in a deed is deemed clear or ambiguous:

> In *Berg v. Hudesman*, 115 Wash.2d 657, 801 P.2d 222 (1990), our Supreme Court rejected the theory that contract language must be ambiguous before evidence of the surrounding circumstances is admissible. Accordingly, we

may consider extrinsic evidence to assist us in ascertaining the intent of the parties in entering into a contract, regardless of whether the language used in the writings is deemed ambiguous.

*Kelley*, 393 P.3d at 830.

## 2. Subsequent actions taken by original grantors and successors in interest are relevant to the inquiry of intent.

After having granted a right of way, actions taken by the original grantors and their successors in interest constitute relevant, extrinsic evidence for construing deeds. Specifically, if the grantor of the title burdened by a railway easement never used the right of way or subsequently took no action to imply ownership, such as deeding or bequeathing the right of way to successors in interest, the absence of such evidence is proof that the grantor did not intend to keep the right of way:

> In holding that Kershaw Sunnyside Ranches was the servient property owner, the trial court implicitly found that Ora Kershaw did not intend to reserve her interest in the railroad right of way and all her interest transferred to her son. Here, Level 3 relies on *Harris v. Ski Park Farms, Inc.*, where we held that a similar exception in a deed did operate to reserve the grantor's interest in the right of way. 120 Wash.2d 727, 746, 844 P.2d 1006 (1993). However, *Harris* contained evidence of the grantor's intent to except the right of way not present here, *most specifically the grantor's subsequent conveyance of the right of way to a third party* and the grantor's broker's declaration that the grantor intended to reserve its interest in the right of way. *Id.* at 735, 742, 744, 844 P.2d 1006.

*Kershaw,* 126 P.3d at 25–26 (emphasis added) (footnote omitted).

The court repeated that it was the lack of any subsequent conveyance that indicated there was no intent to withhold the right of way.

> [T]here is no evidence in the record that Ora Kershaw intended to reserve any interest in the property nor that she later attempted to convey that

10

interest.  Recognizing that the trial court found an intent to transfer the underlying interest, resolving the apparent ambiguity against the grantor, and finding no intent akin to that present in *Harris,* we hold that Ora Kershaw … did not intend to reserve to herself any interest in the railroad right of way.

*Id.* at 26.

Here, the grantors who first used the metes and bounds language in deeds did not subsequently convey the right of way (unlike the facts in *Roeder*), and did not list it as property in their wills, or in any manner evince any intent to withhold the right of way from the grant. Ex. 3 ¶¶ 11, 28, and 46. Likewise, following the partition of the second class shorelands parcels, there is no evidence that parties to the east of the right of way listed property in their wills or otherwise took action that indicated they believed they owned the right of way.

### 3. Roeder confirms that determining whether a conveyance includes the fee underlying a right of way depends on intent of the parties.

The Court in *Roeder* recognized the general "centerline presumption" rule applies to railroad rights of way (i.e*.,* that abutting owners to a railroad easement are presumed to own to the center line) "unless there is something in a deed or surrounding circumstances showing an intent to the contrary," and explained the policy driving this rule as follows:

This rule is based on a presumption that the grantor intended to convey such fee along with and as a part of the conveyance of the abutting land, generally on the theory that the grantor did not intend to retain a narrow strip of land which could be of use only to the owner of the adjoining land. The rule is also

intended to lessen litigation caused by the existence of narrow strips of land distinct in ownership from the adjoining property.

*Roeder*, 716 P.2d at 861. The court emphasized that the goal is to always determine the parties' intent:

> A major concern in examining conveyances of abutting land is, of course, to determine the intent of the parties to the deed. When the deed refers to the grantor's right of way as a boundary without clearly indicating that the side of the right of way is the boundary, it is presumed that the grantor intended to convey title to the center of the right of way.

*Id.*

Based on the facts of that case, and in the absence of any additional extrinsic evidence supporting a contrary conclusion, the court in *Roeder* decided that the metes and bounds description constituted evidence of intent to exclude the right of way. *Id.* at 862. But, as the Defendant recognizes, metes and bounds language is merely one form of evidence and is not dispositive if any additional evidence is presented. U.S. Mem. 16 (arguing "*without further evidence,*" Plaintiffs who have metes and bounds in their title would lose this issue). Left undisturbed by the *Roeder* decision, and in fact reinforced by that decision, is prevailing Washington law which teaches that courts shall consider all relevant evidence presented as to the intent of the parties to the conveyance when construing deeds and, if uncontroverted, may enter judgment as a matter of law.

**B. The deeds themselves or the circumstances in which they were conveyed establish Plaintiffs' predecessors in interest had no intention of retaining the right of way when conveying the adjoining lands.**

**1. All Plaintiffs with the so-called Roeder issue submit evidence establishing they, not others, own the right of way, and some Plaintiffs have deeds materially different from the metes and bounds in Roeder.**

The Plaintiffs in the *Roeder* issue group have effectively three sets of circumstances and will be addressed in the following order: (1) the Spencer, Rossi, and Brockway Plaintiffs; (2) the Schroeder Plaintiffs; and (3) the Matrinez Plaintiff. All Plaintiffs in this group have metes and bounds materially different from the *careful* metes and bounds found in *Roeder* as discussed, below, and they all submit evidence showing that the grantors did not intend to withhold the right-of-way strips in the grants.

**a. The Spencer, Rossi, and Brockway Plaintiffs.**

The Spencers, Rossis and Brockways (hereinafter, the Spencer Plaintiffs) own property within an unrecorded plat made by Willis J. Connell, apparently in 1927. Ex. 3 ¶¶12, 15, 19 (Klinge Decl.). That plat shows distances on the north and south sides of their lots from Lake Sammamish to the western edge of the railroad right of way. Ex. 3F. As with the other Plaintiffs moving for partial summary judgment, to the east of the right of way sits Lake Sammamish Parkway. There are several reasons why the metes and bounds descriptions in the plat, which were carried into their deeds, did not fail to convey the fee underlying the full 100 feet of right of way adjoining their properties.

First, the reference to a metes and bounds description for the Spencer Plaintiffs has a different purpose than what the Court concluded in *Roeder*. The deeds to the Spencer Plaintiffs' properties include a distance to the right of way arising from an unrecorded plat. Ex. 3 ¶ 10 (Klinge Decl.). Unlike the situation in *Roeder*, the reason metes and bounds are placed on the *unrecorded* plat and carried into deeds is that the County Treasurer demanded metes and bounds descriptions for unrecorded plats in order to assess property and enforce assessments. *See* Ex. 4 ¶ 15 (Broadus Decl.). Unrecorded plats have a history of being deemed sufficient for describing property for purposes of conveyance. *Sengfelder v. Hill*, 58 P. 250 (Wash. 1899). However, reference to a lot number in an unrecorded plat was insufficient to confer jurisdiction in a tax foreclosure unless there were metes and bounds to properly identify to the world the property being foreclosed upon. *Napier v. Runkel,* 114 P.2d 534 (Wash. 1941). Accordingly, the metes and bounds were intended to satisfy County rules, not to withhold the right of way in the grant, a fact absent from *Roeder*.

Second, the Spencer Plaintiffs' deeds did not contain the careful, specific metes and bounds found in *Roeder*, which sets them apart from the circumstances in that case. In *Roeder*, after reciting a "typical example" which included a call of a specified number of feet to the "South line of the Railroad right-of-way," the court explained the reason why it found the presumption rebutted: "A boundary falling in the center of the rights of way is inconsistent with the *careful* metes and bounds descriptions in these deeds." *Roeder,* 716 P.2d at 861–62 (emphasis added). Under Washington law, "metes and bounds" refers to lines defined by courses and distances. *Muerling v. Colsen*, 39 P. 616 (Wash. 1914). In *Roeder*, the court

concluded that a description that provides a definite number of feet to the edge of the railroad right of way rebutted the presumption that the property included land beyond the edge and beyond those defined number of feet. *Roeder*, 716 P.2d at 861.

Defendant briefly argues that *Roeder* stands for the proposition that a mere reference to a direction, without a measured metes and bounds description, rebuts the centerline presumption. "[E]ven where the deed at issue did not include a strict metes and bounds description but described the property conveyed as 'lying Northerly of the right-of-way,' the Washington Supreme Court found that the deed did not convey title to the centerline. *Roeder*, 716 P.2d at 862 n.27." U.S. Mem. at 12–13.

This footnote in *Roeder* is not as sweeping as Defendant suggests—that any reference to a geographic direction is sufficient to conclude the grantor was retaining the right of way. In that footnote, the Court specifically referred to the situation involving that one deed without a metes and bounds description as calling for the same result as those that did "under the facts of this case." *Roeder*, 716 P.2d 862 n.27. But the Court did not specify any facts of the case that would make its holding applicable to a deed without a metes and bounds description. *Id.* Consequently, there is no way to know to which facts the Court was referring when it concluded the result would be the same. Thus, the footnote is not useful as precedent, as it is limited to the unaddressed facts in that case.

Moreover, subsequent decisions demonstrate that a mere directional reference to a right of way is insufficient to rebut the presumption. For example, in *Northlake Marine Works, Inc. v. Seattle*, the deed referenced property "south of the … right of way." 857 P.2d 283, 287 (Wash. App. 1993). After acknowledging *Roeder* and the

significance of metes and bounds descriptions therein, the court in *Northlake* concluded that there was no metes and bounds description and that the centerline presumption applied. *Id.* at 289.

The rationale for rebutting the presumption that a grantor did not want to retain a strip of land is even less applicable to the Spencer Plaintiffs. In the unrecorded plat, the distance is from a fluctuating water boundary—Lake Sammamish to the railroad right of way—which makes the distance call in the deed or unrecorded plat far less definite than the careful, specified number of feet which formed the basis of the *Roeder* decision. The reason is that boundaries of property bordered by water move as the water line moves. *Hudson House, Inc. v. Rozman*, 509 P.2d 992 (Wash. 1973). This is a less than precise description which references a distance but adds the disclaimer "more or less" rather than the precise measurement the Court in *Roeder* found significant. *See* Ex. 4 ¶¶ 4, 5, 13–15 (Broadus Decl.).

The Court in *Kershaw* found a provision ambiguous  because the "exception" of a road could refer to removal of the road from the conveyance or it could "just as reasonably be interpreted to reference them because of the significant nature of the easements present." 126 P.3d at 26. Similarly, while the use of metes and bounds here is some evidence of intent to exclude the right of way, the "more or less" reference could just as reasonably be interpreted to simply give notice of the "significant nature of the easements present" and not to demarcate a precise boundary. *Cf. id.*

Further, ambiguity in a deed is always resolved against the grantor. *See Kershaw*, 126 P.3d at 26. The deeds for these Plaintiffs are ambiguous because the

developer was forced to use the metes and bounds for tax assessor purposes, and the "more or less" reference adds additional ambiguity. Thus, these ambiguities should be construed against the grantor and in favor of the Plaintiff grantees. *See Id.*

Finally, as with the other Plaintiffs, the evidence establishes that Connell, the developer and the grantor of the deeds in which the metes and bounds language was first used, did not take any actions indicating he intended to retain the right of way. Prior to 1998, he never deeded it to anyone else, Ex. 3, ¶¶ 13, 16, 20 (Klinge Decl.); it does not show up in his inventory of remaining property in his will, *id.* at ¶ 11; neither he nor any of his successors ever took any action or made any reference indicating that Connell, or anyone claiming through Connell, owned the right of way abutting these three Plaintiffs' properties, *id.*; *see also* Ex. 5 (Spencer Decl.), Ex. 6 (Brockway Decl.), Ex. 7 (Rossi Decl.), and Ex. 8 (McCallum Decl.). Not until after King County acquired the railroad's interests in the right of way did anyone other than Plaintiffs claim ownership.

Further, Connell likely intended to grant the full right of way, not half, to the properties in the Spencer Group because the county road was immediately east of the railroad right of way. It would be nonsensical for a grantor to deed only half of the right of way to the grantee while the other half was burdened by a county road easement and had no other land to which it could attach.

### b. The Schroeder Plaintiffs.

While the Schroeder's property includes a metes and bounds description, it does not place the border along the edge of the right of way. Ex. 3 ¶ 43 (Klinge Decl.). *Roeder* specifically indicates that for the centerline presumption to be rebutted with a metes and bounds description, the metes and bounds must describe the property

17

as "extend[ing] up to, but … not include[ing] a railroad right of way." *Roeder*, 716 P.2d at 861.

The metes and bounds description for the Schroeder's deed does not extend up to the edge of the right of way, but rather *beyond* its edge. Accordingly, the metes and bounds description places the Schroeder's property line within the right of way and not at its nearest edge. Ex. 3 ¶ 43 (Klinge Decl.). This not only shows they were granted some of the right of way, but also creates ambiguity which should be construed in favor of the Schroeders' claim that they received all of the right of way.

As with all the other Plaintiffs, there is also no evidence that the prior owner of the Schroeder property, who used the metes and bounds language for the first time, intended to keep any portion of the right of way. The prior owner, Anna Johnson, did not transfer the right of way to anyone else. Ex. 3 ¶ 46 (Klinge Decl.). She never issued any easements or interests of any kind over the right of way after selling the Schroeders' parcel. *Id.* Nor did she, or anyone asserting rights on her behalf, ever claim that the Schroeders did not obtain title to the right of way. Ex. 9 ¶ 12 (Schroeder Decl.).

### c.  The Matrinez Plaintiff

Donna Marie Raab Matrinez acquired her property from her parents. Like the descriptions of the Spencer Plaintiffs' properties, her deed and the deed to her parents do not use a carefully defined, exact measurement as in *Roeder,* but use a measurement which is only "more or less" from a moving water boundary to the railroad right of way. Ex. 3 ¶ 32 (Klinge Decl.). This is insufficient to prove that the precedessor intended to exclude the adjacent right of way when conveying the property to the Raabs, Ms. Matrinez's parents. Additionally, there is no evidence

that a predecesor intended to reserve the right of way for themselves. No one, other than King County, has ever claimed that the fee underlying the right of way does not belong to Ms. Matrinez. Ex. 10 (Matrinez Decl.).

### 2. The "second class shorelands" grant in the Plaintiffs' deeds conveyed both uplands and the servient estate to the right-of-way easement.

The origins of the phrase "second class shorelines" which appears in the remaining Shorelands Plaintiffs' deeds overwhelmingly establish that these Plaintiffs and their predecessors received all lands between the lake and the right of way, as well as fee title underlying the full right of way itself. And the subsequent actions taken by Plaintiffs and their predecessors, as well as the absence of any action taken by any third party, confirm this is so. Starting from north to south, the parcels with the "second class shorelands" grants were conveyed to the Hughes Estate, Nelson, Freedman, Barrett, and Collins Plaintiffs.[9] *See* Ex. 2, p. 3.

The deed history for these properties is materially common to all these Plaintiffs until the mid-1900s where their chains of title diverge. All these properties are in a single Government section. One lot owned by the Hughes Estate is in Government Lot 1 and all the other Shorelands Plaintiffs' properties, including a second lot owned by the Hughes Estate, are in Government Lot 2. Plaintiffs will address the properties in the two Government lots separately where they diverge.

All these Plaintiffs have deeds which reference ownership of "second class shorelands" which, by definition, would ordinarily mean they are underwater and adjacent to so-called "uplands," i.e., dry ground. *See, e.g.*, *Albee v. Town of Yarrow Point,* 445 P.2d 340, 343 (Wash. 1968).[10] But that is not the case here.

---

[9] The Hughes Estate owns two parcels, Tax Lots # 9071 and # 9085.

[10] "'Second-class shorelands' means the shores of a navigable lake or river belonging to the state,

19

### a. As of 1944, the Palmberg heirs, Plaintiffs' predecessors, owned (1) the uplands in Government Lot 1, including the fee underlying the right of way, and (2) both the uplands and shorelands in Government Lot 2, including the fee underlying the right of way.

The story of these properties begins in the late 19th century. In 1890, Alfred Palmberg received a patent from the United States which perfected his claim and included, among other lands, Government Lots 1 and 2 of Section 20, Township 25 North, Range 6 East. Ex. 3 ¶ 49 (Klinge Decl.). Before then, in 1887, Palmberg had executed a right-of-way deed to the SLS & E railway company expressly reserving "[a]ll riparian and water front rights on Lake Sam[m]amish … ." This Court has determined that Palmberg gave the railroad only an easement. *Beres v. United States*. 97 Fed. Cl. 757 (2011), thus reserving the underlying fee title to himself.

Alfred Palmberg died in 1908, and his wife, Bertha, died in 1918. Before their deaths, Palmberg deeded a one-acre cut-out parcel in the southeastern corner of Government Lot 2 to Alonzo Stares (hereinafter "A. Stares Tract"). This conveyance only matters here to the extent that it affects the disposition of the remaining estate later, as will be seen.[11] When Bertha married Alfred, she already had three children, and then she and Alfred had three more children. Ex. 3 ¶¶ 49, 55 (Klinge Decl.). Bertha left all the remaining Palmberg property to her six children. *Id.*

Ten years later, in 1928, Alfred Palmberg's son, Alfred W. Palmberg, sought to purchase second class shorelands in Government Lot 2 from the State of Washington.[12] As part of that application, a title report ("1928 Title Report") was

---

not subject to tidal flow, lying between the line of ordinary high water and the line of navigability, and more than two miles from the corporate limits of any city." Wash. Rev. Code § 79.105.060 (17).

[11] None of the properties in this group with the shorelands deeds have A. Stares in their chain of title.

[12] The Legislature classified shorelands by their proximity to cities. First class shorelands were those

prepared and submitted to the State. Ex. 3 ¶ 52 (Klinge Decl.). The 1928 Title Report referenced two parcels, one of which was Parcel B.[13] *Id*. Parcel B was described as follows: "All of Government Lot 2, EXCEPT [A. Stares Tract] and except railroad right of way and except County roads." *Id*. Thus, Parcel B was all the land in Government Lot 2 except the A. Stares Lot (since the railroad right of way and County road references were merely notice of easements and could not have been meant to exclude them). The Title Report reflects that the owners of Parcel B were all of Bertha's six children (three of whom were Alfred Palmberg's stepchildren): A. Palmberg, Maude Palmberg, Anna B. Stangroom nee Palmberg, Bessie Zengel, Gertie Gorman, and Bert Stares as tenants in common.

The 1928 Title Report confirmed that the heirs owned all of Government Lot 2 to the Lake (except the A. Stares Tract):

> The records do not disclose the location of the railroad right of way with reference to the meander line of the high water line, however, the deed to the railroad company of the right of way expressly reserves all riparian and water front rights on Lake Sammamish.

*Id*.

In this same timeframe, when the State was in the process of selling the shorelands, the engineer who inspected the site explained that there was a strip of uplands between the shorelands and the right of way:

> These plats show the railway right of way and the county road right of way mentioned in the descriptions and also show that *the line of high water is*

---

within a mile of an incorporated city. *Davidson v. State*, 802 P. 2d 1374, 1376 (Wash. 1991).

[13] Parcel A was also referenced, which was the one acre cut-out previously conveyed to Alonzo Stares. This is not to be confused with a different Parcel A that shows up later in the story.

> *located outside of the west line of the Northern Pacific right of way*, and also
> outside of the government meander line.

Ex. 3 ¶ 52 (Klinge Decl) (emphasis added). The reference to "high water" was to
"ordinary high water" which is the upper limit of the shore lands. *Ghione v. State*,
175 P.2d 955, 963 (Wash. 1946). Therefore, when the State was selling shoreland to
the Alfred Palmberg heirs, there was some non-shoreland (i.e., uplands) on the west
side of the railroad right of way. Of course, the State could only sell the shorelands.
This strip between the shoreland boundary and the right of way boundary was
already owned by the Palmberg heirs.

The State of Washington approved the conveyance of second class shorelands
adjacent to the uplands in Government Lot 2 (excepting the A. Stares Tract), full
payment was made in 1940, and the State executed a Deed to the six Palmberg
heirs. Ex. 3 ¶ 52 (Klinge Decl.). The Deed conveyed all second class shore lands: "In
front of [Government] lot 2 … except [the A. Stares Tract]." *Id.*

### b. In 1945, the Palmberg property was the subject of a partition action which used the phrase "second class shorelands" to mean all lands from the lake to the east border of the railway, thus including the right of way itself.

Just five years later, in 1945, the family had a dispute and Bert Stares, son of
Bertha Palmberg, sued his five siblings for partition in King County Superior
Court.[14] As will be seen, in this partition action, the "second class shorelands"
phrase was used to describe all the Palmberg lands in Government Lot 2 that went
all the way from the lake on the west to the east side of the right of way—i.e., the
"second class shorelands" description included the strip of uplands between the lake

---

[14] While partition actions pre-date this statute, the 1881 statute governing partitions that applied in
1945 still applies today, found in Wash. Rev. Code § 7.52.010, *et seq.*

and the railway, as well as the right of way itself. Initially, the phrase was used in the description of a parcel of land (called Parcel B) that included the lands to the east as well as the "second class shorelands." But as will also be seen, later Parcel B was split in the partition proceedings and, in that split, all lands east of the right of way were referred to in the partition proceedings as Parcel B, and the remaining part—the right of way, the uplands, and the shorelands, continued to be referred to as "second class shorelands."

The complaint for the partition filed by Bert Stares in late 1945 described three discrete parcels for partition: Parcels A, B, and C.[15] Parcel A is not the same "Parcel A," that concerned Alonzo Stares previously, but instead referred to Government Lot 1, which includes Plaintiff Hughes Estate's parcel, discussed in more detail below. Meanwhile, Parcel B included the description of the second class shorelands adjoining and abutting Parcel B, germane to the merits of the five properties in Government Lot 2.

The complaint described Parcel B as including the second class shorelands which were themselves described as "adjoining" *the east side* of the railroad right of way. In other words, the shorelands included the right of way itself:

> Beginning at the northeast corner of said Government Lot 2; thence south along the east line thereof, 569.64 feet; thence west 221.58 feet; thence southwesterly at right angles to the right of way [of the railroad] *15.3 feet to the northeasterly line of said right of way*; thence northwesterly *along said northeasterly line* to the north line of said Government Lot 2; thence east

---

[15] Parcel A was in Government Lot 1 and relates to the Hughes Estate, the northernmost property. *See infra* at 24 for separate discussion of title chain for this property. Parcel C described an area south of the A. Stares Tract, which land was subsequently removed from the suit, and in any case is not germane to the Plaintiffs with deeds referencing the shorelands.

along said north line to the point of beginning; *TOGETHER WITH second class shore lands adjoining*, EXCEPT County Road.

Ex. 3 ¶ 53 (Klinge Decl.) (emphasis added); *see also* Ex. 3-VVV (light gray area). Hence, in the context of this description of the land under the jurisdiction of the Washington Superior Court in this partition action, the phrase "second class shore lands," while techinically a misnomer, became the shorthand description of all the land southwesterly of the easterly line of the railroad right of way—namely, from west to east, the shorelands, strip of uplands, and the right of way itself.

A year later, in late 1946, a title company examined the same three parcels described in the complaint and filed a title report ("the 1946 Title Report"). *Id.* at ¶¶ 54–55. The 1946 Title Report concluded that as a result of the tax foreclosure sale, (1) Parcel B, *except second class shorelands*, was vested in the Stangrooms; and (2) the second class shore lands adjoining Parcels B and C were vested as one-sixth interests in each of Bertha Palmberg's children or their estates: the heirs of Alfred W. Palmberg (the son), Maude Palmberg, Annie Stangroom, Gertie Gorman, Bert Stares and the heirs of Bessie Zengel.

**c. The partition action resulted in the sale of the "second class shorelands" to Plaintiffs' predecessors in title, in which sale the shorelands continued to be treated as including all lands to the eastern edge of, and therefore including, the right of way.**

The partition court commenced trial and entered findings of fact and conclusions of law in early 1949. Ex. 3 ¶ 56 (Klinge Decl.). The court found that the Stangrooms acquired the Parcel B property (which now excluded the so-called shorelands all the

way to the eastern side of the right of way). *Id.* The Court ordered the sale of Parcel A, and the second class shorelands adjoining Stangroom's Parcel B.[16] *Id.*

Subsequently, following the referee notice of sale, the referee's return of sale concluded that J.J. Simpson was the winning bidder for Parcel A (all of Government Lot 1 owned by the Palmberg heirs) at $7,500, and that J.A. Earley was the winning bidder of the second class shorelands adjoining the former Parcel B (in Government Lot 2) and Parcel C combined at $6,600. The court confirmed the referee's sale. *Id.* at ¶ 57. Simpson is the predecessor in interst to the one property owned by the Hughes Estate Plaintiff in Government Lot 1 (Lot # 9071), and Earley is the predecessor in interest to the remaining Shorelands Plaintiffs—Hughes Estate, Freedman, Barrett, and Collins (Lot #9028), in Government Lot 2.

### d. The subsequent history of these properties shows the Shoreland Plaintiffs received and retained, through their titles, fee interest in lands nicknamed "second class shorelands"—i.e., the shorelands, uplands, and right of way.

#### (i) *The Hugheses received and retained all lands in the partition action in Government Lot 1 except for the part later deeded east of the right of way.*

The Hughes Estate owns the right of way because it acquired all the land owned by Palmberg in Government Lot 1, as well as the later-purchased shorelands. In the

---

[16] The referee's sale of real estate (somewhat confusingly) used the phrase "Parcel B" to describe the sale of "The second class shorelands adjoining the following described property . . ." and then described that adjoining land which had previously been labeled Parcel "B" in the partition proceedings. No matter. The referee's new moniker, "Parcel B," necessarily excluded the portion which was quieted in the Stangrooms and necessarily included the remaining Palmberg-heirs land in Government Lot 2, referred to as the so-called shorelands that had been excluded in the title quieted in the Stangrooms.

partition action, J.J. Simpson bought Parcel A and, later, Gertie Hughes (who subsequently bought Parcel A from Simpson), bought the shorelands from the State.

The purpose of the partition action was to allocate to the six Palmberg heirs the property owned by Bertha Palmberg. Parcel A was the property in Government Lot 1 and must have included all the land Palmberg owned in Government Lot 1, including the fee underlying the right of way. Nonetheless, the deed Simpson received from the partition sale described the property as follows:

> Beginning at a point on the north line of Government Lot 1, 630 feet east of the northwest corner thereof; thence south 900 feet; thence southwesterly at right angles to the right of way of the Northern Pacific Railway Company (formerly Seattle and International Railway) *to the northeasterly line of the said right of way*; thence southeasterly along said northeasterly line to the south line of said Government Lot 1...; EXCEPT County Road.

Ex. 3 ¶ 68 (Klinge Decl.) (emphasis added).[17] In using the "northeasterly line of the said right of way," the court must have been rotely using the same concept as had been used for Parcel B—albeit with less specificity. This is so because in Parcel A, at the time of the partition, there was not yet any ownership by Palmberg or the heirs in the shorelands, and the sale to J.J. Simpson was intended to dispose of all the estate in Government Lot 1 (which included the right of way). Accordingly, the sale to Simpson had to include the entire right of way in Government Lot 1. This was in contrast to Parcel B, where the heirs did own the shorelands, and where the partition split the property in two. Moreover, the subsequent history further establishes that Simpson got all of Government Lot 1, including the uplands and right of way.

---

[17] The deed to Simpson is different from the deed to Stangroom in that it does not use a metes and bounds description to describe the edge of the right of way as a property boundary. No distance to the right of way is provided.

Shortly after he purchased Parcel A in the partition sale, Simpson conveyed Parcel A to Gertie Gorman Hughes, Alfred Palmberg's step-daughter. Ex. 3 ¶ 69 (Klinge Decl.). While Gertie was buying the property, she sought to purchase the adjoining shorelands from the State. *Id.* at ¶ 70. Simpson, then still owner of the uplands, waived his right to purchase the shorelands, and the State sold them to Gertie. *Id.* The State described the "second class shorelands" as being adjacent to the Parcel A that Simpson had bought in the partition action and subsequently conveyed to Gertie Hughes. *Id.* The railroad right of way had to be included within Parcel A because the owner of Parcel A was the one who had the preference right to purchase the adjoining shorelands. If Simpson had not purchased the entirety of the uplands, including the fee underlying the right of way, he would not have been treated by the State as the upland owner.

After purchasing shorelands from the state and the remaining lands from Simpson, Gertie Hughes owned both sides of the railroad right of way. When she sold the "second class shorelands" to her son and daughter in law, William and Betty Hughes, she used the same language consistent with the treatment of Parcel B in the partition action, which included any uplands west of the right of way and the right of way itself. Ex. 3 –WW and ¶ 71. Gertie also sold a portion of Government Lot 1 to her grandson and daugher in law, William and Peggy Hughes, but this sale did not include any of the right of way.  Ex. 3 –XX, YY and ¶ 72 (Klinge Decl.) In 1989, William and Betty Hughes sold the remainder of Parcel A to a third-party, Kao.

The deed to Kao described the property sold as extending only as far as "*the northeasterly line of Issaquah-Redmond county road*" and then along that road,

which lies east of the railroad right of way. (Ex. 3-DDD and Ex. 3-AAA (Klinge Decl.). The rest of the Hughes Estate—the so-called "second class shorelands" and the right of way itself—remained with the Plaintiff  Hughes Estate as is evinced both through the history of the use of the phrase "second class shorelands" in this area, as well as the subsequent actions taken by all parties involved.

Therefore, the Hughes Estate owns the full right of way underlying the right of way in Government Lot 1 that abuts their property, not simply because there is a "second class shoreland" deed which was used in the neighboring lot among various Palmberg family members and sucessors as the moniker for all lands to the east border of the right of way, but because the subsequent conveyance by the Hughes family to Kao, and all actions taken thereafter, *see* Ex. 11 (Hughes Decl.), make clear that the right of way and shorelands were intended to remain with the Hughes family.

    (ii)   *The rest of the Plaintiffs, in Government Lot 2, trace their ownership of the right of way back to Earley, who purchased the "second class shorelands" – i.e., the shorelands, uplands, and right of way – in the partition action.*

In the partition action, J. A. Earley bought all of the "second class shorelands" adjoining the uplands in Government Lot 2 that had not been previously sold to A. Stares many years before. (Ex. 3 ¶¶ 57-58 (Klinge Decl.). The court specifically approved of the deed to Earley and that deed used the identical language used during the partition action, wherein Earley received all second class shorelands described as running up to the northeasterly edge of the railroad right of way. To put it differently, if the partition action did not include the right of way in the deed to Earley, then the Court failed to accomplish the whole purpose of the partition

action—to divide assets among heirs. Hence, the only rational interpretation of the shoreland deed to Earley, and the recognition of Stangroom's ownership to a definite number of feet to the northeasterly line of the right of way, is that the deed to Earley included the right of way.[18]

Accordingly, the Plaintiffs in Government Lot 2 (successors of Rose A. Earley, the widow of J.A. Earley), received title to the right of way in their deeds which used the catch-all phrase, "second class shorelands" or "shorelands of the second class" (*See* subsequent conveyances as outlined in Ex. 3 ¶¶ 61-66 (Klinge Decl.); Ex. 13 ¶ 4 (Orrico Decl.).

> (iii) *Additional evidence confirms title in the right of way had transferred to Plaintiffs' predecessors and to Plaintiffs themselves.*

As to Government Lot 1, all lands went to the Palmberg heirs and, subsequently, were retained by the Hughes family when selling the lands east of the Parkway to Kao.

As to Government Lot 2, the only other possible owner of the right of way would have been Stangroom but not only do the above facts speak for themselves that Stangroom didn't get the right of way, the subsequent history shows neither Stangroom nor their successors did anything to suggest they owned it. After the partition was completed, the Stangroom Parcel B (east of the right of way) was not conveyed until the Estate of Annie Bertha Stangroom granted that same parcel in its entirety to Byco Inc. by Deed. Ex. 3 ¶ 56 n.11 (Klinge Decl.).

---

[18] If the deed to Earley did not include the right of way, then Earley would have no access from the only road which was on the east side of the right of way. It would be a truly odd result for the Court to authorize the sale of land to Earley that had no access to the only road which is separated from the Earley property by the railroad right of way, which was not transferred to anyone else.

Additionally the price Earley paid for so-called "shorelands" in the partition action shows that everyone involved understood that the shorelands included more land than merely the submerged lands. Shorelands then were sold by a price per length of shoreline, and not per square foot, measured in "chains"—a length of 66 feet. Gertie Hughes paid only $50/chain for the actual shorelands she bought from the State, but Earley paid $421.25/chain in the partition action. (Ex. 3 ¶ 57 n.9 (Klinge Decl.)). The fact that Earley paid over 8 times the price of so-called "shorelands" strongly suggests that Earley was buying more than land that was entirely underwater.

Further, in 1982, the King County Assessor caught the misnomer "shorelands" and corrected it for the purposes of assessing property taxes. The assessor wrote to Mr. William Hughes, predecessor to the Hughes Estate to explain that the Hughes property was being assessed for uplands despite his deed only referencing shorelands; this was so because Mr. Hughes' estate abutted the former Stangroom tract which had the easterly line as its border:

> Mr. Hughes [sic] property was described only as shore lands adjoin[ing] a tract of land in gov't lot 2 of the section. *The westerly line of the tract ran a course that was probably once the easterly line of the right-of-way. …*

> Judging from similar descriptions in the area, our feeling was that the shore line and the railroad right-of-way was assumed to be the same during the early years of property development along the shore of the lake. With that assumption in mind, we changed the adjoining property owner's tax description to describe the strip when it appeared that assumption best described the situation.

Ex. 3 ¶ 64 (Klinge Decl.) (emphases added).

In other words, the County Assessor's conclusion was that Mr. Hughes and *other* "shore land" owners were in fact the owners of not only the uplands west of the right of way—and were to be assessed property taxes for lands that had previously not been recognized as being uplands—but that their ownership of the "shorelands" included the right-of-way which were "assumed to be the same [as the shorelands] during the early years of property development." This conclusion is, of course, consistent with the history of the Bert Stares suit and the partition proceedings where the catch-all phrase "second class shorelands" included all lands from the lake to the easterly line of the railroad right of way.[19]

And finally, as detailed below, all the Plaintiffs in this group as well as their predecessors, consistently treated the right of way as their own and no one who could possibly have standing to suggest otherwise ever suggested to the contrary.

## II.    If Their Title Failed to Convey the Fee Interests Underlying the Right of Way, then Plaintiffs or Their Predecessors Adversely Possessed the Fee Title Subject to the Railroad Easements Before September 18, 1998.

Arguing that Plaintiffs would be unable to adversely possess the right of way segments at issue here because the possession would (1) interfere with federal control of railroad operations and (2) unlawfully result in the adverse possession of a reversionary interest (U.S. Mem. at 2–3; 21–30), the Defendant fails to realize or acknowledge that each of the predicates upon which it relies is false. First, private ownership (whether through adverse possession or by title) has not and will not interfere with federal control of railroad operations. Second, the fee title at issue is

---

[19] Plaintiffs started being assessed for property taxes around this same time frame. *See* Ex. 12 (Hughes Decl.).

burdened by a common law easement and, as such, is not a "reversionary interest or a remainder interest" (U.S. Mem. at 2.), in the classic sense, and the case on which Defendant relies involves a public easement which cannot be used adversely. This is in direct contrast to a railroad easement, where the fee title can be adversely possessed under Washington law.

Below, Plaintiffs contend that in the unlikely event their title failed to convey ownership underlying the railroad right of way, then the circumstances show they are entitled to partial summary judgment on the alternative basis that they or their predecessors adversely possessed the right of way.

A.  **The ICCTA does not preempt adverse possession of the underlying fee title to property that is burdened by a railroad easement if the adverse possession has no impact on and does not interfere with railroad operations or the STB's regulatory authority over the corridor at issue.**

Predicated on a series of decisions and cases that hold that a party cannot adversely possess a railroad corridor because that would result in interference with the strong federal policy of retaining rail property under federal control, the Defendant reasons that the I.C.C. Termination Act of 1995 (ICCTA) preempts Plaintiffs' adverse possession claims. (U.S. Mem. §II.A.1; *see also id.* at 26 (arguing the Court should rule the ICCTA preempts Plaintiffs' claim "because Plaintiffs' adverse possession of portions of the right-of-way would prevent BNSF ... from reactivating the line and conducting future rail operations, thereby carving strips of the right-of-way out of the national rail system.").) The argument fails at the outset because Plaintiffs' ownership of the fee title underlying the right-of-way easement— whether by title or through adverse possession—manifestly has not, does not, and

will not interfere with the federal government's control over this right of way. Nevertheless, we address the argument as presented.

The Defendant cites four cases and one STB decision finding that either adverse possession, or local government condemnation actions, were preempted by the ICCTA. As to the first, *Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675 (7th Cir. 2011), the Defendant aptly describes the holding as finding preemption because the condemnation action "would unreasonably interfere with transportation on the rail right-of-way." (U.S. Mem. at 23.)

In the second, *B & S Holdings, LLC v. BNSF Ry. Co.*, 889 F. Supp. 2d 1252 (E.D. Wash. 2012), the district court adopted the STB's test for determining whether a state law is preempted under *Jie Ao and Xin Zhou—Petition for Declaratory Order*, FD 34439, 2012 WL 2047726 (STB served June 6, 2012), cited by the Defendant in U.S. Mem. at 24. Both the STB order and the district court decision found adverse possession claims were preempted because they would "permanently strip the railroads of the real property they rely upon to engage in interstate commerce and conduct their business." *See B & S Holdings*, 889 F. Supp. 2d at 1257–58; *see also Jie Ao and Xin Zhou*, 2012 WL 2047726, at *7 (holding permitting adverse possession "would allow landowners to carve off strips of railroad ROW all over the country.").

The third case*, Buffalo Southern Railroad Inc. v. Village of Croton-on-Huds*on, 434 F. Supp.2d 241 (S.D.N.Y. 2006), involved a municipality's direct attempt to control railroad operations at a particular site and to condemn that site and acquire fee simple title. These efforts were clearly designed to interfere with railroad operations. Similarly, in the fourth case, *Wisconsin Cent. Ltd. v. City of Marshfield*,

160 F. Supp. 2d 1009, 1013–14 (W.D. Wis. 2000), the court found that a local government's condemnation action was preempted because it sought to control railroad operations and essentially prohibit the operations in a particular location.

The conclusions in each of these cases should not be divorced from the reasoning: adverse possession is not permitted *if* it prevents or interferes with federally-regulated interstate corridors. That is not the case here. Washington recognizes that one can acquire fee title via adverse possession while the property adversely possessed remains subject to any preexisting easements. *Earnheart v. Carlson*, 736 P.2d 1106, 1108 (Wash. App. 1987). Even if Plaintiffs' ownership of the fee interest via title were hypothetically invalid and Plaintiffs' ownership depends instead on adverse possession, the property remains subject to preexisting easements and their ownership presents no impediment to federal control. Accordingly, any claims for adverse possession of the underlying fee here should not be preempted by federal law: "state and local actions would not be preempted on their face as long as they did not prevent or unreasonably interfere with rail transportation." *B & S Holdings*, 889 F. Supp. 2d at 1258.

A thorough analysis of preemption by the ICCTA to further assist in this analysis can be found in *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404 (5th Cir. 2010). The court explained that federal statutory preemption begins with Congressional purpose, and that while the ICCTA prevents state law from interfering with federally-regulated interstate corridors, it does and cannot go beyond this purpose. Additionally, the court noted there is a presumption against preemption applicable to "'areas of law traditionally reserved to the states, like police powers *and property law* ....'" *Id.* at 407 (emphasis added) (quoting *In re*

*Davis*, 170 F.3d 475, 481 (5th Cir. 1999)). Ultimately, "only laws that have the effect of managing or governing rail transportation will be expressly preempted." *Id.* at 410.

In conclusion, Plaintiffs are claiming title to land which they acquired via adverse possession if their deeds were for any reason ineffective to convey land under the right of way. Critically, Plaintiffs do not claim that they adversely possessed as against the railroad and its easement, but rather that they adversely possessed as against any theoretical underlying fee owner. If Plaintiffs acquired title to land via adverse possession, that title remained subject to a railroad easement, remains subject to an easement for trail use, and remains subject to reinstitution of railroad use. Therefore, Plaintiffs' adverse possession claims in no way interfere with rail transportation or with federal powers to maintain interstate corridors. Accordingly, the Defendant's preemption argument should be rejected.

### B. Plaintiffs' claims that they own the land underlying the railroad right-of-way easement is not barred by Washington law concerning adverse possession claims against a municipality.[20]

As a preliminary matter, Defendant's effort at treading old ground to object to Plaintiffs pursuing ownership via adverse possession—"Notwithstanding the Court's lack of jurisdiction to entertain unperfected adverse possession claims" (U.S. Mem. at 22)—should be dismissed summarily not only because it's an undeveloped objection, but because it is meritless. The "jurisdiction" objection fails to come to grips with established precedent that, if the question of title is in dispute, the Court of Federal Claims is the appropriate forum to determine whether the plaintiff held a

---

[20] In this section, Plaintiffs assume, *arguendo*, that they are not owners of the fee title to the right of way by way of title, and for this reason present their arguments concerning adverse possession.

property interest when a plaintiff is seeking just compensation for the taking of private property by the United States.

And the "unperfected" argument (raised in its prior briefing on jurisdiction, *see* Dkt. 205, at 7), flies in the face of ubiquitous Washington law where the notion of "perfecting" title against third parties in this context is inapt: once the requisite elements of adverse possession are met in Washington State (as in most states), title *is* perfected—no court proceeding is required—and the land belongs to the adverse possessor. *See El Cerrito, Inc. v. Ryndak*, 376 P.2d 528, 533 (Wash. 1962) ("Once a person has title (which was acquired by him or his predecessor by adverse possession), the ten-year statute of limitations does not require that the property be continuously held in an adverse manner up to the time his title is quieted in a lawsuit. He may bring his action at any time after possession has been held adversely for ten years."); *Gorman v. City of Woodinville,* 283 P.3d 1082, 1083 (Wash. 2012) (citing *El Cerrito,* 376 P.2d at 533) ("*Title vests automatically* in the adverse possessor if all the elements are fulfilled throughout the statutory period") (emphasis added).

As to the merits, Defendant argues that under Washington law Plaintiffs cannot adversely possess against the owners of "reversionary interests" (U.S. Mem. §IIC), or "a remainder interest until the future interest becomes a vested interest." (*Id.* at 2.) The argument fails because it misunderstands Washington state law, primarily through misusing *Kiely v. Graves,* 271 P.3d 226, 230-31 (Wash. 2012). A complete reading of the Washington Supreme Court's *Kiely* decision demonstrates the

Defendant's argument is erroneous both on the law and the premise on which its argument is made.

In *Kiely*, the owners of property adjacent to an alley attempted to claim that they had adversely possessed the alleyway. Based on longstanding Washington law, the court reiterated that one cannot adversely possess against property held by a municipality for public purposes, as was the case with the easement in the alley at issue in *Kiely*. *Id*. at 935-37. The court also found that under the circumstances the person attempting to gain adverse possession could not obtain title against the owner of the underlying fee, subject to the easement in the alley. The Court explained the Washington law on public easements.

> [F]ee interests subject to public easements may be considered "mere future expectancies, 'bereft of enjoyment and incapable of pecuniary advantage.' " *Mall, Inc. v. City of Seattle,* 739 P.2d 668 (1987). We further stated, "Landowners with property abutting dedicated streets hold a reversionary fee interest to the center line of the street." *Id*. (citing *Roeder Co. v. Burlington N., Inc*., 716 P.2d 855 (1986); RCW 35.79.040). An adverse possession claim cannot be asserted against a reversionary interest or a remainder interest until the future interest becomes a vested interest.

*Id*. at 233 (some citations omitted). There are four reasons why this language from *Kiely* does not prohibit the adverse possession claims made by Plaintiffs.

First, the fee interest in a public easement for an alley or road was considered by the court to be completely "bereft of [present] enjoyment." *Id*. at 233. In regard to public streets, "the fee owner *cannot use the property for private purposes* without a special permit." *Mall, Inc*., 739 P.2d at 675, *cited in Kiely*, 271 P.3d at 233 (emphasis added).

This is not true for railroad easements as has been explained by the Washington Supreme Court when landowners sued to restrain the railroad from interfering with their use of land on the right of way:

> The railroad contends … that a railroad right-of-way, whether in fee or an easement, is entitled to exclusive possession.....

> However, we must look to the actual use being made of this easement in light of the rule that the servient owner retains the use of an easement so long as that use does not materially interfere with the use by the holder of the easement. That principle is well established.

*Veach v. Culp*, 599 P.2d 526, 528 (Wash. 1979) (emphasis added) (citations omitted).

In *Veach*, the Court reasoned that the railroad use was minimal in that case and that the landowners were permitted to use the right of way so long as it did not materially interfere with the railroad's operations. *Id.* (explaining "the average use by the railroad of this disputed track area would be approximately 1 hour and 15 minutes during the weekends and then only during the summer.")

Similarly, in the ten years between 1988 and 1998 here, the railroad made minimal use of the right of way. (Ex. 9 ¶ 14 (Schroeder Decl.)). As owners of the fee, the holder of the subservient estate was entitled to use the right of way in any way which did not materially interfere with the railroad's use thereof—*i.e,* the rail line could not be blocked. This is in stark contrast to streets, alleys and highways, where the exclusive-use nature of the interest drove the *Kiely* analysis. This renders the analysis from *Kiely* inapplicable to railroad right of ways.

Additionally, while not at issue here but illustrative of how railroad rights of way are treated differently from public streets and alleys such as in *Kiely*, Washington law allows for adverse possession of railroad property. *Netherlands*

*American Mortg. Bank v. Eastern Ry. & Lumber Co.* 252 P. 916, 917 (Wash. 1927).
This shows Washington treats railroad corridors as private property/thoroughfares
for purposes of property ownership under Washington law, and not as public
property or public thoroughfares.

Second, *Kiely* explains the whole case turns on the construction of Wash. Rev.
Code § 7.28.090, which prohibits adverse possession of land which the *government*
holds for public purposes:

> This case hinges on whether an easement dedicated for a public thoroughfare
> constitutes "lands held for any public purpose" under RCW 7.28.090. We hold
> it does.
>
> Initially, it is significant to note that one clause of RCW 7.28.090 prohibits
> adverse possession of government owned property and another clause
> disallows adverse possession of "lands held for any public purpose." In *State
> v. Lundquist*, 60 Wash. 2d 397, 403, 374 P.2d 246 [,249] (1962), the court
> noted, "A legislative body is presumed not to have used superfluous words."
> Therefore, we must give meaning to the "lands held for any public purpose"
> clause distinct from ownership. *The legislature must have intended the clause
> to refer to land held by the government* in something less than fee simple. An
> easement logically would be such a property interest.

271 P.3d at 232 (emphasis added).

The Court in *Kiely* recognized that "property" included a broad number of rights
and implicitly concluded that "land" as used in the statute was similarly broad.
*Kiely,* 271 P.3d at 232 ("When the public holds an easement, the 'lands held for any
public purpose' prong of RCW 7.28.090 is satisfied, barring adverse possession
claims against *that property*.") (emphasis added). Hence, the land burdened by a
public easement includes the fee, as long as the easement remains, and constitutes
land held for a public purpose. Pursuant to the statute, then, adverse possession

cannot apply to government-held land for public purposes, regardless of which interest in that land is at issue.

Here, a private company railroad, and not the local government, owns the easement, making *Kiely's* holding and analysis in support of that holding inapplicable to the issue of adverse possession of the subject properties.

Third, and related to the second point, the description of the interest underlying a street as a reversionary interest is more appropriate for a government-owned alleys, streets and highways than for a railroad easement because the interest in the fee underlying the railroad easement is not a reversionary interest in the classical sense. Reversionary interests are those which include no present rights to use the property (such as in *Kiely*), but rather rights that may come into existence based on future events. *E.g. Preseault v. United States*, 100 F.3d 1525, 1533-34 (Fed. Cir. 1996) ("Under traditional common law estates terminology, a 'reversion' is a future interest remaining in the transferor following the conveyance of certain lesser estates to a transferee, typically when the transferee takes a possessory estate of freehold, for example a life estate. An easement is not such a possessory estate of freehold.").

With alleys, streets and highways, the underlying property owner has no present right to use the right of way for private use. *Kiely*, 271 P.3d. at 234. Because the fee owner has no rights to use any part of the property in the street or alley as long as the easement remains, it is more like a classic reversionary interest. In the case of a railroad easement the fee owner retains right to use, which makes it different from a reversionary interest. *See Veach*, 599 P.2d at 528.

Fourth, and analogous to the reversionary-interest / easement-interest dichotomy, because the underlying fee owner can make no use of the area burdened by a public street, therefore making the interest more akin to a reversionary interest with no present rights to use the property, that owner of the underlying fee has no reason to be on notice of the unauthorized use or possession of a property. That is clearly not the case here. Purported third-party underlying fee owners were free to possess and use their present interest in the servient estate in any way that did not interfere with the railroad's use of the easement for railroad purposes. *Id.* But as shown below, this they did not do and instead did nothing when Plaintiffs were able (and did) adversely possess through their open and notorious occupation of the subject properties.

For the reasons under this fourth point, the concerns of the court in *Kiely* do not apply in the present case. As *Kiely* explained, adverse possession was impermissible under the circumstances specifically because encroachment on the public easement was prohibited as an interference with the public's rights:

> It is ultimately not possible to separate the adverse possession of the Graves fee simple interest from the encroachment upon the public easement. Because it is not permissible to encroach upon a public easement, it is not permissible to adversely possess the underlying fee interest. … To decide otherwise would encourage encroachments upon public easements and hinder public use."

*Kiely,* 271 P.3 at 234 (citing *Baxter-Wyckoff Co. v. City of Seattle*, 408 P.2d 1012, 1015 (Wash. 1965) (city power over use of public streets is exclusive)). Obviously, a busy railroad thoroughfare may as a practical matter limit the uses or extent of uses the owner of the fee can undertake without interfering with the easement. Here, in contrast, the relatively sporadic use of the rail line is not inconsistent with

servient estate owners freely using the area subject to the easement so long as not interfering with railroad operations. *Veach,* 599 P.2d at 528.

In conclusion, none of the concerns addressed in *Kiely* apply here, and the reasons for why they do not apply support the conclusion that there is no bar under Washington law to adversely possessing the servient estate of a property burdened by a railroad easement.

## C. Plaintiffs obtained fee title underlying the easement pursuant to adverse possession if they did not acquire the property pursuant to their deeds.

Plaintiffs seek partial summary judgment that they obtained title as of September 18, 1998, to the underlying fee, subject to the railroad easement, via adverse possession if for any reason their deeds are defective. Below, Plaintiffs review applicable Washington law on adverse possession and next present their evidence to establish their prima facie case that they have title to the subject property via adverse possession.

### 1. Washington State law on adverse possession

In order to establish a claim of adverse possession, there must be possession that is (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile to the record owner. *ITT Rayonier, Inc. v. Bell*, 774 P.2d 6, 8 (Wash. 1989) (citing *Chaplin v. Sanders,* 676 P.2d 431, 434 (Wash. 1984)). Each of these four elements must be concurrently present before the statutorily prescribed period of 10 years begins to run. Wash. Rev. Code § 4.16.020.

The following excerpts capture the application of the rules governing adverse possession under Washington law:

> The essence of adverse possession is just that-possession which is adverse. *It therefore is not possession which must be within the knowledge of the record owner.* It is possession which is adverse and contrary to the claims of the record owner. "The ultimate test is the exercise of dominion over the land in a manner consistent with actions a true owner would take."

*Doyle v. Hicks*, 897 P.2d 420, 422 (Wash. App. 1995) (emphasis added) (citation omitted).

> In determining what acts are sufficiently open and notorious to manifest to others a claim to land, the character of the land must be considered. "The necessary use and occupancy need only be of the character that a true owner would assert in view of its nature and location."

*Chaplin v. Sanders*, 676 P.2d at 437 (Wash. 1984) (citation omitted).

> The nature of possession and attendant acts necessary to constitute adverse use as to a residential parcel or property are deemed sufficient if a person pleading the statute takes and maintains such possession and exercises such open dominion [a]s ordinarily marks the conduct of owners in general, in holding, managing, and caring for property of like nature and condition."

> In other words, in determining whether the use and occupation of claimed lands has been sufficient to support title based on adverse possession, the *character* of the land should be considered. The necessary use and occupancy need only be of the character that a true owner would assert *in view of its nature and location.*

*Krona v. Brett*, 433 P.2d 858, 861 (Wash. 1967) (citations omitted).

### a. Element one: open and notorious use

Possession is open and notorious if a claimant can show *either* that "(1) that the title owner had actual notice of the adverse use throughout the statutory period, or (2) that the claimant used the land such that any reasonable person would have thought he owned it." *Riley v. Andres*, 27 P.3d 618, 621 (Wash. App. 2001) (citation

omitted). Thus actual knowledge on the part of the title-owner is not necessary so long as the use is open and notorious. *See Doyle*, 897 P.2d at 423; *see also Hovila v. Bartek*, 292 P.2d 877, 879 (Wash. 1956) ("[I]f the use of another's land is open, notorious and adverse, the law presumes knowledge or notice in so far as the owner is concerned.") Here, of course, Plaintiffs maintain they are the true owners, rendering the first option impossible—to Plaintiffs' knowledge there were no theoretical title owners to have actual notice of the adverse use. For this reason all Plaintiffs rely on the second prong to show they used the land such that any reasonable person would have thought these Plaintiffs owned it.

In *Riley v. Andres,* the Court of Appeals found that lawn and yard maintenance activities on the land claimed was enough to establish the open and notorious requirement of adverse possession:

> Planting trees without maintaining or cultivating them is not open and notorious use. *[]* But, according to the Rileys, they did more than plant trees and shrubs. After planting several rhododendrons and other bushes in 1968, the Rileys maintained the landscaping on the strip, at least until 1993. They watered and pruned the plants, spread beauty bark, and pulled weeds. And a party who claims by adverse possession must show that its use is that of a true owner, given the lands' nature and location. *[] Here, landscaping was the typical use for land of this character.*

27 P.2d at 621 (emphasis added) (internal citations omitted). The court in *Riley* was following the similar holding in *Chaplin,* where the Washington State Supreme Court found that "consistently maintain[ing] and mow[ing]" a parcel claimed for adverse possession was enough to satisfy the open and notorious requirement. *Chaplin*, 676 P.2d at 437.

Altogether, "in determining what acts are sufficiently open and notorious to manifest to others a claim to land, the character of the land must be considered." *Id.* (citing *Krona*, 433 P.2d 858). "The necessary use and occupancy need only be of the character that a true owner would assert *in view of its nature and location.*" *Chaplin*, 676 P.2d at 437 (emphasis in original) (citing *Krona*, 433 P.2d at 861).

### b. Element two: actual and uninterrupted possession

The general test for actual and uninterrupted possession overlaps with the open and notorious element of the test. *See Washington Practice: Adverse Possession and Related Doctrines—Actual possession—Principles* § 8.9 (2012); *see also Chaplin*, 676 P.2d at 437. As such, "'[u]ninterrupted' obviously does not mean literally that the adverse possessor must be bodily on the land every minute of the statutory period" or that "he has to have permanent, visible objects there all that time." *Id.* Rather, actual and uninterrupted possession is found when the claimant *acts in the same manner that the true owner would. Id.; see also Howard v. Kunto*, 477 P.2d 210, 213 (Wash. App. 1970), *overruled on other grounds by, Chaplin,* 433 P.2d 858 (seasonal use of summer-home land held to be continuous); *Lee v. Lozier*, 945 P.2d 214, 219 (Wash. App. 1997) (finding seasonal occupancy of a summer house did not destroy the continuity of claimant's use where the use was consistent with that of a true owner).

A claim for adverse possession may be defeated if there is a significant or substantial break or abandonment of the claimant's continuity of possession, *see Noyes v. Douglas*, 81 P. 724, 725 (Wash. 1905), but that will not be an issue here.

### c. Element three: exclusivity of use

Like the elements above, "[t]he ultimate test [of exclusivity] is the exercise of dominion over the land in a manner consistent with actions a true owner would take." *Lilly v. Lynch,* 945 P.2d 727, 732 (Wash. App. 1997) (citation omitted). But "[a] claimant's possession need not be *absolutely* exclusive in order to satisfy the exclusivity condition of adverse possession." *Id.* (citing *Crites v. Koch,* 741 P.2d 1005, 1008 (Wash. App. 1987)) (emphasis in original). In fact, the "occasional, transitory use by the true owner usually will not prevent adverse possession if the uses the adverse possessor permits are such as a true owner would permit a third person to do as a 'neighborly accommodation.'" *Id.* (citation omitted).

This neighborly accommodation—that is to say, actions by the true owner that do not negate the exclusivity element—can range from the true owner occasionally walking across the disputed area, *see Froland v. Frankland*, 431 P.2d 188, 191-92 (Wash. 1967) (*overruled on other grounds by Chaplin*, 676 P.2d at 436 n.2), to occasional parking of farm equipment. *See Crites,* 741 P.2d at 1008. For example, in *Frolund,* the Washington Supreme Court held,

> [T]he evidence reveals that the children of the parties, as well as those of other neighbors, played about and over the various neighborhood beach areas with no more than the usual parental approval and restraint, and that the parties themselves occasionally, socially, and casually visited back and forth, and sometimes assisted one another in the performance of various work projects, e.g., beaching the swimming raft for winter storage. Such conduct, under the circumstances, denotes neighborliness and friendship. It does not amount to a subordination of defendants' adverse claim to the disputed wedge....

431 P.2d at 192. Furthermore, in *Crites*, the true owners used the disputed property to occasionally park farming equipment as a shortcut to another parcel of land,

which the court held was merely an accommodation—i.e., did not eradicate the adverse-possessor's claim—as compared to the possessor's "intensive" use which "differed fundamentally in scope and substance" from the "slight" use made by the true owner. 741 P.2d at 1008.

In the end, the crux of the "exclusivity of use" component to adverse possession is simply that the "occupancy and use of property, for the purposes of establishing adverse possession, need only be of the character that a true owner would assert, considering the nature and location of the land. *See Lilly*, 949 P.2d at 732; *Bryant v. Palmer Coking Coal Co.,* 936 P.2d 1163 (Wash. App. 1997).

Here there is no use by any purported record owner of the right of way at all. While there may have been others who used the right of way, for parking, driving or playing, all such use by others was merely a neighborly accommodation.

### d. Element four: hostile use

Hostility "is merely possession without permission of the owner or of anyone who has the legal power to grant permission." *Washington Practice: Adverse Possession and Related Doctrines—Hostility—In general* § 8.12 (2012). However, "[h]ostility does not imply enmity or ill will between disseisor and disseissee; in most cases they do not communicate at all about possession." *Id.* Rather, this element "requires only that the claimant treat the land as his own as against the world throughout the statutory period." *Chaplin*, 676 P.2d at 436.

"The nature of [the claimant's] possession will be determined solely on the basis of the manner in which he treats the property." *Id.* at 436. Even "if the owner knows of the adverse possession and allows it, perhaps in the mistaken belief that the possessor is the owner, this *will not* prevent the possession's being hostile."

*Washington Practice: Adverse Possession and Related Doctrines—Hostility—In general* §8.12 (2012) (emphasis added) (*citing Hovila,* 292 P.2d 877.

### e. Statute of limitations to challenge adverse possession

Under Wash. Rev. Code § 4.16.020, the party claiming adverse possession must have satisfied all the above-described elements and used the land as their own for a minimum of ten years. With the exception of the Spencers and the Freedmans, all Plaintiffs have used the right of way for ten years prior to the taking of the property on September 18, 1998. But so long as Spencer and Freedman predecessors in interest commenced adverse possession on or before September 18, 1988—which they did—that adverse use is included in the equation under the doctrine of "tacking." *See Shelton v. Strickland*, 21 P.3d 1179, 1184 (Wash. App. 2001) ("the element of hostility…does not bar the application of privity to successors through documentary conveyances")*; see also Washington Practice: Adverse Possession and Related Doctrines—Uninterrupted (continuous) possession—Tacking* §8.18 (2012) ("[T]he Washington Supreme Court regards an adverse possession that continues against successive record owners as one continuing period.").

### f. Scope of the adverse possession

Consistent with the overarching maxim that the possession which ripens title is the type of use an owner would make of the property, the physical scope of the possession is not limited to the actual footprints upon which use occurred for a ten year period. If it were, then courts would be forced to carve up lots into potentially numerous irregularly shaped new parcels of land.

Fortunately, the Washington courts have dealt with this issue. In *Lloyd v. Montecucco*, the court explained that just because the adverse use presented in a

jagged line, and the possessor did not occupy every square yard, the trial court's demarcation of the use was proper. 924 P.2d 927, 931 (Wash. App. 1996).

**2. Plaintiffs' evidence shows that under Washington State law they (or their predecessors) satisfied the elements of adverse possession to the subject properties on or before September 18, 1998.**

**a. Donna Marie Raab Matrinez**

Ms. Matrinez is the owner of property which her parents purchased in 1967. Her parents, the Raabs, built sheds, planted gardens, including construction and maintenance of artificially raised beds and fenced the gardens to protect them from deer. *See* Ex. 10 (Matrinez Decl.). The use was extensive, continuous, exclusive and involved the construction and use of multiple structures. The Raabs' and Ms. Matrinez's possession meets the standard for open, notorious, actual and uninterrupted and use hostile to any other claimant to title. *Id.*

No purported third-party owner ever granted permission for the Raabs' extensive use of the right of way. While these uses did not interfere with the railroad's use, they are all uses which are inconsistent with railroad use. But because these uses, related to gardening structures and improvements are not railroad uses, any theoretical title owner should have been aware that these uses were not being done by the railroad pursuant to its easement. Because the use was open and notorious, actual and uninterrupted, exclusive, and hostile to any theoretical record owner, Matrinez has established ownership of the railroad right of way no later than September 18, 1998, the date of the taking at issue in this case.

### b. Clifford and Kathy Schroeder

The Schroeders purchased their property in 1974. *See* Ex. 9 (Schroeder Decl.).
Their use of the railroad right of way has met all of the requirements for obtaining
title via adverse possession under Washington law.

For well over 10 years, the Schroeders have used the entire right of way adjacent
to their property in an open, notorious, actual, uninterrupted, exclusive and hostile
manner. One day in 1977, they discovered a car overturned in a gully or ravine
about 20 feet deep along the rail line with a person crying for help. After helping
her to safety, they filled in the ravine They filled in the gullys on both sides of the
rail line so that they are no longer 20 feet deep, but relatively level with the surface
of the rail line. Shortly thereafter, the Schroeder planted numerous trees and
installed an irrigation system through the right of way to water plants and trees. In
fact, the area of the right of way that they have maintained is colloquially referred
to as the "arboretum section" of the King County trail. *See* Ex. 9 (Schroeder Decl.).

Another portion of the right of way is an area where they have paved with
asphalt which they use for parking and their driveway. In the northwest corner of
the right of way, there is an area in which they have a vegetable garden.  They have
actively maintained these uses that together cover all of the right of way for well
over 40 years. *See* Ex. 9 (Schroeder Decl.). No one has ever disputed the Schroeder's
use or title to the right of way prior to King County being authorized in 1998 to
operate a trail. On the whole, because the Schroeders' use of the right of way has
been open and notorious, actual and uninterrupted, exclusive, and hostile to any
theoretical record owner, the Schroeders established ownership of the railroad right
of way no later than September 18, 1998, the date of the taking at issue in this case.

### c. John and Carolyn Rossi

The Rossis purchased their property at issue in this case in 1983. Ex. 6 (Rossi Decl.). Shortly thereafter, the used the western half of the right of way in a manner which meets all the requirements to acquire title by adverse possession. In the early 1985, they installed a basketball hoop on the west side of the right of way and paved a portion of that half with asphalt. Between the basketball hoop and the railroad right of way, the Rossi's planted trees to provide a buffer from the road and have maintained them ever since. The Rossi's or their family or invitees have used the area as a basketball court and for parking vehicles and other uses related to residential use. *See* Ex. 6 (Rossi Decl.). They are clearly not railroad uses and anyone who might theoretically claim to own the right of way on theory that the Rossis did not purchase it should have been aware and defend their title to the property. No one ever did.

For the remainder of the west half of the railroad not paved for the basketball court and the planting of tres, they installed a vegetable and garden which they have been actively using since 1983 to this day.

On the whole, because the Rossis' use of the right of way has been open and notorious, actual and uninterrupted, exclusive, and hostile to any theoretical record owner, no one could mistake that the Rossis were possessing the right of way as if it were their own. The Rossis have established ownership of the railroad right of way no later than September 18, 1998, the date of the taking at issue in this case.

### d. Raymond and Lael Spencer

The Spencers purchased the property at issue in 1992. *See* Ex. 5 (Spencer Decl.). Since that time they have used the railroad right of way in a manner that entitles

them to title via adverse possession. While their use did not extend for 10 years prior to 1998, the date of the taking, they are able to show title by that date by tacking on the similar use of their predecessor for years before 1992. *Shelton v. Strickland*, 21 P.3d 1179, 1183 (Wash. App. 2001). Their predecessor's prior use is established by long time neighboring property owner. *See* Ex. 8 (McCallum Decl.).

The evidence submitted shows that both sides of the right of way have been used by the Spencers and their predecessors in ways the meet the requirements for adverse possession. In the southwest corner of the right of way, the Spencers have raised garden beds since 1992. Prior to that time, their predecessor used the same area by regularly mowing the lawn and other activities constituting lawn care. The right of way adjacent to the Spencers' property is a driveway which is paved with asphalt and is provided as a neighborly accommodation to others in his neighborhood. There is no recorded deed giving these neighbors, including the Brockways and the Rossi, access across the Spencer property or the railroad right of way. The law is clear that the exclusivity requirement for adverse possession is not missing when an adverse possessor allows others to also use the area as a neighborly accommodation. *See, e.g., Frolund v. Frankland*, 431 P.2d 188, 191-92 (1967), *overruled on other grounds by Chaplin*, 676 P.2d at 436 n.2.

Similarly, the east side of the right of way includes a small shelter for children to wait in a covered area for school buses. This is not a government provided service, but one which the Spencers, like their predecessors, provided to neighbors within the community. The Spencers also have fruit trees within the right of way and a flag pole used for an American flag. These are all uses inconsistent with railroad use. Any theoretical record owner should have been alerted to the fact that someone

52

else was possessing the right of way as if it were their own. The Spencers have acquired title to the entire railroad right of way via adverse possession.

### e. Reid and Susan Brockway

The Brockways purchased their property at issue in 1973 and built their home in 1992. *See* Ex. 7 (Brockway Decl.). In the period before they built their home, there was a vegetable garden in the right of way which they allowed neighbors to use and from which vegetables were used by the neighbors and the Brockways. (*Id.*). There was also a treehouse which their daughter and her friends played in as well as the surrounding overgrown area that consistuted the remainder of the right of way.

When the Brockways began building their home in 1992, they continued to use the right of way but in a different manner. They demolished the treehouse, maintained the area with grass and used it for parking and essentially an extension of their lawn. They have also planted apple trees and maintained them as well as harvested the fruit from them for now decades.

No one ever questioned the Brockway's use of the right of way. It should be clear that that the Brockways were using the right of way as if it were their own and, if for any reason they do not have title via the deed to their property, they are surely the owners via adverse possession.

### f. Robert and Beth Nelson and the Hughes Estate

As addressed above, Beth Nelson is one of the heirs of the Hughes Estate. Her father and mother, William and Betty Hughes owned the property in Government Lot 1 and the shore lands adjacent to the northern 200 feet of Government Lot 2. William and Betty Hughes deeded the southern 96 feet of the total 200 feet in Government Lot 2 to the Nelsons in 1977. Ex. 3 (Klinge Decl.)

In 1977, the Nelsons built their home on the uplands adjacent to the right of way. *See* Ex. 11 (Nelson Decl.) They lived on that lot until they sold the property in November of 1998. The used the entire uplands adjacent to the right of way for well over 10 years prior to the 1998 taking date. If for any reason, they were not the owners of the uplands as addressed above, they certainly became owners of the uplands through adverse possession.

In regard to the two lots immediately north of the Nelson's property owned by the Hughes Estate, one in Government Lot 1 and one in Government Lot 2, the Nelson Estate used those uplands extensively in the period of 1940 through 2000. *See* Ex. 12 (Hughes Decl.), They also used the right of way in several ways as well. A private road cut through the right of way in a diagonal pattern to access the beach area. The Nelsons had an excavation business and parked their equipment on the east side of the railroad tracks but with the right of way on a daily basis from 1986 to 1998. Ex. 11 (Nelson Decl.) The Nelsons had their septic drainfield on the right of way. (*Id.*)

If for any reason the Nelsons and the Hughes Estate did not acquire the right of way through their deeds, they certainly have acquired title prior to 1998 by their adverse possession of the right of way.

### g. Vannessa and Mike Collins

The Collins Plaintiffs bought their property (sometimes referred to as "Lot 9028") from the Estate of Zella F. Short on September 26, 1989. *See* Ex. 13, ¶17 (Orrico Decl). While their use of the right of way did not extend for 10 years prior to September 18, 1998—the Collins Plaintiffs were just under one year short of 10 years—their predecessor's use, paired with their own, spanned from 1983 to the

time of the taking in1998. Combined, they used the property in a manner that met all the criterion of adverse possession.

Zella Short bought the property from John Earley in 1983. See Ex. 13, ¶16 (Orrico Decl). Mrs. Short was a family friend to Mike Collins and to his extended family, who included Gordon Barrett Sr., Gordon Barrett Jr., Don Barrett, and many others. *See* Ex. 14, ¶3 (Collins Decl). Mrs. Short did not build a home on her property but used virtually all her property as a retreat for her and her family friends. She and they, at her invitation, used the right of way for recreation and attended to its landscaping and upkeep. *See* Ex. 14, ¶¶5-6 (Collins Decl). Activities included barbeques, hunting for arrowheads, frogs, and other treasures; campfires, fireworks, birthday and holiday celebrations; erecting tables, benches, and sheds (all built from trees harvested and milled by Mike Collin's family). (*Id.*) And they assisted Mrs. Short with extensive gardening and landscaping, including pruning, installing perennial and annual vegetable gardens, and they maintained the landscaping, mowing the grassed areas and controlling the blackberries, as well as planting deterrent plants such as holly and ivy to deter trespassers. (*Id.* ¶6.)

Mrs. Short passed away in 1986, but with the Short Estate's permission, the Collins/Barrett family continued this same upkeep and use of the right of way to the exclusion of trespassers or any outsiders. (*Id.* ¶¶7-8.) In 1987 Mrs. Short's daughter, on behalf of the Estate, gave Mike Collins permission to start making improvements to the property in preparation for purchasing it once probate was completed. (*Id.* ¶7.) The uses for recreation and maintenance continued, but added to that was the additional work needed to prepare for building the Collins home. And so before and after the purchase of his property (in 1989) Mr. Collins performed extensive

preconstruction work on Lot 9028, including soil testing, landscaping, design work, tree cutting, and site preparation. (*Id.* ¶8.) Thereafter, the Collins Plaintiffs build their home in 1991 and performed extensive landscaping, installed utilities, irrigation, and generally did a significant amount of project work across the entire property, including the right of way area except for the immediate are of the train track itself. (*Id.* ¶9.)

At no point, other than Zella Short, did anyone purport to give Mike or Vanessa Collins permission to use this property as their own. The use of this property was extensive and met the statutory period for adverse possession. Accordingly, long before the taking, the property was adversely possessed.

### h. Don Barrett

The Barretts bought their property in 1961 from Earley. (Ex. 15 (Barrett Decl.) ¶1). Just as all their neighbors did, when they bought the property they believed they were acquiring fee title under an easement and so treated the right-of-way area as their own. (*Id.* ¶¶3-4.)

The Barrett property was an unimproved lot that, beginning in 1982, they maintained year-round, every year, for their private use and recreation. (*Id.* ¶¶4-6.) Throughout the year they cleared and maintained streams, cleared ditches, maintained the access road and parking area, managed weeds and dead leaves, performed tree management, harvested firewood for campfires and residential wood fires; in the Spring they set up for family events, building picnic tables (milled by family), installing tarps, setting up hammocks. (*Id.*.) In 1994 they even installed a salmon fishery for the incubation of salmon and other fish. (*Id.* ¶5.) While the slope to the east of the rail bed was limited in usage because of the slope, the Barretts

56

cleared ditches in that area for the maintenance of stream flow. (*Id.* ¶.) As to the rest of the right of way, the Barretts kept the area natural, planting and maintaining rhododendron, roses, ivy, and native cedar trees throughout the property, as well as holly to inhibit trespassing. (*Id.*)

The Barretts used all of the right of way property as would any owner of the right of way. See discussion of applicable law, *supra*. As such, if they were not already the owners of the right of way, they acquired ownership by having adversely possessed the right of way before the date of taking.

### i.  Judith and Howard Freedman

The Freedman Plaintiffs bought their property on October 12, 1988, from Barry Lewis and his wife, and sold it in 2006. (Ex. 16 ¶1 (Freedman Decl).) When they bought the property they believed they were acquiring fee title under an easement and so treated the area as their own. (*Id.* ¶2.) While their use did not extend for 10 years prior to September 18, 1998—they were 24 days short of 10 years—their predecessors' use extended back to 1975. (*Id.* ¶¶1-4; Ex. 17 ¶3 (Lewis Declaration).)

Mr. Lewis made extensive uses of the right of way on its west side. He built the edge of his house, garage and driveway so that it overlapped the western edge of the easement one foot; next to the driveway and further into the easement he built a rock wall; with the exception of an 8' steep embankment sitting between the rails and his house, year-round he used all parts of the area to the west of the tracks by clearing, landscaping, and maintaining the area as well as installing a play area for his daughter, and he maintained a drain field, cleaning out trees and roots. (Ex. 17 ¶3 (Lewis Declaration).) In addition, on the flat area adjacent to the rails, he parked his boat, trailer, truck and stored firewood in a covered bunk. (*Id.*)

The Freedmans picked up from where Mr. Lewis left off as soon as they bought their property in 1988. (Ex. 16 ¶¶4-6 (Freedman Decl).) Additionally, in the steep embankments to the west and all of the area east side of the tracks they removed excessive brush (mostly blackberry bushes), and other excessive growth and continued to maintain those areas to minimize overgrowth. (*Id*. ¶5.) On the rest of the property, aside from the tracks and 5' to each side which were maintained by the railroad company, they used virtually every square inch by maintaining and mowing, pruning, weeding; planting flowers, shrubs, hedges, a vegetable garden, cypress, cherry, and other fruit trees; installing fencing and irrigation systems, and a walking area with a small garden, trail, bench, flowers, bushes and flowering trees; they stored a sailboat and trailer, wood piles, and maintained the septic drain field. (*Id*. ¶¶4-6.)

Neither the Freedmans nor Mr. Lewis know of anyone who claimed that they were not the owners of the right of way and so they never received permission from anyone to use it as their own. (*Id*. ¶¶2-3; Ex. 17 ¶4 (Lewis Decl).) In short, by 1985, first through the actions taken by Mr. Lewis and next by the Freedmans, the Freedmans had adversely possessed the right of way and owned that land the day the United States took it without compensation.

While all Plaintiffs believe they acquired the fee underlying the right of way through their deed to their property, they certainly have used the right of way as if it were their own for far more than the ten year statutory period to acquire title via adverse possession. Their use has been open, notorious, exclusive, continuous and hostile to any other theoretical person or entity claiming title. And it is beyond

dispute that no one else has ever claimed title. Plaintiffs have met each element for adverse possession prior the date of taking in 1998.

## CONCLUSION

At a glance, the deeds at issue appear to have excluded the right of way. For the Plaintiffs to the south, the deeds used metes and bounds that bear a resemblance to the *Roeder* deeds, and to the north the deeds conveyed "shorelands." But the evidence surrounding the conveyances as well as the subsequent history—to be considered when construing these deeds—overwhelmingly show that the strips of right of way were conveyed to these Plaintiffs and their predecessors in the deeds.

For all the deeds, the subsequent history shows no one else claimed title in the right of way. Further, in the deeds with metes and bounds, less than precise references were used, and the context in which they were granted shows it would have been nonsensical for the grantors to keep the right of way. That is likely why not one of them acted as if they had intended to reserve the right of way for themselves. As for the conveyances that referenced "shorelands," they granted not only shorelands but also the adjoining uplands, including the right of way. This shorthand name was understood by all the parties, the court, the title companies, the tax assessor and anyone else who was involved in the partition of the Palmberg estate in the mid-1900s, when the "shorelands" nickname was created for these properties in the Palmberg legacy. What's more, even if the deeds themselves did not convey the strips, Plaintiffs own them nevertheless through operation of adverse possession. To a person, they and their predecessors used the rights of way—without any third party's permission—as if they owned them, for all to see, for decades leading up to the taking.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendant's motion for summary judgment and instead enter partial summary judgment holding that each of the Plaintiffs filing this motion owned the servient estate, subject to the railway easement, when the United States took their properties without just compensation.

Plaintiffs also respectfully request that the Court schedule oral argument at its convenience.

Respectfully submitted this 2nd day of February, 2018.

ACKERSON KAUFFMAN FEX, PC

s/
Cecilia Fex
Ackerson Kauffman Fex, P.C.
1300 Pennsylvania Ave. NW, Suite 700
Washington, D. C. 20004
Phone: (202) 594-6825
Fax: (202) 789-7349
e-mail: fex@ackersonlaw.com
*Attorney of Record for the following*
*consolidated Plaintiffs:*
*Brown, et al.; Collins, et al.;*
*Estate of Pearl Welch, et al.;*
*Waverly Hills Club, et al.*

STEPHENS & KLINGE LLP

s/
Richard M. Stephens
Stephens & Klinge LLP
10900 NE 8th Street, Suite 1325
Bellevue, WA 98004
Phone: (425) 453-6206
e-mail: stephens@sklegal.pro
*Attorney of Record for the following*
*Consolidated Plaintiffs:*
*Beres; Ritzen, et al.; Morel, et al.;*
*Klein.; Chamberlin, et al.; Nelson, et al.;*
*Lane; Peterson, et al.; Schroeder,;*
*Manning, et al.; and Spencer, et al.*