IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **WARREN BERES**, *et al.*, | ) | |
| | ) | Nos. 03-785L, 04-1456L, 04-1457L, 04-1458L, 04-1459L, 04-1463L, 04-1465L, 04-1466L, 04-1467L, 04-1468L, 04-1469L, 04-1471L, 04-1472L, 04-1473L, 04-1474L |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES**, | ) | |
| | ) | |
| Defendant. | ) | The Honorable Marian Blank Horn |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF JERRY BROADUS

I, Jerry Broadus, make the following declaration:

1. I am a retired licensed land surveyor and inactive (retired) attorney in Washington State. I have considerable experience interpreting legal descriptions of property in King and other counties in Washington, and am the author of "Washington State Common Law of Surveys and Property Boundaries," a book that was accepted for continuing legal education credit in Washington. I have been qualified as an expert witness in property descriptions several times. My C.V. is attached here to as Exhibit A.

2. Richard M. Stephens, an attorney in this case, has asked me to review the property descriptions on three Statutory Warranty Deeds, all concerning parcels in Government Lot 2 of Section 32, Township 25 North, Range 6 East, W.M., in King County. The lots all lie between the abandoned right of way of a railroad and the

Declaration of Jerry Broadus   1

east shore of Lake Sammamish. The Government Lot 2 in question is a small portion of the Northwest Quarter of Section 32. Its southeast corner is the center of Section 32, its south line is the east-west centerline of Section 32, and its west line is the shoreline of the lake.

3. I have been assured by Mr. Stephens that all three deeds trace title back to one Willis J. Connell, who also owned the fee underlying the railroad easement. Mr. Connell produced a map, apparently drawn by a "J. Hudson," (an early surveyor in King County was named John Hudson, but I am uncertain whether he is the Hudson who drew this map) entitled "Willis J. Connell's Subdivision of Gov. Lot 2, Sec. 32-25-6," dated March 1927. This subdivision map was not recorded in the King County Auditor's office, but a copy is readily available at the King County Assessor's office. The subdivision map shows a line of lots, numbered from 1 through 31, running from the south line of the government lot north to a 15 foot wide strip along north line of the government lot. The west boundary of all the lots is a sinuous line apparently representing the shoreline of "Sammamish Lake," while the east line is a line shown as lying 50 feet west of a dashed line labeled "Nor Pac Ry." The dashed line is apparently the centerline of the railroad right of way.

4. The three deeds all use the same form of property description, although with varying degrees of exactness. The southerly deed, to Spencer, begins "at the intersection of a line of said Government Lot 2 with the southwesterly line of the Northern Pacific Railway right-of-way." The description then runs on a bearing and distance, along said right-of-way line, to the true point of beginning of the parcel,

Declaration of Jerry Broadus  2

and then runs around the parcel. The distances along the right-of-way line are given as exact, while the distances leaving and returning to the right-of-way are "more or less" distances (the back line of the parcel is the west line of the government lot, which is the shoreline of Lake Sammamish. Water boundaries move, consequently they do not provide a precise beginning point from which you can measure exact distances). The description also includes a parenthetical: "Also Known As Tract 8 and the northeasterly 25 feet of Tract 7, Connell's Subdivision of Government Lot 2, according to the unrecorded plat thereof."

5. The next deed, to Brockway, begins at the intersection of the south line of Government Lot 2 with the westerly line of the Northern Pacific Railway Right of Way. It then follows the same form of measurements to the true point of beginning of the parcel and around it, with exact distances along the right of way line and more or less distances running between the right of way and the west line of the government lot along the lakeshore. This deed also includes a parenthetical beginning "Being known as tract 16 and the south half of tract 17, Willis J. Connell's subdivision, according to the unrecorded plat thereof...". The final deed, to Rossi, follows the same format and ends with "Also known as Tract 26 and a portion of Tract 27, Willis J. Connell's Subdivision, according to the unrecorded plat thereof."

6. The bearings and distances in the deed descriptions appear to be copied from Connell's Subdivision unrecorded plat, as the exact distance given, on each deed, to the true beginning point of each parcel is the sum of the intervening tract distances

Declaration of Jerry Broadus   3

shown on the map. The survey control shown on the map consists solely of "Iron pipe" monuments at the southeast and northeast corners of Government Lot 2. The bearing of the south line of the government lot is described as "Westerly" on the map. The map contains no other bearings, and no distances, for the boundaries of the government lot. The only distance tie to the railroad right of way on the map is the number 254 between the shoreline and the west edge of the right of way at the south boundary of the government lot.

7. Thus, the three deeds contain metes and bounds descriptions along with additional statements that the parcels are also tracts and portions of tracts shown on the unrecorded plat. The question posed to me by Mr. Stephens is whether the metes and bounds descriptions in these deeds are "careful metes and bounds description[s]" describing the parcels as "extending up to the edge of the right of way" (of the railroad). As a surveyor, I am firmly of the opinion that the statements in each deed referring to the tract numbers in the unrecorded plat are the only way to properly define each parcel, that the distances called as running to the railroad right of way in the metes and bounds portions of the deeds are generally inaccurate, and that the property conveyed with each parcel should be treated the same as lots in a recorded plat.

8. Surveyors in western Washington quickly become familiar with the difficulties of tracing metes and bounds descriptions said to begin where government lot boundaries intersect other lines, such as right of way lines. The methods for defining government lot boundaries have never been clear, and have

Declaration of Jerry Broadus    4

been applied differently in different eras of surveying in this region. Specifically, with Section 32, the south line of Government Lot 2 should be defined as a line running straight west from the east quarter corner of the section to the shoreline of the lake. The problem arises in defining the exact direction of "west". Modern practice prefers to adopt a mathematically weighted mean bearing between the westerly directions of the north and south lines of the section, but this has hardly been the practice in the past. Prior surveyors may have merely run a compass line, or may have attempted to run parallel with some other "westerly" line in the vicinity. Once the area has become developed and families have built homes relying on past surveys, it becomes necessary for the modern surveyor to figure out where those past surveyors actually ran their lines. Any attempt to impose modern practice on parcels first surveyed in 1927 is bound to create chaos, with newly surveyed lot lines conflicting with long-settled occupation lines.

9. The modern surveyor addresses this historical problem by looking at prior records and by investigating where the visible evidence of property lines in the immediate vicinity of the problem have been marked and accepted in the neighborhood. I have not examined these parcels on the ground, but I have performed a record research of recorded surveys in Section 32, and have noted how past surveyors have resolved the boundaries of many parcels in "Connell's Subdivision of Government Lot 2, according to the unrecorded plat thereof."

10. County records disclose eleven recorded surveys in Connell's Subdivision (the recording numbers, referring first to the volume and then to the page number in the

Declaration of Jerry Broadus   5

survey records are: 29-176, 35-243, 74-292, 85-54 [which is a survey of the Brockway parcel], 121-177, 151-267, 215-165, 222-275, 258-29, 339-164/165, and 362-64). Four additional surveys in other parts of the section provide information on the government lot line running west from the east quarter corner, all by the same surveying company (recorded under 69-129, 71-72, 89-121, 100-86). Examining these documents give a detailed picture of how surveyors have approached surveying in Section 32, and the solutions they have reached.

11. First of all, these survey documents show that one cannot define the south line of Government Lot 2, which is the base line for the metes and bounds descriptions, as it should be done according to standard surveying rules–that being a line running straight west from the east quarter corner of Section 32. Instead, the line must bend at the "Iron Pipe" plat monument depicted on Connell's Subdivision as occupying the southeast corner of the government lot. This monument has been adopted for surveys both within and without the subdivision itself. Five recorded surveys have defined the government lot line by explicitly referring to the unrecorded plat, and four others have adopted the same base line using survey points found along the same line.

12. Furthermore, recorded surveys show that surveyors working in the area found existing tract corner pins at the corners of (at least) tracts 1, 2, 3, 7, 8, 9, 12, 13, 14, 15, 16, and 17 in Connell's Subdivision. The legal descriptions on the surveys disclose that these tracts were all described using the same metes and bounds method as used in the three deeds at issue here, with the same references to the

Declaration of Jerry Broadus   6

tract numbers at the end of each description. Also, occupation lines are shown on surveys of tracts 2, 12, 13, 14, 15, and 17, which match the method of surveying according to the unrecorded plat. (Note that modern surveyors of the various tracts would not show whether or not they had reached an opinion as to the ownership of fee title under an abutting railway, and no such opinion is evidenced in any of these surveys). Finally, it is common, when surveying in old plats to find monuments, usually in the form of iron pipes or pins, in rights of way. Eight of these surveys defined the railroad right of way by using such monuments.

13. The metes and bounds portions of the descriptions in the three deeds at issue do not precisely or carefully define the parcels as either including or excluding the adjoining fee portion of the abutting railroad right of way. The only exact distances run along the edge of the right of way, and one cannot define the starting point (where the south line of Government Lot 2 intersects the right of way) without referring to the unrecorded plat. The side line distances in the metes and bounds portions give only "more or less" distances, and inspecting the recorded surveys show that the actual sideline distances of these parcels are considerably at variance with the distances in the metes and bounds descriptions (in some instances over 80 feet longer).

14. For example, surveys of the south line of the Brockway parcel show that the distance measured by the surveyors between the westerly line of Government Lot 2 and the railroad right of way is about 16.5 feet longer than the "220 feet, more or less," recited in the Brockway deed. Similarly, a survey of the south line of the Rossi

Declaration of Jerry Broadus   7

parcel shows that the distance measured by the surveyor between the westerly line of Government Lot 2 and the railroad right of way is about 18.2 feet longer than the "210 feet, more or less," recited in the Rossi deed. The only way to survey the parcels in this unrecorded plat is to apply standard principles for surveying in older plats, using monuments, tract corners, and occupation lines to orient the survey.

15. It is common knowledge among surveyors that metes and bounds descriptions were regularly added to unrecorded plat descriptions at the insistence of the tax assessors, to "improve" the legal descriptions in case the assessor needed to use them for tax foreclosures. Descriptions based entirely on unrecorded plats have always been sufficient to support transfers of property, as long as the plats themselves were available for inspection and could be retraced by a competent surveyor using the same principles as they would apply to surveys in recorded plats. Using those principles, the distance in each deed from the westerly line of Government Lot 2 to the railroad right of way do not define the property because the property would extend to the lake shore, regardless of the actual distance shown on the deed or the plat. Additionally, the deeds include shorelands which means the property extends further than any distance indicated in the plat or in the deeds. In the case of the three deeds at issue here, it is my opinion that the metes and bounds calls in the deeds which give "more or less" distances to the railroad right of way are not accurate. Those calls do not clearly exclude the abutting fee underlying the railroad easement.

16. I was also asked to review the property descriptions of two parcels that were carved out of property deeded to J.A, Earley in Government Lot 2 of Section 20, Township 25 North, Range 6 East, W.M., in King County, that lies southwest of an abandoned railroad right of way, between it and the line of navigability of Lake Sammamish. Both parcels fit in to the northwest 200 feet of property that was deeded by Charles W. Bovee (referee appointed and authorized by a 1949 court decree) to Earley and recorded under AF 3911320. The description of the property in the deed to Earley recites: "Those portions of Govt. Lot 2, Sect 20, Twp 25 N, Range 6 E.W.M., KCW: 2nd class shore lands adjoining (an upland parcel).

17. Mr. Stephens provided me with paperwork from the 1949 partition action among the Palmberg heirs, King County Cause #367315. The "Findings of Fact and Conclusions of Law" state that the case resolves the interests of all parties, known and unknown, claiming any interest in the estate. Parcel B, in the "property involved herein" (Finding of Fact I) describes by metes and bounds an upland parcel that lies northeast of the railroad right of way, but also includes: "together with second class shore lands adjoining, EXCEPT portion if any, in said railroad right of way." Finding IV states that the interests of all persons in the property are described in a title report (I presume the same title report included in the Bill of Particulars filed with the case) that uses the same description for its Parcel B. Finding V states "That title to Parcel B, exclusive of second class shorelands," had been earlier acquired by Stangroom.

18. Conclusions of Law II requires that the "shore lands in Parcel B" should be sold, and Conclusion V appoints Bovee to that responsibility. Bovee's notice of referee's

Declaration of Jerry Broadus  9

sale thus describes its Parcel B as "The second class shore lands adjoining the following described property," followed by the description of the Stangroom parcel (which is the parcel that lies northeast of the railroad right of way).

19. The issue I was asked to examine was whether the property as described in the deed to Earley (and consequently the parcels that were carved out of the Earley property) includes a narrow strip of land that lies between the present shore of Lake Sammamish and the railroad right of way. In my opinion, it does.

20. The deed of shore lands to Palmberg heirs was executed in February of 1940 and conveyed the state's interest in "shore lands of the second class, as defined by Chapter 255 of the Session Laws of 1927." That definition, found in Section 8, covers "public lands belonging to the state bordering on the shores of a navigable lake or river not subject to tidal flow between the line of ordinary high water and the line of navigability..." At the time Palmberg's son applied for purchase, the Palmberg heirs already owned the adjoining portion of Government Lot 2. A government lot adjoining a navigable lake does not itself include lands below the ordinary high water line. Thus the deed from Bovee to Earley, which describes the adjoining second class shore lands as being included in "Those portions of Govt. Lot 2" is itself ambiguous, because shorelands by the statutory definition are not included in a government lot, and therefore subject to interpretation as evidenced by the actions of the parties, including other words in the documents conveying the properties in the partition of the Palmberg property.

Declaration of Jerry Broadus   10

21. The court case partitioning the property purported to cover all persons with interest in the Palmberg lands, directed that the "shorelands in parcel B" be sold, and describes those shorelands as "adjoining" the portion of Parcel B that lies northeast of the railroad right of way. "Shore lands" according to the statutory definition would not "adjoin" the portion of Parcel B lying northeast of the railroad if there was a narrow strip of land lying between the shore of the lake and the railroad right of way ("adjoin" is defined, in Black's Law Dictionary, 5th Ed. 1979, on page 39 as "touching or contiguous, as distinguished from lying near to or adjacent."). The word "adjoining" is further used in the Bovee notice of sale and in the deed to Earley. None of these documents state that their use of the word "shorelands" (or "shore lands") was limited to the exact statutory definition in the state's shore land deed to Palmberg and heirs.

22. The only logical interpretation, given that all of the interests in the Palmberg property were to be resolved, and given that Palmberg and heirs owned the statutory shore lands and the adjoining portion of government lot 2, is that all the land lying between the lake shore and the upland portion of the government lot, lying northeast of the railroad right of way, was intended to be disposed of. There is nothing to support an intent that the narrow strip of land between the shore and the railroad right of way would not pass to Early in the Bovee deed.

23. This logic supports a survey of one of the two parcels at issue here, recorded in 2013 for Mike and Allison Glover (vol. 301 page 54). That survey of the Glover parcel recites the same legal description (based on the Earley deed) of a portion of the "second class shorelands adjoining" (the upland parcel that lies northeast of the

Declaration of Jerry Broadus   11

railroad right of way) and depicts the property as extending all the way from the shore of the lake to the southwest edge of the railroad right of way. The same logic was apparently used by the surveyor of a boundary line agreement for Donald Barrett (vol. 261 page 18) recorded in 2009, which graphically shows all the parcels in the area extending to the railroad right of way, just above a notation of "2nd class shorelands Lake Sammamish."

24. The partition of the Palmberg property among his heirs confirmed property previously owned by Palmberg northeast of the railroad right of way in Stangroom, and that led to the deeding of the property southwest of the railroad to Earley. There is now a narrow strip of land, occupied by a house, between the railroad and the shore of the present lake. The evidence of the intent of this overall set of transactions is that that narrow strip should be accepted as part of the Earley land, and those parcels that were carved out of it. As those parcels abut the railroad right of way, and were not described by metes and bounds, they should be credited with the adjoining portion of the underlying fee title below the railroad easement.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct and was executed by me this 31 day of January, 2018, at _Puyallup_, Washington.

_Jerry R Broadus_
Jerry Broadus

Declaration of Jerry Broadus   12

# CURRICULUM VITAE

**JERRY RAY BROADUS**
PO Box 249, Puyallup, Washington 98371
Phone: (253) 279-4774
jbroadus@seanet.com

| | |
|---|---|
| **PROFESSIONAL LICENSES:** | Washington State Land Surveyor #17660 - Retired<br>Idaho State Land Surveyor #4337 - Retired<br>Washington State Bar Association, Attorney #14699 - Inactive |
| **LEGAL EDUCATION:** | University of Puget Sound School of Law; JD summa cum laude, awarded May 1984, Class Standing: first in class, GPA 3.75<br><br>**Honors and Activities:**<br>University of Puget Sound Law Review, 1982-1984<br>Museck Scholarship, 1983-1984<br>Scholarship for Scholastic Achievement, 1982-1983, 1983-1984<br>American Jurisprudence Book Award for highest standing in corporations<br>West Publishing Annual Student Award, 1984 |
| **HIGHER EDUCATION AND HONORS:** | University of Texas Graduate Program in English; one semester<br>University of Texas, 1966-1970; BA, double major in English and archaeology<br><br>**Honors:**<br>Special honors and Dean's List |
| **ARTICLES PUBLISHED:** | Boundary Law: The Rule of Monument Control in Washington. 7 Univ. Puget Snd. L. Rev. 355-85 (1984)<br>Shoreline Boundaries in Washington, 5 U.P.S. Environmental Law Quarterly, 1-4 (1983); Also published in 8 Evergreen State Surveyor (American Congress on Surveying and Mapping) 10-13 (May 1984)<br>Adverse Possession, (co-authored with Dale Carlisle), 3 Wash. Real Property Deskbook, Ch. 59 (2nd Ed. 1988) (3rd Ed. 1995) (4th. Ed. 2000)<br>Global Positioning, The Remeasurement of Mt. Rainier, The Climb, 14 Point of Beginning (**POB**) No. 1, 19-23 (1988)<br>The Surveyor and the Law, Regular column in Point of Beginning,(**POB**) starting with Vol. 14 No. 4 (1989) ending in November, 2001<br>The Surveyor and the Law, P.O.B. Publishing Co., Canton, MI (1990)<br>Washington Shoreline Boundaries, Washington Boundary Law and Dispute Resolution, Professional Educ. Systems, Inc. (1994)<br>Using GPS to Map Rhododendrons in China, 20 **POB**, No. 2, 58-65 (1994)<br>Understanding Property Boundary Surveys, Washington Boundary Law and Adjoining Landowner Disputes, Professional Educ. Systems, Inc. (1995) (1996)<br>Water Boundaries and Surveys in the Western States, An Overview for Attorneys, published in "Land Surveys, A Guide for Lawyers and Other Professionals", American Bar Association, 215-24 (1999)<br>2000 Update to Surveys, Subdivision and Platting, and Boundaries, published by Municipal Research Services Center of Washington and linked on their website.<br>"A Perspective on The Manual of Instructions for the Survey of the Public Lands", USDI (co written with Bob Dahl) (2007) |
| **BOOKS PUBLISHED:** | Washington State Common Law of Surveys and Property Boundaries, Land Surveyors Association of Washington (2010) |

Ex. 4A-1

| | |
|---|---|
| **JERRY RAY BROADUS** | **Researcher:** Hourly employee at Sitts and Hill Engineers, 253-474-9449 |
| **WORK EXPERIENCE:** | **Vice President and Shareholder,** Winter 2014 to 2016: Geometrix, Inc. Puyallup, WA. Duties: Research, Expert testimony. Most activities performed as subcontractor for Sitts and Hill Engineers, Tacoma, WA. 253-474-9449 |

**Vice President and Shareholder,** Summer 1989 to 2013: Geometrix Surveying, Inc.,Puyallup, Washington. Duties: Responsible for all surveying decisions, including field, office, boundary research and testimony, for two person surveying company. Expert testimony and frequent lecturer and continuing education provider.

**Land Use Manager and General Counsel.** Spring 1987 to Summer 1989: P.E.I. Consultants, Inc., Federal Way, Washington. Duties: Surveying and client representation in land use projects including subdivisions, rezones, conditional use permits, and municipal relations. Project Manager for special projects involving surveying and legal expertise. General legal advice to company.

**Associate Attorney.** Fall 1985 to Spring 1987: McGavick, Graves, Beale, & McNerthney, P.O. Box 1317, Tacoma, Washington. Duties: Trial attorney and legal counsel, concentrating in real estate and land use.

**Law Clerk.** Summer 1984 to Fall 1985: The Honorable Stanley Worswick, State of Washington Court of Appeals, Div. II, Tacoma, Washington. Duties: Legal research and writing of pre-hearing memoranda and opinion drafts. Bailiff.

**Internships:** Part-time spring and full-time summer, 1983: Rush, Kleinwachter, Hannula & Harkins, Tacoma, Washington; Fall 1983 to summer 1984: Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern, Tacoma, Washington. Duties: Legal Research and writing of memoranda and briefs in land use, real property, and business law. Assistance in trials and land use hearing; ex-parte hearings before commissioners and interviewing of witnesses.

**Chief of Surveys.** 1977-1981, Summer of 1982: Pac-Tech Engineering (formerly known as J.J. Sleavin and Associates), Tacoma, Washington. Duties: Professional level land surveying such as subdivisions, condominium platting, and boundary surveys. Responsible for property surveys, including research and preparation of courtroom exhibits for litigation. Duties also included management of survey crew personnel and negotiation of contracts.
1973-1977: Employed as a **land surveyor** for two firms: Philip M. Botch and Associates of Bellevue, Washington; and John J. Vadai and Associates of 1971-1973: Employed as a **land surveyor** in Texas by the Texas State Department of Parks and Wildlife.

| | |
|---|---|
| **HONORS/ACTIVITIES:** | Land Surveyors Association of Washington, Surveyor of the Year, 1992<br>American Congress on Surveying and Mapping Fellow<br>Delegate and Consultant to National Congress of Engineering Examiners Committee on Digital Signatures for Design Professionals.<br>Member of Clark's Creek Greenway advisory committee.<br>Volunteer at Nisqually and Malheur National Wildlife Refuges<br>Named one of the surveying profession's "Top 25 Surveyors" in the country from a poll taken by Professional Surveyor Magazine , Announced Sept. 2006<br>"Sounding Board Member" for 2009 Edition of BLM Surveying Manual |
| **PROFESSIONAL TEACHING** | Instructor of over 1,000 Professional Development Hours for Land Surveyors, Washington Bar Association and Bureau of Land Management |